## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### MASTER FILE NO.  08-CIV-22572-COOKE/BANDSTRA

---

IN RE BANKUNITED SECURITIES
LITIGATION

---

THIS DOCUMENT RELATES TO:

ALL ACTIONS

---

## INDIVIDUAL DEFENDANTS' RAMIRO A. ORTIZ AND HUMBERTO L. LOPEZ'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants Ramiro A. Ortiz ("Ortiz") and Humberto L. Lopez ("Lopez"), (collectively, "Individual Defendants"), by and through undersigned counsel, hereby file this Motion to Dismiss Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws [D.E. 67] (the "Motion to Dismiss"), and in support state as follows:

### I.    Introduction

Plaintiffs have filed a 120 page Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint") containing 280 separate numbered paragraphs.[1]  The Defendants' allegedly false statements generally fall within one of the following categories:    (1) asset quality, including underwriting standards and loan characteristics; (2) the allowance for loan losses; (3) the Bank's capital status; and (4)

---

[1] References to paragraphs of the Amended Complaint herein will be in the form "AC ¶ ____."

compliance with generally accepted accounting principles ("GAAP").[2]   In certain instances, Plaintiffs have pled the "who, what and when" required to state a 10b-5 claim.  That is, Plaintiffs have pled a multitude of specific statements, on specific dates which they attribute to one or the other of the Defendants herein.  *See* AC, ¶¶ 44 – 129.  However, as set forth in detail below, Plaintiffs have failed to allege with the required particularity:  (1) why these statements are alleged to be false, and (2) the required scienter.  When compared to the particularity of the statements that are pled, the extremely general and conclusory nature of the remainder of Plaintiffs' allegations are apparent  Additionally, most of the statements are puffery or forward-looking and not actionable.  Plaintiffs have therefore attempted to assume away their pleading burden for two thirds of their claim, which they cannot do.

## II.  The Plaintiffs' Claims Fail Because the Allegations in the Amended Complaint Do Not State Facts with the Requisite Degree of Particularity to Support a Claim of Securities Fraud

Count I of the Amended Complaint asserts claims against the Individual Defendants for alleged violations of § 10(b) of the Exchange Act and Rule 10b-5.  "In order to state a claim under § 10 (b) and Rule 10b-5, a plaintiff must show the following:  (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

Rule 9(b) of the Federal Rules of Civil Procedure, the Public Securities Litigation Reform Act ("PSLRA") (15 U.S.C. § 78u-4(b)(1)) and Eleventh Circuit case law all require securities

---

[2] While space limitations preclude addressing each of the statements set forth in the Amended Complaint, this Motion to Dismiss will address in detail all of these categories of statements.  Additionally, attached hereto as *Exhibit "1"* are copies of all of BankUnited's relevant public filings, including those referred to in the Amended Complaint.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

fraud claims to be pled with a high degree of particularity. The plaintiff must "specify each statement alleged to have been misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all <u>facts</u> on which that belief is formed." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citing 15 U.S.C. § 78u-4(b)(1)) (emphasis added).[3] "Under Rule 9(b), plaintiffs must allege: (1) the precise statements, documents and misrepresentations made; (b) the time, place, and person responsible for the statement; (3) the content and the manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud." *Ferrell v. Durbin*, No. 07-14878, 2009 WL 322049, at *4 (11th Cir. Feb. 9, 2009). Again, plaintiffs must allege <u>facts</u> to support the conclusion that the statement or omission was misleading. *Id.* Bald assertions of falsity are insufficient to state a cause of action. *Id.*

### A.    **Summary of Plaintiffs' Failures to Plead with Particularity**

Plaintiffs allegations throughout the Amended Complaint are grossly inadequate and fall far short of the pleading requirements of the PSLRA and Rule 9(b). Plaintiffs fail to allege any facts to support their conclusion that the statements or omissions made by Defendants throughout the class period were false and misleading. "While the Plaintiffs may have identified adequately specific statements alleged to be misleading, and have generally described the conduct which they allege render those statements actionably misleading, they have not alleged sufficiently the circumstances of the conduct to show <u>why</u> each statement was false or misleading." *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d 1297, 1308 (N.D. Ga. 2006) (emphasis added) (dismissing complaint because particularity pleading requirement was unmet).

---

[3] The allegations in the Amended Complaint are made on information and belief. Amended Complaint, page 1. However, as detailed herein, Plaintiffs have failed to state with particularity the facts upon which their beliefs are based.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

Plaintiffs' attempt to claim that Defendants' statements concerning BankUnited's capital position, earnings and net income, expected loan losses, underwriting practices, borrowers' credit quality, loan loss reserves and internal controls during the Class Period were false and misleading and caused Defendants to overstate BankUnited's earnings and net income. *See, e.g.,* AC, ¶ 64. However, after subjecting the Amended Complaint to a statement-by-statement analysis, the glaring deficiencies become obvious. Again and again, Plaintiffs attempt to disguise their suppositions as facts.

Plaintiffs include a nine-page section in the Amended Complaint entitled "Post Period Announcements Give Further Details Regarding the Defendants' Fraudulent Practices During the Class Period." This section, like most of Plaintiffs' allegations, is entirely devoted to convincing the Court to make the improper inference that because the Bank eventually failed, Defendants' statements throughout the entire previous twenty (20) month Class Period must have been false. Asking the Court to make such a giant, unsupported leap to this conclusion is wholly improper. "The PSLRA and Rule 9(b) prohibit Plaintiffs avoiding dismissal at the pleading stage where their complaint requires facts necessary to support their allegations to be inferred." *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d at 1311 (dismissing complaint where the Court was required to speculate and make deductions to reach the conclusions advocated by Plaintiffs). Under Rule 9(b) and the PSLRA, Plaintiffs cannot substitute rank speculation and wishful extrapolation for pleading with particularity. Additionally, Plaintiffs seem to forget that the state of the entire United States' economy dramatically deteriorated from the start of the Class Period in 2006 to the time the "Post Period Announcements" were made in 2009.[4]

---

[4] Determining whether a complaint states a plausible claim is context-specific, and the Court is required to draw on its experience and common sense. *Ashcroft v. Iqbal*, 129 U.S. 1937, 1940 (2009). Therefore, this Court is not

4

**B.     Plaintiffs' Conclusory Allegations Contain No Facts to
Support Their Conclusions**

Although the Amended Complaint sets forth certain statements alleged to be fraudulent,
who made the statements and when the statements were made, it fails to allege with particularity
why and how those statements were false and misleading. 15 U.S.C. § 78u-4(b)(1) (requiring the
complaint to set forth the facts as to why the statements are believed to be false). Each section of
the Amended Complaint lists the statements claimed to be fraudulent, and then inserts a
paragraph at the end of each section that purports to explain why the statements listed are false
and misleading. For example, AC ¶ 128 (which is representative of the paragraphs in the other
sections of the Amended Complaint) states that:

> [t]he statements set forth in [the section] above concerning BankUnited earnings
> and net income, underwriting and appraisal standards, expected loan losses,
> borrowers' credit quality, internal controls, and capital position <u>are false and
> misleading because</u>, as set forth...above, Defendants knowingly or recklessly
> overstated BankUnited's earnings and net income by, among other things,
> improper use of accepted accounting principles; failing to properly reserve for
> loan losses on Option ARM loans; engaging in unsafe and unsound lending
> practices; and ignoring escalating loan losses.

AC, ¶ 128 (emphasis added). *See also* AC, ¶¶ 53, 64, 71, 82, 95, 111 and 123 (containing nearly
identical language as AC, ¶ 128). However, in each of those paragraphs that purport to explain
<u>why</u> the statements are false and misleading, no facts are alleged. Rather, the allegations are
merely restated as conclusory assertions.

In AC, ¶¶ 53, 64, 71, 82, 95, 111, 123 and 128 Plaintiffs fail to allege which accounting
practices BankUnited improperly used and how those accounting principles were improperly
used, how the Bank failed to properly reserve for loan losses, what unsafe and unsound lending

---

required to, nor should it, put on blinders to the fact that the entire banking industry was, during the Class Period,
subjected to a national housing and economic crisis resulting in an industry-wide deterioration of loan portfolios and
capital positions.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

practices the Bank engaged in, how those lending practices were unsafe and unsound, and how Defendants ignored the escalating loan losses.[5]   Furthermore, Plaintiffs' bald assertions of falsity are not tied to any particular statement, but rather purport to serve as the reasons why all of the statements or omissions by Defendants in the Amended Complaint are false and misleading. Plaintiffs have failed to plead any facts to support the conclusion that the statements are false and misleading, and this subjects the Amended Complaint to dismissal. *Garfield*, 466 F.3d at 1262.

### C.   Plaintiffs Allegations Regarding BankUnited's Underwriting Standards are Not Pled With Particularity

The gist of Plaintiffs' claims relating to the underwriting standards seems to be that Defendants falsely stated that BankUnited had strict underwriting standards that were conservative in relation to other lenders. *See* AC, ¶¶ 47, 49, 58, 61, 63, 69, 76, 91, 108, 113, 115, 117 and 126. Defendants' statements that are alleged to be false relate to the underwriting factors used by BankUnited. These factors (including FICO scores, LTV ratios, an internal appraisal process and no subprime and piggyback lending) were identified throughout the Class Period by Defendants and mentioned by Plaintiffs throughout the Amended Complaint. *See,* *e.g.,* AC, ¶¶ 94, 108, 113, 115 and 117.

Plaintiffs, however, merely assert that Defendants' statements related to the Bank's underwriting are false and misleading but fail to allege any facts to support such a conclusion. Instead, Plaintiffs again rely on the implication that because the Bank eventually failed, the statements surrounding the Bank's underwriting process during the Class Period must have been

---

[5] Indeed, in these paragraphs Plaintiffs have, on the one hand, alleged that Defendants ignored escalating loan losses, and on the other hand have alleged that Defendants significantly increased the provision for loan losses in recognition of these escalating loan losses. *See, e.g.,* AC, ¶¶ 65, 73, 83 and 87.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

false.  Such conclusory allegations are wholly inadequate to state a claim for securities fraud.  *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d at 1308 (dismissing complaint where "Plaintiffs [did] not allege by more than implication" that the Defendants' statements were misleading).

For example, Plaintiffs claim that Defendants' statements that the Bank does not engage in subprime lending are false, but allege no facts at all that indicate that BankUnited engaged in subprime lending during the Class Period.  AC, ¶¶ 49, 76, 80, 94, 105, 108, 113, 115, 117 and 126.  In fact, Plaintiffs do not even define subprime lending, a term for which no standard definition exists.  Plaintiffs do not allege that BankUnited's portfolio contained subprime loans because credit scores below a certain amount, or that BankUnited's borrowers had limited debt experience or poor credit.  Plaintiffs do not state that a certain percentage of BankUnited's portfolio was subprime or which loans were subprime.  The Amended Complaint is totally devoid of any facts or even references that illustrate that BankUnited engaged in subprime lending.  Plaintiffs simply state that Defendants' statements regarding subprime lending are false and nothing further.  The same is true of all of the other underwriting factors mentioned by Defendants throughout the Class Period, which Plaintiffs claim were false.

Plaintiffs allege that Defendants' statements noting the average LTV and FICO scores were false and misleading.  AC, ¶¶ 59, 94, 108, 117 and 126.  However, Plaintiffs never state what the LTV or FICO scores actually were if not those stated by Defendants or any other facts that would support the conclusion that the statements were fraudulent.  The only explanation provided is that the FICO scores "were of virtually no value given the extensive material deficiencies in BankUnited's appraisal, underwriting, and other lending practices."  AC, ¶ 64.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

Plaintiffs, however, do not state what the material deficiencies were, what the other lending practices were, or state any other facts to support their conclusory allegations.

Plaintiffs also claim that Defendants' statements that the "underwriting is performed at the fully indexed rate" are false and misleading. *See* AC, ¶¶ 49, 80, 94, 108, 113, 117 and 126. However, Plaintiffs never allege that BankUnited did not underwrite at the fully indexed rate. No facts at all are provided in the Amended Complaint that indicate the statements were false and misleading. These bald assertions are exemplary of the allegations throughout the Amended Complaint, and require it to be dismissed. *Ferrell*, 2009 WL 322049 at *4 (dismissing complaint where "[t]he only factual allegation [was] a bald assertion").

The only attempt made by Plaintiffs to explain why the statements relating to the underwriting standards of the Bank were false and misleading is contained in AC, ¶ 53, which states: "BankUnited engaged in 'unsafe and unsound' lending practices that relied on the extensive use of limited documentation and no-documentation 'liar's loans'…" Plaintiffs are making the unsupported assumption that because BankUnited made reduced documentation loans, the Bank's underwriting standards were not strict. "Plaintiffs, in essence, [are] ask[ing] the Court to make unwarranted deductions." *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d at 1310. However, "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Id.* (citing to *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

Additionally, Plaintiffs themselves state in AC, ¶ 50 that BankUnited disclosed that it made reduced documentation and no documentation loans. BankUnited also disclosed (as noted by Plaintiffs in the Amended Complaint) that these loans were "counterbalanced by stringent

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

requirements for other underwriting criteria, including lower loan-to-value ratios, higher FICO scores, credit enhancements such as mortgage insurance and lower debt-to-income ratios." AC, ¶ 66. Plaintiffs do not allege that the reduced documentation loans lacked these characteristics, or even that these loans were more problematic than BankUnited's full documentation loans. In fact, the charts created by Plaintiffs themselves show that the percentage of non-performing no documentation loans was equivalent to the percentage of no documentation loans in BankUnited's portfolio. AC, ¶ 117 (showing, for example, that BankUnited's no documentation loans made up 9.1% of the total portfolio and 8.5% of the total non-performing loans in the portfolio).[6]

Finally, time and time again, Defendants defined what they meant by "strict underwriting" and "conservative underwriting" in their statements and public filings. Plaintiffs acknowledge the same but fail to state how these statements were false. AC, ¶¶ 94, 108, 113, 115 and 117, stating, for example, in paragraph 108, that

> 'BankUnited has adhered to conservative underwriting standards…We are not a subprime lender…[a]nd, unlike some other lenders in the industry, we have underwritten to the fully indexed rate and followed strict policies for outside appraisal reviews conducted by our own staff…reduced documentation loans undergo a reasonableness test on income' [and] 'the various risks of our loan portfolio are mitigated by our underwriting requirements, which include credit qualifications and LTV ratios directly correlated to potential risk' [including] and average borrower FICO score of 708.

---

[6] Plaintiffs incorrectly state in footnote three (3) of the Amended Complaint that the 2Q 2008 Form 10-Q contained a reporting error. The error is contained in the 1Q 2008 Form 10-Q for the period ending March 31, 2008, and the 2Q 2008 Form 10-Q reports the information correctly. Plaintiffs state that the error is in the percentage of limited documentation loans, but the error is actually related to the percentage of no documentation loans in the payment option loan portfolio (which is substantially less than reported). The 1Q Form 10-Q and paragraph 117 of the Amended Complaint state that no documentation loans make up 9.1% of the total one-to-four family residential loan portfolio, or $884,828,000.00, while the no documentation loans make up 31.3% of the option ARM Portfolio, or $2,293,330,000.00. This is impossible as the total dollar amount of no documentation loans in the entire one-to-four family residential loan portfolio cannot be less than the dollar amount of the portion of no documentation loans in the Option ARM portfolio.

9

Therefore, to the extent these terms have any substantive meaning, that meaning must be derived from the context in which they were used. *Garfield*, 466 F.3d at 1265. Plaintiffs have not only failed to provide this context, they have failed to explain why the use of these terms were at all misleading.

### D.   Plaintiffs Allegations Regarding BankUnited's Capital Position are Not Pled with Particularity

Another allegation repeated throughout the Amended Complaint relates to the Defendants' statements about the Bank's capital status. Plaintiffs cite to numerous examples throughout the Class Period where Defendants stated that the Bank "maintain[ed] its strong capital position in excess of regulatory requirements." AC, ¶ 73. *See also AC*, ¶¶ 55, 83, 88, 94, 103, 114, 115, and 117. Plaintiffs, however, fail to provide any facts to support the conclusion that these statements related to the Bank's capital position were false and misleading at the various times when these statements were made. In the context of BankUnited's public filings, the "regulatory requirements" regarding the Bank's capital position, as recognized by Plaintiffs in AC, ¶¶ 37 and 38, refers to the OTS' minimum capital requirements to qualify as "well capitalized." The Amended Complaint does not state, even once, that at any time during the Class Period the Bank was not well-capitalized under this definition or otherwise.[7] Instead, as discussed in greater detail below, Plaintiffs make the assumption that because the Bank eventually lost its well-capitalized status, that Defendants misrepresented the Bank's capital status throughout the Class Period. These types of allegation – where Plaintiffs allege fraud by

---

[7] In fact, AC, ¶ 140 states that "on September 5, 2008, Defendants disclosed that the Office of Thrift Supervision reclassified the Bank's regulatory capital status from well-capitalized to adequately capitalized." The 8-K disclosing that change in status states that it was on that same day, September 5, 2008, that the OTS reclassified the Bank to adequately capitalized. Stated differently, prior to September 5, 2008, or during the Class Period, the Bank was well-capitalized, thereby causing Defendants' statements to be true. Indeed, even on September 5, 2008, notwithstanding the reclassification by the OTS, BankUnited's capital ratios still exceeded the minimum levels necessary for the bank to qualify as well capitalized.

10

implication – are insufficient to state a claim under either §10(b) or §20(a) of the Exchange Act. *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d at 1308 (dismissing complaint where "Plaintiffs [did] not allege by more than implication" that the Defendants' statements were misleading).

### E.  Plaintiffs Allegations Regarding BankUnited's Violation of GAAP are Not Pled With Particularity

Plaintiffs also inadequately plead that Defendants violated GAAP and took advantage of "smoke and mirrors" accounting. *See, e.g.,* AC, ¶ 50. Although not at all clear, it appears from the context of AC, ¶ 27 that the term "smoke and mirrors" is attributed to confidential witness ("CW") 6, a salesman. *See* AC, ¶ 20. Because the quoted language does not include the word accounting, but rather is used by Plaintiffs to modify it, it is not clear exactly what idea "smoke and mirrors" was intended by CW 6 to convey. More importantly, the description of CW 6's background and employment at BankUnited does not indicate that he or she has <u>any</u> accounting experience or expertise. Consequently, notwithstanding Plaintiff's throwing quotes around it, the term "smoke and mirrors" accounting repeatedly used by Plaintiffs in the Amended Complaint is entitled no weight. *See Mizzarro v. Home Depot, Inc.,* 544 F.3d 1230, 1240 (11th Cir. 2008) (The "weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made …." Confidential witnesses are not afforded weight unless "the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge….").

The Amended Complaint is completely devoid of any factual allegations defining "smoke and mirrors" accounting. Rather, the Amended Complaint indicates that the so-called "smoke and mirrors" accounting practices were, in fact, in conformance with GAAP. AC, ¶ 25 (stating

11

that "accounting rules permitted BankUnited to recognize as immediate period income the amount of the expected, higher rate interest payments that were scheduled to come due on its Option ARM mortgages at a later date…").   Plaintiffs are correct that accounting rules (or GAAP) permitted Defendants to apply this accounting principle.[8]   Therefore, Plaintiffs have only alleged facts that support that Defendants conformed with GAAP – not that they violated GAAP. In any case, Plaintiffs have not provided any explanation, much less particularized facts, showing why the use of this "permitted" accounting rule was misleading.   *See Garfield*, 466 F.3d at 1263 (affirming dismissal because the accounting allegations were "vague and difficult to evaluate" – the complaint did "not specify when the improper accounting occurred" or how the accounting characterizations were improper).

The Amended Complaint merely lists various accounting principles set forth by GAAP, and states that they were relevant for BankUnited to consider.   *See* AC, ¶ 231.   Plaintiffs do not allege which GAAP principles Defendants violated, how they violated those principles, or even that Defendants did not consider GAAP.[9]   The only attempt to explain how and why Defendants violated GAAP is found in AC, ¶ 247 which contains a string of conclusory allegations such as that the Bank's financial statements were "not useful," "not reliable" and "not complete."   This paragraph is typical of the Amended Complaint.   The "explanation" is simply a restatement of the allegations and falls far short of the requirements of Rule 9(b) and the PSLRA that securities fraud must be pled with a high degree of particularity.

---

[8] This accounting practice referred to in AC, ¶ 25 is a function of accrual accounting and is the recognition of deferred interest as current period revenue.

[9] The inadequacy of Plaintiffs' allegations regarding the violations of the provisions of GAAP is discussed in greater detail below.

12

**III.    Most of the Statements are Forward-Looking and
        Protected by the Safe Harbor Provision of the PSLRA**

The refrain of Plaintiffs' Amended Complaint is that Defendants made false and misleading statements that misrepresented the Bank's financial situation and practices.[10] However, most of the statements are not actionable because they are within the safe harbor provision and/or are immaterial.[11] The PSLRA safe harbor protects defendants from liability for certain forward-looking statements, regardless of the truth or falsity of that statement, and regardless of the defendant's state of mind when making the statement. *Harris v. Ivax*, 182 F.3d 799, 803 (11th Cir. 1999); 15 USC § 78u-5(c).    If the forward-looking statement is identified as such[12] and is accompanied by meaningful cautionary statements[13] identifying important factors that could cause actual results to differ materially, it is within the safe harbor and the inquiry ends without an examination of the defendant's state of mind. *Theoharous v. Fong*, 256 F.3d 1219, 1226 (11th Cir. 2001), citing 15 U.S.C. § 78u-5(c)(1)(A)(i)); *Harris*, 182 F.3d at 803, 807 n.10. The defendant's state of mind and the falsity of the statement are not an issue in the safe harbor analysis unless a material forward-looking statement is not accompanied by sufficient

---

[10] Specifically, it alleges false and misleading statements about the Bank's capital position, earnings and net income, expected loan losses, underwriting and appraisal practices, borrowers' credit quality, loan loss reserves, and internal controls. *See e.g.*, AC, ¶¶ 64, 71, 82, 95, 111, 123 and 128.

[11] *E.g.*, AC, ¶¶ 47, 49, 55, 58, 59, 61, 63, 65, 67, 69, 72, 73, 76, 77, 80, 83, 88, 91, 94, 103, 105, 113, 114, 115, 117, 126.

[12] This was done in, *e.g.*, the 2006 10-K which states that it contains forward-looking statements, identifies the kinds of key words indicative of such statements ("will likely result," "expect," "will continue," "anticipate," "estimate," "project," "believe," "intend," "will," "should," "would," "could," "may," "can," "plan," "target"), and also notes that forward-looking statements may include, but are not limited to, discussions concerning projections of revenues, expenses, income, earnings per share, margin, asset growth, loan production, deposit growth, and other performance measures; expansion of operations, including…development of products and services; and discussions on the outlook of the economy, competition, regulation, taxation, company strategies, subsidiaries, investment risk, and policies. It notes that actual results could differ and lists important factors affecting the results. (p.3). See the Appendix for a list of these statements in the relevant SEC filings.

[13] The statute for oral forward-looking statements is very similar, with some differences in identifying it and defining the accompanying meaningful cautionary statements. *See* 15 U.S.C. § 78u-5(c)(2).

13

cautionary language.   In that case, the plaintiff must prove[14] that the defendant made the statement with actual knowledge at that time that it was false.  *Harris*, 182 F.3d at 803; 15 USC § 78u-5(c)(1)(B).[15]

Consistent with the intent of the PSLRA, the Eleventh Circuit's approach favors an early conclusion that statements are forward-looking and within the safe harbor.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999).  The entire statement and context must be examined.  *Harris*, 182 F.3d at 806-807; *In re Smith Gardner Sec. Litg.*, 214 F.Supp.2d 1291, 1305 S.D. Fla. 2002).  If that examination reveals that it is a mixed statement, e.g., historical observations and predictions based on those observations, or a statement of the company's current condition along with forward-looking statements, the entire statement qualifies as forward-looking.  *Ehlert v. Singer*, 245 F.3d 1313, 1317 (11th Cir. 2001); *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d at 1306 (citing *In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1374 (S.D. Fla. 2001)).  A material and misleading omission may fall within the safe harbor provision.  *Ehlert*, 245 F.3d at 1317; *Harris*, 182 F.3d at 806.  The threshold question is whether a statement qualifies as forward-looking.

### A.    The Forward-Looking Statements

The forward-looking statements can be grouped roughly into four overlapping categories,[16] which are discussed in detail immediately below.  Due to space limitations, only representative samples are discussed, but more examples are identified in footnote 11.

---

[14] Here *prove* refers to the allegations in the Amended Complaint.  *Harris v. Ivax Corp.*, 998 F.Supp. 1449, 1455 (S.D. Fla. 1998), *affirmed* 182 F.3d 799 (11th Cir. 1999).

[15] There is no safe harbor protection for a forward-looking statement "included in a financial statement prepared in accordance with [GAAP]."  15 U.S.C. § 78u-5(b)(2)(A), and none of those are discussed here.  Note, however, that the 10-Qs and 8-Ks contain only unaudited financial statements.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

### 1.   Classically Forward-Looking Statements

Classically forward-looking statements fit squarely into the statutory definition of "forward-looking," and include (A) a statement containing projections of revenues, income, loss and other financial items; (B) a statement of management's plans and objectives for future operations; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management; or (D) any statement of the assumptions underlying or relating to (A), (B) or (C).  15 USC § 78u-5(i)(1). They also contain some of the key words that typically identify forward-looking statements.[17]

Classically forward-looking statements in the Amended Complaint include, "[B]ut the ultimate losses, as we said, shouldn't be significantly higher [than] where we're at today" (see AC, ¶ 58)[18]; "We expect third and fourth quarter loan loss provisions will be recorded at a rate similar to the first two quarters of fiscal 2007" (see AC, ¶ 67); "the Company announced that it expected its diluted earnings to be approximately $0.62 per share" (AC, ¶ 72); "[if the company had an increase in charge-offs of] 40 basis point[s], I think everybody around here would be drop dead shocked" (AC, ¶ 76); and "BankUnited does not expect loan losses in the coming months to be significantly higher than levels experienced in comparable periods in the past, although non-performing assets are expected to increase" (AC, ¶ 80) (emphasis added to indicate forward-

---

[16] For the sake of brevity, the statements will be characterized as falling into one category or description, although they may actually fit into multiple categories and they may also be immaterial.

[17] See e.g., the 2006 and 2007 10-Ks which states that words and phrases such as "will likely result," "expect," "will continue," "anticipate," "estimate," "project," "believe," "intend," "will," should," "would," "could, "may," "can," "plan," "target," and similar expressions indicate forward-looking statements.  This is another way that the Bank has satisfied the statutory requirement of identifying forward-looking statements. See also footnote 11 and the Appendix.

[18] Quotations taken directly from the referenced filings and transcripts, rather than from the Amended Complaint, are indicated by the signal see in the paragraph citation.  Some punctuation is omitted from direct quotes from the Amended Complaint solely for the purpose of making it more readable.

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

looking phrases).  Each of these statements is a projection of estimated future income or losses, so each is forward-looking.

### 2.    Forward-Looking When Read in Context

As presented in the Amended Complaint, some forward-looking statements may not be as obvious, but they are clearly forward-looking when read in context, as they must be.  *Harris*, 182 F.3d at 806-807.  For example, Plaintiffs allege, "In the 2006 Investor Presentation, Defendants falsely claimed that the Company focused on a [h]igh quality credit culture" (AC, ¶ 49).   This phrase appears in the Presentation on a page titled "BankUnited's Strategy," indicating that this is a statement of the plans and objectives of management for future operations which fits squarely within the statutory definition of a forward-looking statement.  *See* 15 USC § 78u-5(i)(1)(B).[19]   Similarly, AC, ¶ 72 takes Defendants' statements out of context by quoting only two sentences from a paragraph.  When the entire statement is read in context, it is clearly a forward-looking projection of financial losses:

> "BankUnited continues to experience low net charge-offs.[20]  Net charge-offs are expected to total approximately $1.1 million … The company continues to believe that losses will not be significantly higher than historical levels. BankUnited expects to report total non-performing assets of approximately $125 million, or 0.86% of total assets.

(emphasis added to show the part of text quoted in AC, ¶ 72).

---

[19] Another example of a forward-looking statement about strategy is, "A focus on Credit Quality is a core tenet of BankUnited's *strategy*: NPA ratio *expected* to be 60 bps …losses are *not expected* to substantially increase…" (AC, ¶63).

[20] It is inappropriate to isolate this statement from the context, but even if it were analyzed in isolation this sentence has "forward-looking connotations." *Ehlert v. Singer*, 245 F.3d 1313, 1318 n.5 (11th Cir. 2001) (applied to the statement, "the company is devoting significant resources to the development of enhancements to its existing products").

16

### 3. Forward-Looking Under 11th Circuit Precedent

A statement might not appear to be forward-looking (e.g., phrased in the present tense) but is forward-looking under the precedents of the Eleventh Circuit. For example, among the challenged statements in *Harris* were "the challenges unique to this period in our history are now behind us" and "[o]ur fundamental business and its underlying strategies remain intact…Only a limited number of companies are positioned to meaningfully participate in this rapidly growing market and, among them, IVAX is certainly well positioned." Although not phrased as estimates or projections, the court held both statements to be forward-looking because "a statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance." 182 F.3d at 805.

Lopez's statement that the "Company's mortgage products continue to meet the needs of educated borrowers while adhering to federal guidelines and maintaining our strict underwriting and credit quality standards" at AC, ¶ 47 and ¶ 58 are forward-looking statements about the state of the company because their truth or falsity will not be discernible until a future time. This principle applies equally to the statements that "the Company had the '[a]bility to grow production without sacrificing credit quality" and was "committed to responsible growth without sacrificing credit quality'" (AC, ¶ 61) and that it "continues to experience low net-charge offs" and "continues to believe that losses will not be significantly higher than historical levels." (*See* AC, ¶ 72). The truth or falsity of the statements could not be discerned when they were made. Additionally, "[r]epresentations regarding the state of a business' position in a changing market or the soundness of its growth strategies are necessarily forward-looking." *Harris v. Ivax Corp.*,

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

998 F.Supp. 1449, 1453 (S.D. Fla. 1998), *affirmed* 182 F.3d 799 (11th Cir. 1999); *see also Fong*,

256 F.3d at 1226 n.8.

### 4.    Forward-Looking Statements About Loan Losses

Because the Amended Complaint focuses strongly on loan losses,[21] these statements

merit specific mention.   Reserves, allowances and provisions for loan losses are inherently

forward-looking projections,[22] as explained in the 2006 10-K (p. 35):

> The allowance for loan losses is a subjective judgment that management
> must make regarding the loan portfolio, and is established and continued at levels
> that management believes are adequate to cover probable losses resulting from the
> inability of borrowers to make required payments on loans.  Estimates for loan
> losses are made by analyzing…Since the calculation of appropriate loan loss
> allowances relies on management's estimates and judgments relating to inherently
> uncertain events, actual results may differ from these estimates. …

In other words, the term "allowance for loan losses" is another way of saying "management's

current estimate of future losses in the loan portfolio."  The adequacy of the estimate starts to

become discernible only in hindsight, and then a provision is estimated and recorded "as a charge

to income in amounts necessary to adjust the allowance for loan losses as determined by

management through its review of asset quality."  2006 10-K (p. 53).

Examining the following statement (AC, ¶ 50) with that understanding reveals that,

despite Plaintiffs' objection, this is a forward-looking statement:

> We evaluate the collectibility [sic] of our loan portfolio and provide an allowance
> for loan losses that we believe is adequate based upon such factors as:
>
> • the risk characteristics of various classifications of loans;
> • previous loan loss experience;
> • specific loans that have loss potential;

---

[21] *See, e.g.*, AC, ¶ 50, 55, 59, 63, 65, 67, 77, 80, 83, 87, 101, 105, 112, 136.

[22] Reserves are projections or forecasts.  *In re John Alden Financial Corp. Sec. Litig.*, 249 F.Supp.2d 1273, 1277
(S.D. Fla. 2003) (regarding medical claim reserves).

18

- delinquency trends;
- estimated fair market value of the collateral;
  [current economic conditions;] [23]
- the views of our regulators; and
- geographic and industry loan concentrations.

Estimates of collectability are integrally related to the projections of loan losses and are inherently forward-looking. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242-243 (3d Cir. 2004) (citing, among others, *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291, 1296 (S.D. Fla. 2002)). In its entirety, this is a forward-looking statement of the assumptions underlying the estimate of the collectability of loans, which is used to project the allowance for loan losses, one aspect of future economic performance. *Ehlert*, 245 F.3d at 1318; *Harris*, 182 F.3d at 806 (deciding "we expect reserves for returns and inventory writeoffs to be well above typical quarters" to be a statement of the assumptions underlying predictions elsewhere in the document and thus forward-looking), *citing* 15 U.S.C. § 78u-5(i)(1) (D). Use of the present tense does not make this any less of a forward-looking statement. *Harris*, 182 F.3d at 805.

Similarly, the use of the past tense does not affect the forward-looking connotations of the statement, "[d]uring the quarter ended December 31, 2006, management performed an evaluation of delinquency trends in its residential portfolio . . . Based on its review of portfolio quality, management increased the allowance for loan losses to a level it believes to be appropriate given the composition of its loan portfolio. . ." (AC, ¶ 59). This is another forward-looking statement of the assumptions underlying the projection for loan losses. 15 USC § 78u-5(i)(1)(A) and (D).

---

[23] In their quotation of this list of factors, Plaintiffs omitted the highly relevant factor of "current economic conditions."

Tew Cardenas LLP

Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

### 5.   Accompanied by Meaningful Cautionary Statements

The forward-looking statements are within the safe harbor because they are accompanied by cautionary language[24] warning of risks "of a significance similar to that actually realized." *Harris*, 182 F.3d at 807; 15 U.S.C. § 78u-5(c)(1)(A)(i).   References in BankUnited's public filings to cautionary language are gathered in the Appendix.   The risks that materialized, according to Plaintiffs, are that the Bank overstated its earnings and net income by claiming as current period income the "deferred interest payments on negatively amortizing Option ARM loans that Defendants knew BankUnited would not and could not ever collect" and by failing adequately to reserve for "known and/or inevitable loan losses on its Option ARM loan portfolio" (AC, ¶ 53(a) and (b)).[25]   Defendants disagree with Plaintiffs' characterization but acknowledge that the cautionary statements must warn of  risks similar to collection problems with Option ARMs, especially negatively amortizing Option ARMs, failure to set adequate reserves, and the effect of non-collectability and insufficient reserves on earnings and income. In fact, the cautionary statements warn of exactly those risks.

The statement from AC, ¶ 50 is found on page 17 of the 2006 10-K in a section with the heading "An inadequate allowance for loan losses would reduce our earnings."   The quoted statement is the last part of the first paragraph, which begins:

---

[24] All are properly identified as forward-looking.  See footnotes 11 and 16 and e.g., the 2006 10-K which gives specific examples of words and phrases that indicate forward-looking statements and also notes that forward-looking statements may include, but are not limited to, discussions concerning projections of revenues, expenses, income, earnings per share, margin, asset growth, loan production, deposit growth, and other performance measures; expansion of operations, including,…development of products and services; and discussions on the outlook of the economy, competition, regulation, taxation, company strategies, subsidiaries, investment risk, and policies.  It notes that actual results could differ and lists important factors affecting the results.

[25] By complaining that the Bank would never collect on negatively amortizing Option ARMS and that losses on Option ARMs were inevitable, Plaintiffs further reveal how much this action is based on impermissible hindsight. Early in the class period, before the collapse of the Florida and national real estate markets and national and international economies, only prescient bankers might have known that the Bank would never collect or that losses were inevitable.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

> We are exposed to the risk that our customers will be unable to repay their loans according to their terms and that any collateral securing repayment of their loans will not be sufficient to assure full repayment. Credit losses are inherent in the lending business and could have a material adverse effect on our operating results and our ability to meet our obligations. Volatility and deterioration in domestic and foreign economies may also increase our risk for credit losses. Our portfolio composition, as of September 30, 2006, of which approximately 97% of loans are primarily secured by real estate, tends to reduce loss exposure. We evaluate our collectability [sic] ….

The cautionary warnings continue on page 18, immediately after the objected to statement:

> If our evaluation is incorrect and borrower defaults cause losses exceeding our allowance for loan losses, our earnings could be significantly and adversely affected. We cannot assure you that our allowance will be adequate to cover loan losses inherent in our portfolio. We may experience losses in our loan portfolios or perceive adverse trends that require us to significantly increase our allowances for loan losses in the future, which would also reduce our earnings.

The above-quoted section is elaborated on and reiterated on page 35 of the 2006 10-K. This paragraph explains how economic conditions factor into estimating the allowance for loan losses and why there could be large changes in estimates for loan losses during a declining and depressed economic market as occurred during the class period.

The 2006 10-K states on page 50 that the interest income includes the deferred interest payment from option ARMs and on page 16 explains the consequent increase in net interest income from negative amortization and discusses the repayment risk of option ARMs:

> **Non–cash portion of our net interest income and repayment risks may grow because of our concentration in option ARM loans.**
>
> Seventy-eight percent of the loans that we originated in fiscal 2006 were option ARM loans and at September 30, 2006, these loans made up 58% of our loan portfolio. …The amount of negative amortization is a non-cash item that is accrued in net interest income. This amount of net interest income will continue to increase as the negative amortization in our option ARM loans increases.
>
> … If a loan negatively amortizes in the initial year the consumer must make the payments up in the later years of the loan. This presents a potential repayment

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

risk if the consumer is unable to meet the higher payment or to repay the loan through refinancing or sale of the underlying property.

Furthermore, the risks of changes in the economic conditions (including unemployment and a downturn in real estate values) are detailed on page 18, which warns, for example, of possible increases in delinquencies, non-performing assets, charge-offs, and increased provisions for loan losses. The 10-K also notes, "The residential mortgage-origination business is a cyclical industry, has recently been at its highest levels ever and may decline, which would reduce the number of loans we originate and could adversely impact our business." (2006 10-K p. 22) Although ignored in the Amended Complaint, these are among the significant economic changes that materialized during the class period and affected the Bank's projections, assets, and capital position. These cautionary warnings are more than adequate to bring the forward-looking statements within the safe harbor.

### 6. Immaterial Statements are Non-Actionable, Whether Forward-Looking or Not

Many of the allegedly false and misleading forward-looking statements are immaterial, and for that reason alone are within the safe harbor regardless of state of mind or accompanying cautionary language. *Theoharous v. Fong*, 256 F.3d at 1225 n.6; 15 U.S.C. § 78u-5(c)(1)(A)(ii). It is a basic tenet of securities law that immaterial statements are not actionable, so this section will address both forward-looking and not forward-looking immaterial statements without distinguishing between them.

Statements that are not the type of facts on which analysts and investors rely are immaterial and cannot be the basis of an action for securities fraud. *See, e.g., TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976); *Southland Sec. Corp. v. Inspire*

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

*Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir. 2004).  A statement may be immaterial[26] because it's too vague, too generalized, and/or considered puffery.[27]  Generalized positive statements in the Amended Complaint about the company's competitive strengths, experienced management, and future prospects such as "the employment of well trained and experienced underwriters and appraisers" (AC, ¶¶ 66, 74, 80), company had the "[a]bility to grow production without sacrificing credit quality" (AC, ¶ 61), and was "committed to responsible growth without sacrificing credit quality" (AC, ¶ 61) are immaterial, *Southland Sec.*, 365 F.3d at 372.

The Eleventh Circuit noted that the use of the word "strong" indicated the empirically unverifiable (and unreliable) nature of the statement. *Next Century Communications Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003).  Similar immaterial phrases appear often in the Amended Complaint, e.g., "high quality" or "conservative" credit culture (AC, ¶¶ 49, 76), and "strict" underwriting, appraisal process, or credit quality (AC, ¶¶ 47, 58).  That does not mean that they are meaningless because, for example, Lopez explained what he meant by strong or conservative underwriting: no subprime, no piggybacks, low LTVs, and high FICO scores.  (*See, e.g.*, AC, ¶¶ 58, 69,[28] 105).  But Lopez's use of the word "conservative" to describe his opinion

---

[26] "Immaterial" is used here to include all permutations of immateriality. *See In re Rexall Sundown, Inc. Sec. Litig.*, No. 988798CCIVDIMITROULEA, 2000 WL 33539428, at *4 n.4 (S.D. Fla. Mar. 29, 2000) (final order of dismissal in unreported PSLRA case) (characterizing defendant CEO's "vague statement of non-concern" as puffery or spin in the face of bad news regarding a competition and too vague to be misleading under Rule 10b-5).

[27] Puffery typically characterizes the kind of statement that is not empirically verifiable, as it is inherently expressive of opinion. *See Next Century Communications Corp. v. Ellis,* 318 F. 3d 1023, 1028 (11th Cir. 2003) (holding "as our Company's strong performance continues" to be non-actionable puffery which as a matter of law would not induce reliance; applying Georgia law to issues of fraud virtually identical to those in federal securities law, and see federal cases cited at 1029). This is not to say that the careful use of an adjective renders every statement immaterial, but rather these kinds of optimistic remarks are a typical part of business and are recognized by reasonable investors as inherently not reliable.

[28] The partial quotes in the Amended Complaint do not necessarily reflect this.  For example, the transcript for this Analysts' call reflects that Lopez said, "Of particular note is not only the excellent credit parameters but you can see if the level of documentation is reduced, other compensating credit factors such as higher FICO scores and lower

of these practices may not be what another person would consider "conservative," so it is immaterial.

Additionally, these same kinds of characterizations, including "focused on a high quality credit culture" (AC, ¶ 49); "our mortgage offerings meet the needs of educated borrowers while maintaining our strict underwriting standards" (AC, ¶ 58); "focus on Credit Quality is a core discipline of BankUnited's Strategy" (AC, ¶ 63); "strong history of properly managing risk" (AC, ¶ 63); and "vigorous underwriting standards which are constantly evaluated and refined" (AC, ¶ 63), were held to be immaterial under the PSLRA by the Second Circuit. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase, Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009) (that the company "set the standard for integrity," had "risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process" and would "continue to reposition and strengthen its franchises with a focus on financial discipline" were immaterial despite plaintiffs' position that bank's poor financial discipline led to liability or involvement in the WorldCom and Enron scandals).

### 7.    The Forward-Looking Statements Were Not Made with Actual Knowledge That They Were False or Misleading

Assuming *arguendo* that any material forward-looking statements are not accompanied by cautionary language, they would still be within the safe harbor because Plaintiffs have not alleged particular facts to support their allegations that Lopez and Ortiz had actual knowledge of the falsity of each statement. *Theoharous v. Fong*, 256 F.3d at 1226; 15 U.S.C. § 78u-5(c)(1)(B).

---

LTVs are required.  We obviously closely manage the loan portfolio to manage our risk, and the provision for loan losses is … nearly three times our level of charge-offs.  Our charge-offs have always been very low because of the quality of our borrowers and our underwriting standards."

This is the only safe harbor category for which the Defendants' state of mind is relevant. *Fong*, 256 F.3d at 1224 n.6; *Harris v. Ivax*, 182 F.3d at 807 n.10.

Plaintiffs' conclusory allegations do not adequately allege that Ortiz and Lopez actually knew that their statements concerning loan loss reserves were false, even assuming the statements of the confidential witnesses are reliable, which they are not. *See Mizzaro*, 544 F. 3d at 1240. For example, Plaintiffs assert that CW 2 was aware that Defendants were aware of concerns about the inadequacy of the loan loss reserves in the late 2007-early 2008 time frame; that CW 3 was aware of senior management's role in determining loan losses; that CW 4 and 5 were aware of the Bank's decisions regarding loan loss reserves (AC, ¶ 20); that CW 2, 4 and 5 "confirm" that "Defendants were aware of analyses throughout the Class Period showing that delinquencies and defaults were rising sharply in BankUnited's loan portfolios" (AC, ¶ 34); "Confidential Witness 2 stated that senior management was also aware of the OTS's concerns about the adequacy of BankUnited's loan loss reserves" (AC, ¶ 95); and "[a]s described by Confidential Witnesses 2, 4, and 5, despite the fact that Defendants became aware of escalating loan losses during the Class Period, they routinely failed to approve increased loan loss reserves to levels that accurately reflected anticipated losses" (AC, ¶ 166). Even if Defendants were "concerned" with or "aware" of escalating loan losses, this does not mean that Defendants knew that their statements were false when made.

The only allegation containing facts is that on May 13, 2008, one month before the end of the class period, "the SEC instructed the company to more clearly disclose in future filings why the balance of payment option non-performing loans increased 1,168.6% from September 30, 2006 to September 30, 2007 and how the increase was contemplated in your computation of

25

your allowance for loan losses." (AC, ¶ 121). This allegation, however, does not suggest that Ortiz or Lopez knew their statements about loan losses were false when they were made; it does not even suggest that they knew from May 13, 2008 on that the statements were false. These insufficient factual allegations are coupled with a series of conclusory allegations that fail to prove that Defendants knew their statements were false when made; consequently all the forward-looking statements about loan losses are within the safe harbor.

## IV.    Plaintiffs Have Failed to Plead Scienter with Particularity

Under the PSLRA, a plaintiff must plead scienter with exacting particularity. The Court in *Mizzaro*, 544 F.3d at 1238-39 summarized the rules relating to pleading scienter as follows:

> [T]he PSLRA raised the standard for pleading scienter. Specifically, in any securities fraud class action
>
>> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*
>
> 15 U.S.C. § 78u-4(b)(2) (emphasis added). Thus, in a securities fraud class action, a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b). Moreover, the complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).
>
> Although the PSLRA substantially raised the <u>pleading</u> standard for scienter, it did not change any <u>substantive</u> intent requirements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). In this Circuit it is by now well-established that § 10(b) and Rule 10b-5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Id.* at 1281 (quotation marks omitted). We have described "severe recklessness" this way:
>
>> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

26

that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.*, at 1282 n.18 (quotation marks omitted). Putting the PSLRA and our substantive scienter case law together yields the following stringent standard: to survive a motion to dismiss in this case, [plaintiffs] must (in addition to pleading all of the other elements of a § 10(b) claim) plead "with particularity facts giving rise to a strong inference" that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements.

Any discussion of what constitutes a "strong inference" of scienter must begin with the Supreme Court's recent decision in *Tellabs*. In that case, the Court held that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, [Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308] 127 S.Ct. [2499] at 2510 [(2007)]. Because the strong-inference inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.*, at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.*, at 2510, 2509. *Tellabs* explained how to balance opposing inferences this way:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations of the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." ...Yet the inference of scienter must be more than merely "reasonable" or "permissible" –it must be cogent and compelling, thus strong in light of other explanations.

*Id.*, at 2510. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.*, at 2511.

Notably, this test is not the same as the standard we employ for summary judgment under Fed.R.Civ.P. 56, because it asks what a reasonable person would think, not what a reasonable person could think.

27

As set forth in detail below, Plaintiffs have totally failed to plead scienter as to Ortiz and Lopez with the required particularity.

### A.   General Allegations of Scienter

For example, although AC, ¶ 14 and ¶ 16 recite the "knew or recklessly disregarded" language of scienter generally, these conclusory allegations are supported only by speculation or other equally conclusory allegations. *Garfield*, 466 F.3d at 1265 (claims of securities fraud cannot be based on speculation and conclusory allegations) (citation omitted). In this characteristic, these paragraphs are typical of the allegations regarding scienter throughout the Amended Complaint.

Specifically, AC, ¶ 14 relates to Defendants' general access to a broad array of non-public corporate information, including through their attendance at weekly management and Board of Directors meetings. Indeed, Plaintiffs have done nothing more than state the obvious as any senior executive officer or director in any company would have access to these types of information. *Hubbard v. Bank Atlantic Bancorp, Inc.*, No. 07-61542-CIV, 2008 WL 5250271, at *14 (S.D. Fla. Dec. 12, 2008) (allegations that defendants held senior management positions and had access to inside information insufficient to plead scienter); *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291, 1301 (S.D. Fla. 2002) (same). Plaintiffs have not alleged in AC, ¶ 14 that any of this "information" contradicted, or was even inconsistent with, any information publicly disclosed by BankUnited. Other than "during the class period" which is alleged to extend over twenty (20) months, no time frame is specified as to when Ortiz or Lopez are alleged to have acquired such information, nor are any specifics concerning this information disclosed. Notwithstanding the extreme generality of these allegations, Plaintiffs conclude that the mere

28

possession of "such information" demonstrates Defendants' knowing or severely reckless misconduct. This paragraph does not come close to alleging facts with particularity, much less facts giving rise to a strong inference of scienter, and therefore contributes nothing towards satisfying Plaintiffs' heavy burden of pleading scienter with particularity as to each alleged violation for each individual Defendant as required.

Likewise, AC, ¶ 16 relates to Defendants' alleged "access to adverse undisclosed information." Even if some detail about this alleged "adverse information" were provided, which it is not, "it is not enough to make conclusory allegations that Defendants had access to the 'true facts' in order to demonstrate scienter, particularly where the Complaint fails to allege 'which Defendant knew what, how they knew it or when.'" *In re: Coca-Cola Enterprises, Inc. Sec. Litig.*, 510 F.Supp.2d 1187, 1201 (N.D. Ga. 2007) (citation omitted). Additionally, Plaintiffs have liberally employed the group pleading convention of attributing to the "Defendants" generally statements in group published information. While group pleading may be sufficient to plead false or misleading statements by a group of defendants, *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d at 1299-1300, it is insufficient to plead scienter. *Hubbard*, 2008 WL 5250271, at *11, n.8. Consequently, AC, ¶ 16 contributes nothing toward establishing scienter on the part of Ortiz or Lopez.

In AC, ¶ 20 Plaintiffs purport to provide information about eight confidential witnesses. The weight to be accorded to allegations based upon the proffered statements of confidential witnesses "depends on the particularity of the allegations in each case." *Mizzaro*, 544 F.3d at 1240. Here, both the proffered statements of the confidential witnesses and the allegations upon which they are based are vague, general and conclusory. Only one, CW 2, purports to provide

29

any information concerning Ortiz or Lopez.[29] Even this information is vague and conclusory. Specifically, it is alleged that:

> Confidential Witness 2 is a former BankUnited employee who served as an Executive Vice President in BankUnited's Residential Lending Department from 2002 through February 2008. Confidential Witness 2 attended weekly management meetings with BankUnited's senior management, including Defendants Camner, Ortiz, and Lopez. Based on Confidential Witness 2's position in the Company, Confidential Witness 2 was personally aware that the OTS was concerned about BankUnited's Option ARM lending practices as early as the summer of 2007 and that senior management at BankUnited was aware of these concerns at that time. Confidential Witness 2 is also aware that Defendants Camner, Ortiz, and Lopez became aware of concerns about the inadequacy of BankUnited's loan loss reserves in the late 2007 – early 2008 time period.

This cryptic description provides no particularity and is just a series of apparently unconnected circumstances. For instance, it is alleged that CW 2 attended weekly management meetings with Ortiz and Lopez, among others. However, nothing is alleged anywhere in the Amended Complaint concerning the dates of these meetings, the information presented at them or how they relate in any way to any statements by Ortiz or Lopez. "[O]missions and ambiguities count against inferring scienter…" *Tellabs*, 551 U.S. at 325. Likewise, CW 2 is alleged to have become "aware that the OTS was concerned about BankUnited's Option ARM lending practices" and that "senior management" was "aware" of these "concerns" "as early as the summer of 2007."[30] It is not alleged what these "concerns" of the OTS were or the context in which they were made, much less when or how CW 2 and senior management became "aware" of them, or whether Ortiz and Lopez were among the senior management who achieved such awareness. It is not alleged, for example, that CW 2 discussed these alleged OTS "concerns"

---

[29] Ortiz and Lopez are mentioned in the description of CW 3 as well, but this witness is only alleged to have attended meetings with Ortiz and Lopez. The undersigned has not found any specific information in the Amended Complaint attributed to CW 3, concerning Ortiz or Lopez or otherwise.

[30] A similar allegation is repeated in AC, ¶¶ 27, 34 and 95.

with Ortiz or Lopez. Indeed, the only statement on this topic attributed to the OTS (but not to any person in particular) is the statement in AC, ¶ 34 that Bank United should "perhaps limit Option Arms."[31] Although this statement is characterized by Plaintiffs as the OTS "pressuring" Bank United, the word "perhaps" does not convey a feeling of much urgency or concern. More importantly, Plaintiffs do not bother to allege, even generally, that after this "concern" was supposedly "articulated by the OTS in the summer of 2007," that BankUnited did not in fact limit origination of option ARM loans. Similarly, it is alleged that CW 2 became "aware" that Ortiz and Lopez "became aware" of "concerns" about the "inadequacy" of BankUnited's loan loss reserves in "late 2007 – early 2008." Again, Plaintiffs do not allege how Ortiz and Lopez became "aware" of these "concerns," what these "concerns" were, who had expressed these "concerns", that CW 2 discussed these "concerns" with Ortiz or Lopez or how they relate, if at all, to any statements made by Ortiz or Lopez. This is a far cry from meeting Plaintiffs' burden of alleging with particularity facts giving rise to a strong inference of scienter as to each Defendant for each violation as required. *Phillips*, 374 F.3d at 1017-18. The remaining information purportedly provided by CW 2, in AC, ¶¶ 14, 27, 34, 82, and 95, is just as vague and conclusory. Such generalities are entitled to no weight. Consequently, such general, conclusory allegations are plainly insufficient to establish a strong inference of scienter as to Ortiz and Lopez.

Other than in AC, ¶¶ 14 and 16 discussed above, Plaintiffs' only attempt to plead facts to allege scienter by Ortiz and Lopez are contained within the "General Allegations of Scienter" at pages 66-76 of the Amended Complaint, and the "additional facts" relating specifically to Ortiz

---

[31] It is not clear from the Amended Complaint whether this is a quote from an OTS employee, a quote from CW 2 characterizing an impression of some statement or conduct by an OTS employee, a characterization by Plaintiffs' counsel or something else.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

at pages 81-82 and Lopez at pages 82-83 thereof. The "General Allegations of Scienter" are aptly titled for they consist mostly of little more than the same vague conclusory allegations made in the previous sixty-five (65) pages of the Amended Complaint. Indeed, the only paragraph among these eleven (11) pages that specifically relates to Ortiz and Lopez is AC, ¶ 171 that concerns performance targets for executive bonuses, which is addressed in more detail below. The only new material is contained in AC, ¶¶ 175 to 187 relating to BankUnited's efforts to raise capital. In these paragraphs, Plaintiffs have asserted their conclusions again that "Defendants'" statements at various times "throughout the class period" that BankUnited was "well capitalized" and "was adequately reserving for loan loss contingencies" were "false and misleading." AC, ¶ 175.

However, Plaintiffs have completely failed to set forth facts with particularity giving rise to a strong inference that Ortiz or Lopez knew, or were severely reckless in not knowing, these statements were false at the times these statements were made. Specifically, stripped of conclusory allegations and speculation, and taken as a whole, there are no <u>facts</u> alleged in AC, ¶¶ 175 to 187 (or for that matter elsewhere in the Amended Complaint) to indicate that the money sought to be raised by BankUnited was for any purpose other than the stated purposes which, with regard to the $400 million offering, included "contributing capital to [the Bank]," the most natural inference. *See* AC, ¶ 132. Therefore, Plaintiffs have alleged no facts from which a strong inference of scienter can be drawn as to Ortiz and Lopez from BankUnited's capital raising efforts.

**B.**   **Allegations of Scienter as to Ortiz**

The only statement in Plaintiffs' 113 page tome that the undersigned have found that is

32

directly attributed to Ortiz is set forth in AC, ¶ 76, and relates to a July 26, 2007 analyst conference call. That statement, in its entirety, is:

> that the Company "do[es] not, nor have we ever, engaged in sub prime lending" and the Company is "not hiding anything … Our credit culture has been a conservative one on all lines of business, and I got to tell you, [if the Company had an increase in charge-offs of] 40 basis point[s,] I think everybody around here would be drop dead shocked."

(emphasis in Amended Complaint). Clearly, the second half of this statement is forward-looking and therefore protected by the PSLRA safe harbor provisions as set forth above. However, even if it were not, Plaintiffs have provided no particularized facts that would give rise to an inference, much less a strong inference, that Ortiz made any part of this statement on July 26, 2007 with scienter. In fact, Plaintiffs have alleged nothing to indicate that this statement reflected anything but a firmly and honestly held belief by Ortiz at the time.

A portion of the allegations, contained in AC, ¶ 171 and AC, ¶¶ 81-82, purports to describe the incentive based bonus portion of Ortiz' compensation which Plaintiffs allege gave Ortiz a motive to commit fraud. Without more, as here, allegations that executives had a motive to commit fraud by virtue of incentive based bonus compensation is insufficient to demonstrate scienter. *In re Coca-Cola*, 510 F.Supp.2d at 1201; *see also Bryant v. Avado Brands*, 187 F.3d at 1285-86 (allegations of motive and opportunity to commit fraud, without more, are not sufficient to demonstrate the requisite scienter); *Mizzaro*, 544 F.3d at 1255-56 (same); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F.Supp.2d 1253, 1275 (M.D. Fla. 2009) (same).

## C.   Allegations of Scienter as to Lopez

The allegations of AC, ¶ 171 and AC, ¶¶ 82-83 purport to describe the incentive based bonus portion of Lopez's compensation which Plaintiffs allege gave Lopez a motive to commit

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

fraud. These allegations are as deficient as to Lopez as they are as to Ortiz, as set forth above. Consequently, these allegations are insufficient to allege scienter as to Lopez.

The issue of the alleged undefined OTS "concerns" are revisited by Plaintiffs in AC, ¶ 41, which relates to certain correspondence between the SEC and BankUnited.[32]    That correspondence, which is not attached to the Amended Complaint, is attached hereto as *Exhibit "2"* and again demonstrates the lengths to which Plaintiffs are willing to stretch to attempt to state a claim.

Plaintiffs begin with the conclusory statement, unsupported by citation to any source, that the OTS examiners began meeting "frequently" with Camner and Lopez in the "November 2007 – January 2008 timeframe (and continued to do so throughout the remainder of the class period)." Upon this conclusory statement Plaintiffs stack another conclusory allegation, also unattributed to any source, that these Defendants "had frequent discussions with the examiners and were intimately aware of the examiners' concerns and findings." Again, no details about these alleged "concerns and findings" are provided, nor is it alleged when Lopez became "aware" of them.[33]    From these conclusory allegations Plaintiffs further conclude that Defendants therefore "actively concealed the existence and results of the OTS examination from investors until after the class period."[34]   As evidence of this assertion, Plaintiffs cite Lopez's April 11, 2008 correspondence with the SEC.   In one answer in particular, they allege,

---

[32] The same conclusory allegations regarding this correspondence reappear in AC, ¶¶ 109 and 111, and the analysis of the allegations of paragraph 41 herein apply with equal force.

[33] Indeed, even if any such concerns and findings were actually communicated to Lopez by the OTS "during the class period" which ended on June 19, 2008, there is no allegation that he knew of them on April 11, 2008.

[34] This allegation is particularly disingenuous because Plaintiffs know, or should know, the entire record of an OTS examination, including the resolution thereof, is confidential and not subject to disclosure.  12 C.F.R. § 512.3.

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

"Defendant Lopez falsely denied the existence of the OTS examination in response to direct

questioning by the SEC." The actual question and answer to which Plaintiffs refer is:

> **2.  It appears that you have significant operational difficulties, and have experienced a decline in your capital adequacy and liquidity.  Describe any agreements or understandings, written or oral, with your regulatory agencies or their representatives.  If you have been subject to any regulatory actions or have received any recommendations your financial regulators, please advise the staff regarding the nature of any recommendations made, any steps that you have taken to implement the requirements or recommendations of your regulators and management's opinion as to the extent to which you have complied with the recommendations.**

> We do not have any agreements or understandings, written or oral, with our regulators, agencies or their representatives at the present time.  We have not been subject to any regulatory actions or received any recommendations from our financial regulators.

Clearly, the SEC did not ask in this question whether BankUnited was undergoing a periodic

examination,[35] nor did Lopez address (much less deny) an ongoing OTS examination.  Lopez

simply stated that BankUnited had no "agreements or understandings" with its regulators at that

time, nor had they been "subject to any regulatory actions or received any recommendations"

from them.  Plaintiffs have therefore grossly misrepresented this statement and its import.  As set

forth above, Plaintiffs have provided no information concerning the existence of any such

"agreements," "understandings," "regulatory actions" or "recommendations" as of April 11,

2008.  There are therefore no facts that have been alleged or presented in the Amended

Complaint to indicate that this statement was false when made, much less particularized facts

giving rise to a strong inference of scienter by Lopez.

Plaintiffs, in AC, ¶¶ 51, 70, 93, 107 and 116, also allege that Lopez signed SOX

certifications in connection with BankUnited's public filings in an apparent attempt to establish

---

[35] Plaintiffs have implied that this OTS examination was an extraordinary event rather than what it was, a required periodic exam. *See* 12 C.F.R. § 563.171(a).

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

scienter by Lopez. However, Plaintiffs have not alleged facts establishing the existence of "glaring accounting irregularities or other 'red flags,'" at the time of such SOX certifications necessary to make such SOX certification probative of Lopez's scienter. *Garfield*, 466 F.3d at 1266-67; *Mizzaro*, 544 F.3d at 1251. Consequently, no inference of scienter can be drawn as to Lopez from these SOX certifications.

Plaintiffs have also alleged in conclusory fashion that BankUnited's financial statements were prepared in violation of GAAP. *See*, AC, ¶¶ 16, 33, 50, 53(f), 211, 217, 218 and 243. Of these, only AC, ¶¶ 217, 218 and 243 attempt to provide any detail at all, but even these paragraphs only contain generalized conclusory allegations of wrongdoing that are not linked to specific Defendants, specific statements or specific dates. As with all allegations of scienter, GAAP violations must be pled with particularity. *In re Coca-Cola*, 510 F.Supp.2d at 1200. Even properly particularized allegations of GAAP violations alone are insufficient to give rise to a strong inference of scienter. *Id.; Garfield*, 466 F.3d at 1269; *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d at 1302. Such violations give rise to an inference of scienter only when accompanied by additional facts and circumstances showing fraudulent intent. *Id.*

Here, in order to infer that BankUnited's financial statements were prepared in violation of GAAP, the Court would have to accept as true Plaintiffs' other conclusory allegations of fraud (such as that the statement that borrowers had average FICO scores in excess of 700 and did not engage in sub-prime lending), <u>and</u> that Lopez knew (or was severely recklessly in not knowing) that these statements were false when made. As set forth in detail above, Plaintiffs have not adequately pled that these statements were false, much less that they were made with scienter.

36

As with everything else in the Amended Complaint, Plaintiffs' attempt to allege scienter due to GAAP violations is a house of cards and must fail.

In another attempt to give some weight to their otherwise fact free allegations of GAAP violations, Plaintiffs devote 17 pages of their Amended Complaint (Section X. at pp. 83-100) to set forth all of the accounting principles that they believe apply to BankUnited's financial statements.[36]  However, in all of this verbiage only one fact is alleged, in AC, ¶ 242, and that fact is wrong.  Specifically, Plaintiffs allege that until "the April 2008 correspondence with the SEC … BankUnited's discussions did not contain specific reference to the proportions of the Option ARM loans that were made on a limited-or no-documentation bases."  In fact, in an 8-K dated *April 18, 2007,* in an 8k dated *July 26, 2007* (at p. 10), in the 10-K for fiscal year end *September 30, 2007* filed on *November 29, 2007* (at p. 50) and the 10-Q for the quarter ended *December 31, 2007* filed on *February 12, 2008*, the percentages of limited documentation and no documentation loans of the loan portfolio were disclosed.  Additionally, the risks inherent in reduced documentation loans were discussed in the 10-Q for the quarter ended *March 31, 2007* filed on *May 10, 2007* (at p. 43), and in the 10-K for the fiscal year end *September 30, 2007* filed on *November 29, 2007* (at p. 22).  Finally, as acknowledged in AC, ¶ 68, in a conference call with analysts on *April 19, 2007*, the characteristics of reduced documentation and no documentation loans were discussed.  Consequently, it is impossible to credibly argue that

---

[36] All of the risks described by Plaintiffs in this catalog of principles were fully and timely disclosed to the public. For example, compare the risks described in the 2006 audit risk alerts described AC, ¶ 229 with the risk disclosures set forth on pages 16 – 18 and 22 of BankUnited's 2006 10-K.

BankUnited first disclosed that it made reduced documentation or no documentation loans in the April 2008 correspondence with the SEC.[37]

Even the specific "GAAP provisions" BankUnited is alleged to have "violated" in AC, ¶ 218 are inapposite. Specifically, SFAS No. 140 relates to the transfer or servicing of financial assets, not loan losses, SFAS No. 115 and SAB Topic 5 relate to investment securities, and SFAS No. 157 and SFAS No. 159 did not become effective for Bank United until October 1, 2008, after the end of the class period.[38]

Plaintiffs have also attempted to allege scienter on the basis that "Defendants" failed to "sufficiently" or "adequately" reserve for loan losses. *See, e.g.*, AC, ¶¶ 25, 33, 34, 52(b), 59, 63, 64, 71, 80, 82, 95, 104, 123 and 128. However, as recognized in AC, ¶¶ 55, 65, 73, 83, 87, 100 and 112, and more particularly in BankUnited's public filings,[39] BankUnited continually increased its loan loss reserves in recognition of anticipated loan defaults throughout the class period. Thus, Plaintiffs argument that BankUnited's increases in its loan loss reserves were "insufficient" or "inadequate" is really a quibble with the judgment of senior management (i.e. that management did not cause the company to reserve more). This exact argument was rejected by the Court in *Hubbard*, 2008 WL 5250271 at *18 as evidence of scienter.

---

[37] It is also not credible to argue that the disclosure of this information was perceived as a negative in the marketplace. As indicated, the percentages of the Bank's no documentation and limited documentation loans was first disclosed in an 8-K on April 18, 2007. On that day BankUnited's stock closed at $22.54 on volume of 1,826,823 shares. On April 19, 2007, the day after this disclosure, BankUnited's stock closed at $22.71 (i.e., up .17) on volume of 4,929,013 shares (over 2.5 times the prior day's volume). It is therefore clear that the disclosure of this information was perceived by BankUnited shareholders as a positive.

[38] The effective dates of these SFAS provisions were disclosed beginning in the December 31, 2006 10-Q for SFAS 157 (at p. 9) and in the March 31, 2007 10-Q for SFAB 159 (at p. 9-10).

[39] Plaintiffs have apparently confused the provision for loan losses, which is the quarterly adjustment to the allowance for loan losses, with the allowance for loan losses which is the running total of the adjusted prior period allowance for loan losses plus the current provision for loan losses. It matters little, however, since both numbers only increased throughout the class period.

38

Finally, Plaintiffs argue that Defendants' (including Lopez) statements that BankUnited was "well capitalized" or had a "capital position in excess of regulatory requirements" were false and misleading. *See, e.g.*, AC, ¶¶ 37, 44, 53(e), 73, 83, 88, 94 and 103. Plaintiffs apparently come to this conclusion by the following syllogism: (1) a "well capitalized" institution is defined by statute as one that maintains a "Total Risk Based" capital ratio of 10% or greater, a "Tier 1/Risk Based" capital ratio of 6% or greater, and "Tier 1/Leverage" ratio of 5% or greater (AC, ¶ 38); (2) on January 27, 2009 (more than six (6) months after the end of the class period) the Company announced that its fourth quarter 2008 "Tier 1 Core capital ratio was 3.4% and Total risk-Based Capital ratio was 7.1%" (AC, ¶¶ 40, 152) (i.e., below the statutory minimums); therefore (3) BankUnited's capital ratios had been below the statutory minimums to qualify it as "well capitalized" for the entire class period. *See* AC, ¶ 37.

This argument fails to explain in what way BankUnited's class period capital ratio calculations were wrong (the Company's public filings consistently showed its capital ratios to exceed the "well capitalized" minimum thresholds), what the actual capital ratios were, and how and when Defendants (including Ortiz and Lopez) are supposed to have known this. Absent such factual detail, Plaintiffs' allegations do not allege scienter by Ortiz or Lopez as to the characterization of the Company as "well capitalized." Moreover, "[t]he mere temporal proximity of the conflicting statements is not sufficient: '[T]emporal proximity between positive statements stressing a Firm's strengths and announcements or poor economic performance do not create an inference that the earlier statements were fraudulent.'" *In re Republic Services, Inc. Sec. Litig.*, 134 F.Supp.2d 1355, 1361 (S.D. Fla. 2001) (quoting from *In re Health Care Compare Corp. Sec. Litig.,* 75 F.3d 276, 283 (7th Cir. 1996)).

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

In addition, Plaintiffs' argument ignores the more reasonable inference that the capital position of BankUnited deteriorated rapidly with the escalation of loan defaults along with the escalating decline of the housing market. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of the other explanations.  A complaint will survive, we hold, only if a reasonable person <u>would</u> deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310 (emphasis supplied).  Plaintiffs' inference that BankUnited's capital position was always deficient over the twenty (20) month class period, because it was deficient six (6) months after the end of the class period is neither cogent or as compelling as other non-culpable inferences.  Consequently, Plaintiffs' claims of scienter as a result of the decline in BankUnited's capital position must fail.

**V.**     **Plaintiffs' § 20(a) Claim Must be Dismissed**

Because Plaintiffs have failed to adequately plead a violation of § 10(b) and Rule 10b-5, their § 20(a) control person claims against Ortiz and Lopez must necessarily fail as well. *Mizzaro*, 544 F.3d at 1255.

**Conclusion**

Based upon the arguments and authorities set forth above, Defendants Ortiz and Lopez request the Court to dismiss the Amended Complaint against them in its entirety.

40

## RULE 7.1 CERTIFICATION

The undersigned counsel for movants hereby certifies that he has conferred with all parties or non-parties who may be affected by the relief sought in this Motion in a good faith effort to resolve the issues raised in the Motion and has been unable to do so.

Respectfully submitted,

**TEW CARDENAS LLP**
*Attorneys for Individual Defendants*
Four Seasons Tower
1441 Brickell Avenue, 15th Floor
Miami, Florida 33131
Telephone: 305.536.1112
Facsimile: 305.536.1116

By:___/s/ Dennis A. Nowak_____
          DENNIS A. NOWAK
          Florida Bar No. 328979
          C. THOMAS TEW
          Florida Bar No.098160
          JESSICA FRANK
          Florida Bar No.  0055839

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically this 28th day of August, 2009 with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via e-mail and U.S. mail, either via transmission of Notices of Electronic Filing generated by CM/ECF or via U.S. mail to for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____/s/ Dennis A. Nowak_____

527911.1

41

*In re BankUnited Securities Litigation*

Case No. 08-CIV-22572-COOKE/BANDSTRA (S.D. Fla.)

**SERVICE LIST**

Michael J. Pucillo, Esq.
mpucillo@bermandevalerio.com
Wendy H. Zoberman, Esq.
wzoberman@bermandevalerio.com
BERMAN DeVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel:    561/835-9400
Fax:    561/835-0322

*Lead Counsel for Lead Plaintiffs Louisiana
Municipal Police Employees
Retirement System and Oklahoma Police
Pension & Retirement System*

Glen DeValerio, Esq.
gdevalerio@bermandevalerio.com
Leslie R. Stern, Esq.
lstern@bermanesq.com
BERMAN DeVALERIO
One Liberty Square
Boston, MA 02109
Tel:    617/542-8300
Fax:    617/542-1194

*Lead Counsel for Lead Plaintiffs Louisiana
Municipal Police Employees
Retirement System and Oklahoma Police
Pension & Retirement System*

Jack Reise, Esq.
jreise@csgrr.com
Paul J. Geller, Esq.
pgeller@csgrr.com
Douglas Scott Wilens, Esq.
dwilens@csgrr.com
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL   33432
Tel:    561/750-3000
Fax:    561/750-3364

*Attorneys for Plaintiff Waterford
Township General Employees Retirement
System and Movant The Pension &
Annuity Funds*

Martin D. Chitwood, Esq.
mchitwood@chitwoodlaw.com
Ze'Eva K. Banks, Esq.
zbanks@chitwoodlaw.com
Robert W. Killorin, Esq.
rkillorin@chitwoodlaw.com
James M. Wilson, Jr., Esq.
jwilson@chitwoodlaw.com
CHITWOOD HARLEY HARNES LLP
1230 Peachtree Street NE
Promenade II, Suite 2300
Atlanta, GA 30309
Tel:    303/873-3900

*Attorneys for Movant Georgia Municipal
Employee Benefit System Retirement Fund*

525608.1