**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Master File No. 08-CIV-22572-COOKE/BANDSTRA**

_____

IN RE BANK UNITED SECURITIES
LITIGATION

_____

THIS DOCUMENT RELATES TO:
ALL ACTIONS

_____


**LEAD PLAINTIFFS' LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM AND THE OKLAHOMA
POLICE PENSION AND RETIREMENT SYSTEM'S MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

 A. Defendants' Scheme, Part 1: Reckless Business And Accounting Practices Involving The Explosion Of Less Than Fully Documented Option ARM Loans .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

  1. Liar's Loans And Option ARMs . . . . . . . . . . . . . . . . . . . . . . . . . . 7

  2. Disregard For Appraisal And Underwriting Standards . . . . . . . . . 8

  3. Misrepresentation of Loan Loss Reserves . . . . . . . . . . . . . . . . . 9

 B. Defendants' Scheme, Part 2: Concealing OTS' Concerns From Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 C. Defendants' Scheme, Part 3: Concealing The Reasons For BankUnited's Efforts To Raise Capital . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 I. LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS A SECURITIES FRAUD COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 II. THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS CAMNER, ORTIZ AND LOPEZ ACTED WITH SCIENTER . . . . . . . . . . . . . 15

 A. Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

  1. The Cease And Desist Orders And SEC Correspondence Clearly Support Lead Plaintiffs' Allegations Of Scienter . . . . . . 16

  2. Defendants' Knowledge Of And Failure To Follow Interagency Lending Guidelines Support An Inference Of Scienter . . . . . . . . 21

  3. Confidential Witnesses Confirm Defendants' Scienter . . . . . . . . 25

  4. Defendants' Efforts To Raise Capital During The Class Period Support Lead Plaintiffs' Allegations Of Scienter . . . . . . . 29

  5. That Defendants' Misstatements And Undisclosed Facts All Related To BankUnited's Core Business Supports An Inference Of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  6. Defendants' Receipt Of Incentive Bonuses Tied To BankUnited's Financial Performance And Defendant Camner's Insider Stock Sales Support A Strong Inference Of Scienter . . . . 32

  7. Defendants Either Knowingly Or Recklessly Failed To Follow GAAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       a.    Defendants Failed To Disclose Risk-Layering In BankUnited's Option ARM Portfolio . . . . . . . . . . . . . 34

       b.    "Smoke and Mirrors" Accounting And BankUnited's Failure To Follow The Second Step Of Proper GAAP Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   8.    Defendants' Ineffective Internal Controls And False SOX Certifications Support A Strong Inference Of Scienter . . . . . . . 40

B.    There Is No Fraud By Hindsight Here. . . . . . . . . . . . . . . . . . . . . . . . . . 41

III.    THE COMPLAINT ADEQUATELY PLEADS ACTIONABLE MISSTATEMENTS AGAINST DEFENDANTS CAMNER, ORTIZ AND LOPEZ WITH THE REQUISITE PARTICULARITY . . . . . . . . . . . . . . . . . . . 43

A.    The Complaint Sufficiently Alleges Particularized Facts That Defendants' Statements Were False And Misleading . . . . . . . . . . . . . . . 43

   1.    The Complaint Adequately Alleges Defendants' Knowledge Or Reckless Disregard Of BankUnited's Unsafe And Unsound Lending Practices, Accounting Practices, Risk Layering, And Capitalization In A Scheme To Artificially Inflate Income And Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

   2.    The Complaint Properly Pleads GAAP Violations . . . . . . . . . . . 46

   3.    The Complaint Properly Pleads Actionable Misstatements Regarding BankUnited's Loan Loss Reserves . . . . . . . . . . . . . . 47

B.    Defendants Cannot Sanitize Their Misrepresentations And Omissions By Calling Them "Forward Looking" . . . . . . . . . . . . . . . . . . . . . . . . . . 48

   1.    Defendants' Misrepresentations And Omissions Concerned Existing And/Or Historical Fact And Thus Are Not Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

   2.    Reserves Relate To the Current Period And Are *Not* Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   3.    Defendants' False And Misleading Statements And Omissions Were Not Accompanied By Meaningful Cautionary Language . . 52

   4.    The Complaint Adequately Alleges Defendants' Misstatements Were False When Made . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C.    Defendants' Misstatements Were Not Mere "Puffery" . . . . . . . . . . . . . 57

IV.    PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON CLAIMS . . . . . . 59

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Lead Plaintiffs, Louisiana Municipal Police Employees' Retirement System and the Oklahoma Police Pension and Retirement System (collectively "Lead Plaintiffs" or "Plaintiffs"), submit this Opposition to the Motions to Dismiss the Consolidated Amended Class Action Complaint ("Complaint")[1] filed by Defendant, Alfred Camner ("Camner"), and Defendants, Ramiro Ortiz ("Ortiz") and Humberto Lopez ("Lopez") (collectively "Defendants").  For the reasons set forth herein, the Motions should be denied.

**PRELIMINARY STATEMENT**

Defendants would have this Court believe that they were innocent victims of a real estate crisis that came out of nowhere and caught them by surprise.  These bankers were the highest ranking officers of what was the largest banking institution headquartered in Florida – a bank that was found by its federal regulator to have "engaged in unsafe and unsound practices" during the Class Period that resulted in BankUnited "being in an unsatisfactory condition."[2]  Yet Defendants disavow any role in the events that led BankUnited to failure and left its investors holding hundreds of millions of dollars in worthless stock.

Plaintiffs' allegations are straightforward.  This action arises out of an egregious fraud perpetrated by BankUnited's former senior management, Defendants Camner, Ortiz and Lopez.  As detailed in the Complaint, BankUnited held itself out as a conservative mortgage lender that applied "stringent credit standards," "vigorous underwriting" and "very tough appraisal" practices in its mortgage lending business; a bank that was "well capitalized" and "adhering to federal guidelines;" and a bank with an adequate allowance for loan losses.  Defendants Camner and Lopez signed public filings making these same representations, and representing that BankUnited's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and also signed certifications attesting to the accuracy and

---

[1] All references to "¶___" are to paragraphs in the Complaint. All references to "MTD____" are to page numbers stamped on the exhibits filed with the Ortiz and Lopez Motion to Dismiss.  All references to "Plts' Ex. __" are to Lead Plaintiffs' Exhibits filed herewith.

[2] *See In re BankUnited, FSB*, OTS Docket No. 08045, Order to Cease and Desist ("Cease and Desist Order") and incorporated Stipulation and Consent to Issuance of Cease and Desist ("Stipulation"), attached as Exhibits 10.3 and 10.4 to BankUnited Financial Corporation Form 8-K, filed September 19, 2008, Plts' Ex. 1.  A Court may take judicial notice of public filings on a motion to dismiss.  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

reliability of the Company's financial results and the effectiveness of its internal controls throughout the Class Period.  Defendants selectively released information about BankUnited's loan portfolio, misleading investors into believing that general market declines did not threaten BankUnited, holding BankUnited out during the Class Period as being "different" from other failing banks because:  its "underwriting standards [were] extraordinarily different;" it had "strong appraisal review process[es];" it "took a very different approach to underwriting [its] residential loans;" and its "underwriting was at a much higher level [than its competitors]."

In reality, BankUnited's loan portfolio and underwriting standards were anything but "conservative," and during the Class Period, until mandated by the SEC, BankUnited did not disclose precisely how many of its riskiest loans were originated on a less than fully-documented basis.  The Bank was loading up on risky Option ARM loans and limited or no documentation or "liar's" loans, using inappropriate appraisal practices, was grossly undercapitalized, and had inadequate loan loss reserves.  It did so even though the Office of Thrift Supervision ("OTS") had communicated its concerns about Option ARM lending to Defendants in the summer of 2007 and OTS examiners had expressed their concerns about BankUnited's lending practices, layered risks in the Bank's Option ARM loan portfolio, inadequate loan loss reserves, and the Bank's inadequate capitalization to Defendants during an investigation of these practices from November 2007 through May 2008.  Ultimately, the OTS documented these issues in its Stipulation and Cease and Desist Orders based upon a January 2008 Report of Examination.  Defendants clearly knew or, absent recklessness, should have known, that the Bank's underwriting and appraisal practices, and its failure to take into account the extreme risk associated with these lending practices, violated federal guidelines, BankUnited's internal controls, and GAAP during the Class Period.

Plaintiffs' claims are supported by statements from eight confidential sources with corroborative knowledge, as well as 2008 correspondence between the Company and the SEC, disclosures made in BankUnited's Form 10-Q for 3Q 2008, and by the conclusions and assessments reflected in the OTS' Cease and Desist Orders.  Lead Plaintiffs are not pleading fraud by hindsight – alleging that disclosures made in later filings should have been made in earlier.  Rather, the Complaint sets forth in detail the existence, *during the Class Period*, of obvious "red flags" that, in the absence of extreme recklessness, would have alerted Defendants to the wrongdoing alleged.

In their Motions to Dismiss, Defendants repeatedly mischaracterize and cherry-pick from Plaintiffs' allegations and the law in various attempts to argue a different case or to convince this Court that tangential issues somehow cure their knowing or reckless false statements. Defendants also deny Lead Plaintiffs' allegations and present their own set of facts, which they then urge this Court to accept. If anything, Defendants' improper denials and alternative explanations only raise factual issues that cannot be decided at this procedural stage.[3]

Tacitly acknowledging the strength of Plaintiffs' scienter allegations, Defendants focus their motions on the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and mischaracterize Plaintiffs' allegations as forward looking predictions of future performance. To the contrary, the Complaint clearly references Defendants' undisputed knowledge and assertions concerning *current* financial conditions and underwriting practices that are definitively not forward looking. Defendants further argue that the alleged misstatements – even if forward looking (which they were not) – were accompanied by meaningful cautionary language, and that Plaintiffs' allegations fail to "prove" Defendants' actual knowledge that their statements were false when made. Those arguments, under the facts of this case, cannot withstand scrutiny.

Defendants also argue that that the Complaint fails to allege sufficient facts to support a "strong inference" that they acted with scienter (*i.e.*, intentionally or recklessly), as required by the PSLRA. Specifically, Defendants assert that the Complaint lacks particularity in establishing that Plaintiffs' confidential witnesses possess the required personal knowledge of the information they purport to convey and because the Complaint's allegations are too "generalized" and "conclusory." Camner Br. at 2, 9, 24, 26, 28, 29, 30, 32; Ortiz & Lopez ("O&L") Br. at 5, 7, 23, 26, 28, 29, 31, 32, 34, 36. These arguments plainly lack merit. Each confidential witness is

---

[3] For instance, Defendants Ortiz and Lopez debate whether BankUnited properly accounted for its Option ARM mortgages under GAAP (Ortiz & Lopez Br. at 12). *See In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) ("Whether or not the Companies' practice of accounting for IRUs was ever acceptable under the applicable provisions of GAAP cannot be determined in advance of the development of the record."). Defendants' denials of allegations concerning Defendant Camner's opportunistic stock trades (Camner Br. at 33) and the extraordinary nature of the OTS examination (Ortiz & Lopez Br. at 35, n. 35), as well as Defendants' rationalization for their behavior are also improper on a motion to dismiss, as Plaintiffs' allegations must be taken as true and all inferences drawn in Plaintiffs' favor. *Clark v. City of Oswego*, 5:03-CV-202, 2006 U.S. Dist. LEXIS 95769, at *10 (N.D.N.Y. March 26, 2006) (defendant cannot attempt to refute the complaint or present a different set of allegations).

described fully by position held, proximity to the offending conduct and relevant time frame. The confidential witness' accounts are corroborated by the OTS' conclusions that BankUnited engaged in "unsafe and unsound practices," as well as the SEC's March 2008 observations that BankUnited had "significant operational difficulties," and had "experienced a decline in [its] capital adequacy and liquidity."

Under *Tellabs*, the Supreme Court set forth the following standard for pleading a "strong inference" of scienter:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Here, the totality of Plaintiffs' allegations:  corroborated allegations of numerous contemporaneous witnesses; inferences that can be drawn from the nature and magnitude of the fraud alleged; the OTS' findings; and the suspicious nature and timing of Defendant Camner's insider stock sales, are more than sufficient to plead the requisite "strong inference" of scienter at this stage, even if they might not constitute incontrovertible proof of Defendants' fraudulent intent or recklessness.

Defendants' remaining arguments are easily exposed as perfunctory efforts to distract this Court's attention from the factual and legal issues that it must consider here.  Defendants' attempt to cloud the issues and shoehorn this case into an ill-fitting stereotype, citing securities cases in which motions to dismiss were granted, is simply disingenuous. [4]  The facts and allegations in those cases differ from each other and significantly differ from this case, in part due to the OTS Cease and Desist Orders that detailed numerous failures at BankUnited concerning Option ARM lending and capitalization, the March 2008 SEC correspondence that noted deficiencies in BankUnited's capital and disclosures and detailed allegations from highly-placed Confidential Witnesses. [5]

---

[4]  Defendants' memoranda fail to note subsequent decisions in cases cited in which leave to replead was granted.  In *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267 (S.D. Fla. 2008), for example, leave to replead was granted, and a subsequent motion to dismiss the amended complaint was denied.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-CIV-61542, slip op. (S.D. Fla. May 11, 2009) ("*Hubbard II*"), Plts' Ex. 2 at 4, (holding amended complaint sufficiently alleged defendants knew, or were reckless in not knowing, about the underwriting deficiencies in the company's commercial real estate loans).

[5]  *See, e.g., Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009) (finding complaint alleged "no 'glaring accounting irregularities' or 'other red flags' that the financial statements contained material misstatements or omissions"); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1242, 1251

Defendants further seek to convince this Court that Plaintiffs have alleged merely that Defendants failed to "predict the unexpected downturn in the economy or its effect on BankUnited." Camner Br. at 3. In truth, none of the claims in the Complaint require such prescience on the part of Defendants[6]. The crux of Plaintiffs' claims is that Defendants made specific, affirmative representations about the lending practices and financial condition of BankUnited which were seriously undermined or flatly contradicted by undisclosed facts of which Defendants were well aware or recklessly indifferent to *at the time the statements were made*. As such, the Complaint adequately and specifically alleges multiple violations of the federal securities laws.

## STATEMENT OF FACTS

Defendants Camner, Ortiz, and Lopez engaged in an unlawful scheme during the Class Period that was, at its heart, intended to falsely and misleadingly increase BankUnited's period income and assets, and thereby artificially inflate BankUnited's stock price by:

(1) Engaging in reckless business and accounting practices in connection with the Bank's Option ARM mortgage lending, particularly by directing the Bank to issue riskier Option ARM loans made on a less than fully-documented basis, threatening the Bank's fundamental safety and security while artificially inflating BankUnited's period revenues and income, as well as overstating the value of assets reported on the Company's balance sheet;

(2) Falsely and misleadingly concealing the reality of the Bank's lending practices from investors and attempting to characterize BankUnited as somehow different from its competitors, while falsely and misleadingly touting the Company's income and earnings, borrower quality, and the adequacy of its loan loss reserves, and its adhering to industry-standard lending,

---

(11th Cir. 2008) (noting five of six confidential witnesses were store level employees and "the type of fraud alleged would be very difficult for senior management to detect"); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266-67 (11th Cir. 2006) (finding there were no allegations "that indicate the presence of such 'red flags' in the company's financial statements").

[6] Defendants' macro-economic arguments are also irrelevant for purposes of this motion. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 n. 53 (C.D. Cal. 2008) ("[I]t is the Court's task to manage this litigation efficiently and avoid wasteful arguments. … '[J]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930's, the Court cannot use that fact to infer anything in particular about a business operating at the time.'") (citation omitted).

5

underwriting, and appraisal practices including by consistently stating that BankUnited was a "conservative" and/or otherwise prudent lender;

(3) Making false and misleading statements with respect to BankUnited's capitalization including concealing from investors the Company's true motivations for proceeding to undertake a $400 million secondary stock offering; and

(4) Concealing from investors the facts that BankUnited was facing questions and criticism from regulators about the Bank's primary lending practices starting in approximately the summer of 2007, and that the Bank was under intense scrutiny from the OTS starting in November 2007 in connection with the "unsafe and unsound practices" that ultimately caused the Bank to be in an "unsatisfactory condition" due to the Bank's failures with respect to rising loan defaults, inadequate capital, and inadequate loan loss reserves.

### A.     Defendants' Scheme, Part 1:  Reckless Business And Accounting Practices Involving The Explosion Of Less Than Fully Documented Option ARM Loans

The Complaint alleges in detail that Defendants knowingly or recklessly engaged in business and accounting practices designed to overstate BankUnited's income and assets by pursuing a course of business that was nearly entirely dependent on an explosion of risky Option ARM loans, the substantial majority of which was comprised of even riskier "Limited Documentation" (as defined in the Complaint) "liar's loans" in which BankUnited failed to verify either a borrower's income, employment status, or both.  ¶¶20, 22, 27, 39, 53, 109, 117, 142, 144, 164, 217.  The considerable risks associated with Option ARM lending, particularly in the case of "stated income" loans that were ultimately identified by the OTS as being among the key reasons for the Bank's failure (¶¶142, 144), were further compounded by the Bank's shoddy and professionally inadequate appraisal/underwriting practices that substantially increased the risks associated with its loans.  ¶¶20, 28-32.  Knowingly or recklessly disregarding these risks – and failing to disclose the true nature of BankUnited's lending practices and the substantial likelihood of even greater loan losses arising when these particular risk factors were compounded – served to artificially inflate BankUnited's period income and the value of assets on its balance sheet in violation of GAAP.  ¶¶20, 25-26, 33-34, 50, 53-54, 95, 105, 164, 166, 191.

1.      **Liar's Loans And Option ARMs**

BankUnited, at Defendants' direction, increasingly pursued a business plan during the Class Period that heavily concentrated the Bank's mortgage lending in purportedly profitable but inherently risky Option ARM loans, particularly pushing BankUnited into large volumes of extremely risky Option ARM loans made on a less than fully-documented basis.  ¶¶20-22, 27, 109, 117, 164.  Limited Documentation and/or no-documentation loans are often referred to in the mortgage lending industry as "liar's loans" given that in those cases, a borrower's stated income and/or assets – key indicators of a borrower's creditworthiness – are never verified.  ¶27.  The Complaint describes how less than fully documented Option ARM loans were particularly risky not just because they carried the substantial negative amortization and related risks that accompanied fully-documented Option ARM loans (¶24), but also because "liar's loans" carried a further set of substantial and material risks  – risks that the OTS deemed to be a key component of BankUnited's "unsafe and unsound" lending practices (¶¶39, 137, 142, 144-45) and that the SEC deemed worthy of additional disclosure in March 2008.  ¶¶109, 242.

Knowingly or recklessly disregarding these risks, Defendants saw particular opportunities in pushing the expansion of Option ARM lending, including by eschewing traditional loan documentation standards and relying on "liar's loans" to fuel a dramatic expansion in BankUnited's reported short-term net income, earnings, and assets during the Class Period.  ¶¶20-21, 27, 164.  In particular, the Complaint describes Confidential Witness 2's recollection of how and why BankUnited's senior management, including Defendants Camner and Ortiz, pushed for more and more Option ARM lending to fuel BankUnited's growth, despite the risks associated with those loans.  ¶27.  The Complaint alleges that Defendants designed and implemented the Bank's lending strategies, including: pushing for greater numbers of loans originated through third party mortgage brokers through BankUnited's "wholesale" division (¶¶20, 27, 164); and creating incentive compensation systems for third-party mortgage brokers that encouraged brokers to sell Option ARM loans rather than other mortgage products, even when alternative, less profitable, products might have been in a customer's best interest (¶¶20, 164).  Furthermore, as described in detail below, the Complaint alleges how BankUnited, with Defendants' knowledge and/or direction, also acted to increase its loan volume by disregarding industry-standard underwriting and appraisal practices.

In addition to dramatically increasing the volume of loans at BankUnited by consciously

loosening borrower documentation and other standards (¶27), the Complaint details how Defendants intended to take advantage of unique accounting benefits associated with Option ARM lending to increase short term income and earnings by engaging in what one Confidential Witness with knowledge of the Bank's mortgage lending policies and practices, described as "smoke and mirrors" accounting.  ¶¶20, 25, 27.

Defendants' reckless pursuit of apparent short-term profits from "liar's loans" and Option ARM lending appeared to the investing public to have been successful (¶¶21-22) until BankUnited began to collapse under the weight of accumulated failures that flowed from these undisclosed unsafe and unsound lending practices, as documented by the OTS.  ¶¶142-45.

Defendants had additional motivations for pushing the Bank's expansion of these lending practices.  Specifically, Defendants were motivated to pursue BankUnited's risky strategies to achieve significant performance based bonuses that were based, in part, on increasing BankUnited's short-term net income, earnings per share, and total assets.  ¶¶164, 166, 168-69.

## 2.     Disregard For Appraisal And Underwriting Standards

The Complaint contains considerable detail regarding BankUnited's pervasive failures to follow industry-standard underwriting practices during the Class Period, particularly with respect to the Bank's appraisal and appraisal review practices.  ¶¶20-21, 28-32.  As described by Confidential Witness 1, a former BankUnited senior appraiser and appraisal reviewer, BankUnited routinely disregarded industry-standard appraisal guidelines set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP") and as required by federal law in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") for the specific purpose of meeting the aggressive loan production targets set by Defendants and to increase BankUnited's income and earnings.  ¶¶28-29.

Confidential Witness 1 alone documented nearly 500 incidents involving overstated property values and/or other inappropriate appraisal practices in connection with mortgages issued by BankUnited, despite the Bank's knowledge that loan amounts exceeded the value of the properties backing those loans.  ¶29.  Of these incidents, the Complaint provides details for three specific loans that Confidential Witness 1 describes as being indicative of systemic appraisal failures at BankUnited:  Loan No. 511340-2 (November 2006, property had a "significantly overstated value" due to lack of current comparable sales prices); Loan No.

511921-9 (December 2006, National Appraisal Manager overruled a determination that an appraisal was "intentionally overstated" under pressure from BankUnited sales staff); and Loan No. 4725354 (February 2007 finding that appraised value had been overstated was ignored by underwriter who sought a "rubber stamp" third party appraisal before issuing the loan based on the overstated value – the loan went into default).  ¶¶30-32.

In addition, Confidential Witness 1 describes how, despite BankUnited's repeated difficulties and failures with respect to its appraisal and appraisal review practices, the Bank's appraisal review department was viewed by results-driven management as a nuisance and an impediment to BankUnited's financial success, and was therefore deliberately chronically understaffed so as to prevent diligent and timely review of relevant appraisal data.  ¶28.

These pervasive deficiencies in BankUnited's appraisal and underwriting practices were well known to Defendants who, despite being provided reports on appraisal failures prepared by Confidential Witness 1, took no corrective action and declined to discipline employees involved in these practices.  ¶¶20, 30-32.  In addition, Defendant Camner took the highly unusual step of traveling across the country in the summer of 2006 to meet with Confidential Witness 1 to pressure Confidential Witness 1 to ease up on conscientious appraisal reviews that were seen as acting as a brake on BankUnited's earnings growth, admonishing Confidential Witness 1 to "cut them, but not too many."  ¶¶28, 165.

### 3.     Misrepresentation of Loan Loss Reserves

The Complaint alleges that GAAP permitted BankUnited to immediately recognize as period income the full amount of interest that was due to be received from an Option ARM mortgage at some point in the future, even when the borrower was actually paying less than the full amount of interest owed on the loan in that period and the loan was negatively amortizing. The Complaint states, however, that GAAP accounting rules *also* required BankUnited to take additional steps to account for and reduce the reported amount of these income streams based on assessments of the risk of default associated with those loans by recording appropriate loan loss reserves.  ¶¶25, 33-34, 217, 225, 229, 238-40.  Similarly, GAAP further required that BankUnited write down known or reasonably ascertainable loan losses by taking impairment charges in connection with those losses in the period that those losses were identified.  ¶¶217, 224-25, 238-40.  BankUnited either knowingly or recklessly failed to take these necessary

"follow-up steps" in accounting for its Option ARM loans given the substantial risks associated with those loans – particularly the less than fully-documented Option ARM loans – thereby inflating its period income and earnings, and overstating the value of assets recorded on its balance sheet. ¶¶20, 25, 33-34.

During the Class Period, Defendants consistently sought to reassure investors of the adequacy, soundness, and "conservative" nature of BankUnited's loan loss reserves and touted the appropriateness or strength of those loan loss reserves in terms of BankUnited's accounting for risks and anticipated loan losses.  ¶¶50, 63, 66-68, 75, 80, 90, 101-02, 105, 166.  In addition, when challenged by investment analysts who sought guidance or clarification with respect to BankUnited's loan loss reserves during the Class Period, Defendants consistently and strongly defended BankUnited's practices and denied analysts' suggestions that BankUnited's loan loss reserves could be inadequate.  ¶¶33, 105.  When an October 25, 2006 Sterne Agee analyst report noted that BankUnited's reserves were at "very thin levels" relative to its peers (including Downey Financial, an Option ARM lender that failed one month later, in November 2006) ¶33, Defendants ignored this concern and stated in a February 26, 2007 analyst presentation that BankUnited's loan loss reserves "reflect conservatively underwritten, real estate collateralized loans."  ¶61.  Similarly, Defendants, in addition to giving other assurances regarding reserves on a January 24, 2008 conference call, dismissed analyst concerns about the apparent inadequacy of BankUnited's Option ARM loan loss reserves (¶105, MTD1548) and its estimates of projected losses among Option ARM loans that were only about 1/3 of those projected for such loans by S&P.  ¶105, MTD1552-53.  Defendant Lopez stated that the difference between BankUnited and other Option ARM lenders was that "it all goes back to when the loan was originated ... our underwriting standards are probably some of the strongest in the industry." *Id.*  Following up on Lopez's comments, Defendant Camner touted the purported benefits of BankUnited's in-house appraisal practices as providing assurance with respect to loan quality, and further stated, "we believe that our portfolio's in much better shape than a lot of the entities you're talking about." ¶105, MTD1553.  Rather than this serving as a wake up call to Defendants, BankUnited continued to maintain inadequate loan loss reserves and Defendants continued to defend them. ¶105.

The inadequacy of BankUnited's loan loss reserves was one of the key factors that the OTS cited in the BankUnited Cease and Desist Orders as having put BankUnited in the

"unsatisfactory condition" that ultimately caused its failure.  ¶¶142, 144.  Far from this being a conclusion reached by the OTS following the Class Period based on new information or analyses, the OTS had been discussing the inadequacy of BankUnited's loan loss reserves with Defendants starting in the summer of 2007 (¶¶20, 95) and then again throughout the course of the examination that began in approximately November 2007.  ¶¶20, 35, 41.  The Complaint indicates, quoting from BankUnited's Form 10-Q for 3Q 2008, that it is clear that BankUnited and the OTS had been in discussions with BankUnited about increasing its loan loss reserves and "enhance[ing] its policies and procedures regarding the Bank's allowance for loan losses" long before the close of 3Q on June 30, 2008.  ¶137.

### B.    Defendants' Scheme, Part 2:  Concealing OTS' Concerns From Investors

Starting in approximately November 2007, OTS examiners arrived at BankUnited's Coral Gables headquarters and commenced a periodic examination of BankUnited.  ¶¶20, 35, 41. This particular examination involved considerably more OTS personnel, had an unusually long duration (from approximately November 2007-May 2008), and otherwise appeared to be more probing than a typical examination.  *Id*.  The examination followed OTS' discussions with BankUnited in the summer of 2007, when OTS personnel had been in discussions with BankUnited management and communicated that the OTS was "concerned about BankUnited's Option ARM lending practices" and its loan loss reserves at that time.  ¶¶20, 27, 34, 82, 95.

Throughout the course of BankUnited's examination, from the November 2007 start (¶¶20, 27, 35) and the January 31, 2008 Report of Examination (¶¶142, 144), and leading directly into the discussions and negotiations with the OTS that were described in BankUnited's 3Q 2008 10-Q (¶137), Defendants concealed from investors the existence the OTS' substantial and material concerns about BankUnited's lending, accounting, and other business practices. ¶41.  In addition to concealing the fact that the OTS had expressed substantial concerns to BankUnited about its Option ARM lending and reserves during the Class Period (¶¶20, 95), Defendants also concealed that BankUnited was engaged in substantial discussions with the OTS during the Class Period on practices that were fundamental to the BankUnited business model – and the scheme perpetrated by Defendants.  ¶137.  Of particular note, Defendants failed to disclose during the Class Period that BankUnited was aware of specific OTS concerns about: Option ARM lending; loans made on a less than fully-documented basis; BankUnited's

capitalization; loan loss reserves; and asset growth.  ¶137.  Indeed, these factors were among the "unsafe and unsound" lending practices cited by the OTS in the Cease and Desist Orders, notably "rising delinquencies and defaults in [BankUnited's] Option ARM loan portfolio, a significant portion of which was originated on a 'stated income' basis" and a need for "greater levels of capital and allowance for loan and lease losses" that marked the beginning of the end for BankUnited.  ¶¶142, 144.

### C.    Defendants' Scheme, Part 3:  Concealing The Reasons For BankUnited's Efforts To Raise Capital

A simple review of a timeline of facts alleged makes it clear that the Complaint alleges sufficient facts to establish that Defendants were aware that their statements about BankUnited's capitalization were false.  Although BankUnited first disclosed on August 25, 2008 that the OTS had advised it of "certain concerns" including, perhaps the most grave among them, that BankUnited was required to undertake "efforts to seek to raise at least $400 million of capital," Defendants knew that BankUnited was facing acute capitalization problems for over a year prior to this disclosure.  ¶¶137, 181.  On December 8, 2006, BankUnited filed a preliminary proxy statement in connection with an increase in the number of outstanding shares of BankUnited stock from 60 million to 100 million shares.  ¶181.  Three and a half months later, on April 18, 2007, the Company filed a registration statement for an indeterminate number of securities at an indeterminate amount and announced a $160 million offering of HiMEDS securities, ostensibly for various "general corporate purposes" that did not include covering anticipated loan losses (despite analyst observations that BankUnited's loan loss reserves were at "very thin levels" relative to its peers). ¶¶176-78, 182.  Following an over-allotment sale in May 2007, the HiMEDS offering, raised approximately $178.5 million for BankUnited.  ¶179.

On January 2, 2008, while Defendants were in discussions with the OTS and had become aware of the OTS' concerns about BankUnited's Option ARM lending practices, loan loss reserves, and capitalization (¶¶20, 27, 34-35, 82, 95), the Company filed a registration statement in connection with a proposal to raise *$400 million* in capital (¶183) – precisely the amount that BankUnited would eventually disclose that the OTS had required it to raise.  ¶137.  The Complaint describes how, consistent with the OTS' directions, the Company took steps to undertake a $400 million secondary offering throughout the remainder of the Class Period, including filing two preliminary proxy statements on May 6, 2008 and June 17, 2008 to increase

12

the number of outstanding BankUnited shares from 100 million to 200 million, and from 200 million to 500 million shares, respectively.   ¶¶185-86.  Finally, after the market closed on June 18, 2008, the Company filed a series of documents with the SEC to effectuate a $400 million secondary stock offering, thus finally demonstrating the reality of the dire capital position at BankUnited, and ending the Class Period.  ¶257.

## ARGUMENT

### I.   LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS A SECURITIES FRAUD COMPLAINT

Plaintiffs' §10(b) and Rule 10b-5 claims must satisfy federal notice pleading requirements and the requirements of Fed.R.Civ.P. 9(b) and the PSLRA.  "In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Hubbard v. BankAtlantic*, 625 F. Supp. 2d at 1277-78 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Under this standard, on a Motion to Dismiss, the Court must accept all well-pled factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *Garfield,* 466 F.3d at 1261; *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n. 2 (11th Cir. 2001).  The Supreme Court reaffirmed the application of this standard to cases brought under the PSLRA, noting also that "private securities litigation [i]s an indispensible tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets."  *Tellabs*, 551 U.S. at 320-322 n. 4 (quotations omitted).

Rule 9(b)'s particularity requirement is met when the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba*, 256 F.3d  at 1202 (citation omitted).  "A sufficient level of factual support for a [10(b)] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when, where, and how:  the first paragraph of any newspaper

story.'"   *Garfield*, 466 F.3d at 1262 (citation omitted).[7]

The PSLRA requires the Complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. §78u-4(b)(1); *see also, In re 21st Century Holding Co. Sec. Litig.*, 07-61057, 2008 U.S. Dist. LEXIS 108196, at *12-13 (S.D. Fla. Nov. 7, 2008).   Contrary to Defendant Camner's assertion, the Eleventh Circuit in *Mizzaro*, 544 F.3d at 1239, did not "state" that this particularized pleading standard is "even more demanding than would be required to avoid a motion for summary judgment."   Camner Br. at 6.   The court in *Mizzaro* simply stated that the test is *not the same* as the standard employed for summary judgment.   In fact, *Mizzaro* was not even addressing the pleading standard for particularity under the PSLRA, it was addressing the PSLRA's pleading standard for scienter as delineated by the Supreme Court in *Tellabs*.[8]

Notwithstanding the word "all" in §78u-4(b)(1), it is not required that Plaintiffs plead with particularity *every* fact upon which their beliefs concerning false or misleading statements are based.   "Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs."   *Novak v. Kasaks*, 216 F.3d 300, 313, 314 n. 1 (2d Cir. 2000) (noting that reading "all" literally would produce illogical results that "Congress cannot have intended"); *In re Employee Solutions Sec. Litig.*, CIV 97-545, 1998 U.S. Dist. LEXIS 16444, at *13 (D. Ariz. Sept. 22, 1998) ("Defendants contend that the complaint does not set forth the basis and sources for the information and belief allegations as required by the PSLRA.   Plaintiffs respond that the complaint states that its allegations are based on an extensive investigation by plaintiffs' attorneys, and mentions the documents reviewed by the attorneys.   That is sufficient.").   Indeed,

---

[7] Defendant Camner mistakenly implies that notice pleading under Fed.R.Civ.P. 8(a), and the pleading requirements under Fed.R.Civ.P. 9(b) and the PSLRA are mutually exclusive.   Camner Br. at 5.   However, the Eleventh Circuit has cautioned that "Rule 9(b) must not be read to abrogate rule 8 ... and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading."   *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir. 1985).

[8] With respect to the PSLRA's pleading requirement of a "strong inference" that the defendant acted with *scienter*, *Tellabs* actually *relaxed* the ordinary rule under which a tie goes to the defendant.   *See Tellabs*, 551 U.S. at 330 (Scalia, J., concurring).   *See also In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1292 n. 8 (M.D. Fla. 2007) (magistrate's recommendation), adopted, 541 F. Supp. 2d 1283 (M.D. Fla. 2008).

as this Court noted in *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1372 n. 30 (S.D. Fla. 2001), "It is important to observe that the PSLRA, although mandating more particular pleading, in no way altered the standard of review applicable to the well pleaded allegations of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (*i.e.*, the allegations are viewed in the light most favorable to the plaintiff)."

The PSLRA requires that the Complaint allege, with particularity, facts giving rise to a strong inference that Defendants acted with scienter. 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "In this Circuit this scienter requirement is satisfied by showing that the defendants had 'an intent to deceive, manipulate or defraud' or that the defendant 'acted with a severely reckless state of mind.'" *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1183 (S.D. Fla. 2005) (quoting *Bryant*, 187 F.3d at 1282-83).[9]

## II.   THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS CAMNER, ORTIZ AND LOPEZ ACTED WITH SCIENTER

### A.   Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

In *Tellabs*, the Supreme Court addressed the PSLRA's scienter pleading requirements and held that courts must "accept all factual allegations in the complaint as true" and then determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 323 (emphasis in original).

*Tellabs* cautioned that a court's job is "to assess all the allegations holistically," and to determine whether the allegations "accepted as true and taken collectively, would [allow] a reasonable person [to] deem the inference of scienter at least as strong as any opposing inference." 551 U.S. at 326. Moreover, in determining whether a complaint alleges facts giving rise to a strong inference of scienter, a court may "take into account" only those "plausible opposing inferences" – *i.e.*, plausible non-culpable explanations for the defendants' conduct – that may be "rationally drawn *from the facts alleged*." *Tellabs*, 551 U.S. at 314 (emphasis

---

[9] Defendants repeatedly suggest that Plaintiffs are required to show that Defendants *intentionally* or knowingly committed fraud. Camner Br. at 26, 30; O&L Br. at 34, n. 33. Although Plaintiffs' allegations suffice to allege intentional misconduct, it should be noted that in this (and every other) Circuit, allegations that give rise to a strong inference of *reckless* misconduct on Defendants' part are equally sufficient to plead scienter. *See, e.g., Garfield*, 466 F. Supp. 3d at 1264 (citing *Bryant*, 187 F.3d at 1282 n. 18).

added).  The Court further emphasized that "[t]he inference that the defendant acted with scienter need not be irrefutable ... or even the 'most plausible of competing inferences,'" *id.* at 324 (citation omitted), but rather need only be "*at least as likely as* any plausible opposing inference." *Id.* at 328 (emphasis in original).  In other words, any "ties" go to plaintiffs.

Notwithstanding the Supreme Court's directives that allegations must be considered "collectively" and "accepted as true," Defendants analyze the Complaint in a stilted and piecemeal fashion, disregarding key factual allegations, while arguing that other select allegations  fail "without more" or "alone" to support a strong inference of scienter.  *See*, *e.g.*, O&L Br. at 33 (no inference of scienter from performance based bonus "without more"); *id.* at 36; Camner Br. at 32 (no inference of scienter from GAAP violations "alone").

Under *Tellabs*, the test for pleading scienter is:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  551 U.S. at 326.  Here, the totality of facts alleged plainly support a strong inference under *Tellabs* that Defendants either knew or recklessly disregarded that their statements regarding BankUnited's underwriting practices, capital levels, and the accuracy of BankUnited's financial statements were materially false or misleading.  Lead Plaintiffs allege a plethora of "red flags" that should have placed Defendants on notice that BankUnited was engaged in wrongdoing to the detriment of investors.  *Garfield*, 466 F.3d at 1266-67 (scienter can be established when there are "glaring accounting irregularities or other 'red flags' that the financial statements contained material misstatements or omissions"); *In re Eagle Bldg. Techs.* 319 F. Supp. 2d 1318, 1328 (S.D. Fla. 2004) ("Red flags are those facts which come to the attention of [a defendant] which would place a reasonable [defendant] on notice that the ... company was engaged in wrongdoing to the detriment of its investors").  *See also In re Hamilton Bancorp, Inc.,* 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002) (red flag alleged where auditor knew that OCC was conducting investigation of bank).

### 1.    The Cease And Desist Orders And SEC Correspondence Clearly Support Lead Plaintiffs' Allegations Of Scienter

In an effort to evade this highly probative if inconvenient fact, Defendants go to great lengths to misrepresent the Cease and Desist Order and incorporated Stipulation entered into

between the Bank and its regulator, the OTS.[10]  Defendant Camner describes it as "a comment regarding 'deterioration in the Bank's real estate portfolio' due to market conditions."  Camner Br. at 10.  Defendants Ortiz and Lopez claim Plaintiffs' allegation that BankUnited engaged in "unsafe and unsound" lending practices merely ask this Court to make "unwarranted deductions."  O&L Br. at 8.  The Cease and Desist Order and Stipulation (Plts' Ex. 1) reveal how disingenuous these assertions are.  The Stipulation in its first paragraph states that "the OTS is of the opinion that grounds exist to initiate an administrative proceeding against [the Bank] pursuant to 12 U.S.C. §1818(b)."[11]

Under the heading "***OTS Findings of Fact***" the Stipulation states:

> ***Based on its January 31, 2008 Report of Examination of [the Bank], the OTS finds that [the Bank] has engaged in unsafe and unsound practices that have resulted in [the Bank] being in an unsatisfactory condition***, primarily due to the rising delinquencies and defaults in its payment option arm loan portfolio, a significant portion of which was originated on a 'stated income' basis.  The deterioration in this portfolio has resulted in the need for greater levels of capital and allowance for loan and lease losses.[12]

¶¶39, 142, 144.  Further, the Cease and Desist Order, under the heading "***Loan Analysis and Reporting***" states:

> Effective immediately, the Board shall ensure that [the Bank] has, maintains and adheres to internal loan analysis and reporting policies and procedures that, at a minimum, (a) ***address the concerns and recommendations noted by the OTS in its January 31, 2008 Report of Examination (2008 Examination); (b) ensure that [the Bank] appropriately measures the multiple layered risks in its loan portfolio.***

*Id.*  Further, the Cease and Desist Order, under the heading "***Allowance for Loan and Lease Losses***" ("ALLL") states:

---

[10] A similar Cease and Desist Order and Stipulation was entered into between BankUnited Financial Corp. and the OTS ("BUFC Cease and Desist").

[11] Title 12 U.S.C. §1818(b)(1) permits the OTS to issue a Cease and Desist Order if a bank or affiliated party is engaging or has engaged in various proscribed activities, including engaging in an unsafe or unsound practice in conducting the business of a depository institution.

[12] Both Stipulations were signed by Defendants Camner and Ortiz and each stated, "Each Director signing this Stipulation attests that he or she voted in favor of a Board Resolution authorizing the consent of [BUFC/the Bank] to the issuance of the [Cease and Desist] Order and the execution of the Stipulation."

Within thirty (30) days, the Board shall prepare and submit to the Regional Director for review and comment a detailed written plan to ensure that [the Bank] maintains and adheres to ALLL policies, procedures, timeframes, and calculation inputs and criteria that provide for the timely establishment and maintenance of adequate and appropriate ALLL (ALLL Program).  The ALLL Program shall, at a minimum:  (a) *address the concerns and recommendations noted in the 2008 Examination; and (b) fully comply with (i) Generally Accepted Accounting Principles (GAAP); (ii) OTS Chief Executive Officer Letter No. 250 (December 13, 2006)*, (iii) Section 261 of the OTS Examination Handbook, and (iv) all other applicable regulatory guidance regarding ALLL.

*Id.* at ¶¶142-145.[13]  In addition to the January 31, 2008 Report of Examination referenced in the Cease and Desist Order, BankUnited's 3Q Form 10-Q filed on August 25, 2008 stated:

BankUnited has been advised by the OTS of certain concerns that BankUnited has agreed to address.  *Several of the measures addressing these concerns were already in progress at the time the Company and the Bank entered into agreements with the OTS to address the concerns.  At this time, some of the measures have been completed and others are in progress. These measures include efforts to seek to raise at least $400 million of capital* and to submit an alternative capital plan to be applicable if the Company is unable to raise the $400 million; *termination of the option ARM loan program ...; termination of reduced and no documentation loan programs*; reduction of the portfolio of negative amortization loans; and enhanced monitoring and internal reporting, as well as reporting to regulators on option ARM loan reduction efforts, preservation and enhancement of capital, mortgage insurance and liquidity strength.

*See* June 30, 2008 Form 10-Q, Plts' Ex. 4 at 22, 24, 61; ¶137.

BankUnited sought to raise, not coincidentally, $400 million in capital as early as January 3, 2008 (¶96), and on June 18, 2008, filed a series of documents to effectuate the $400 million offering.  ¶132.  Also, BankUnited terminated its payment Option ARM loan program on or about May 5, 2008 (Plts' Ex. 4 at 53).  Further, "during the second quarter of 2008 [which ended March 31, 2008], BankUnited ceased originating stated income, reduced documentation or no documentation loans."  *See* BankUnited Form 10-Q for the period ended March 31, 2008, MTD1225, and BankUnited's Form 10-Q/A for the period ended March 31, 2008, MTD1334. ("[D]uring the second quarter of 2008, BankUnited ceased originating stated income, reduced

---

[13] The December 13, 2006 OTS Chief Executive Officer Letter; which contains the 2006 Interagency Policy Statement on the Allowance for Loan and Lease Losses ("2006 ALLL Policy Statement"), Plts' Ex. 3, is discussed further *infra*.  These allegations and others in the Complaint (¶¶20, 95) debunk Defendant Camner's argument (Camner Br. at 15 n. 8) that the Complaint fails to allege "the OTS raised any issue regarding the amount of allowances."

documentation or no documentation loans."). These documents and disclosures raise a strong inference that, at least as early as January 3, 2008, "BankUnited [had] been advised by the OTS of certain concerns" regarding BankUnited's undercapitalization, Option ARM loan program and reduced and no documentation loan programs, which BankUnited agreed to address and, that no later than May 5, 2008, BankUnited entered into agreements with the OTS to address these concerns, none of which was disclosed to the investing public.[14]

This inference is also corroborated by confidential witness statements that during the Class Period Defendants Camner, Ortiz and Lopez were well aware of the OTS' concerns about BankUnited's Option ARM lending practices, loan loss reserves, and capitalization.[15] ¶¶20, 41, 95. Such investigations by government agencies and resultant Cease and Desist Orders have been held to bolster the inference of scienter at this stage of the litigation. *See Eastwood Enters., LLC v. Farha*, 07-CV-1940, 2009 U.S. Dist. LEXIS 88945, at *13 (M.D. Fla. Sept. 28, 2009) ("Additionally, the investigations into WellCare by various government agencies only serve to bolster the inference of scienter at this stage of this action. Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, *i.e.*, that the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored.") (citing cases); *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1371 (M.D. Fla. 2008) (Where class period ended in January 2007, "knowledge [by the top officers of the company] of the cease and desist order of May 2007, coupled with the GAAP violations alleged, further supports sufficiency of the allegations."); *In re Hamilton Bancorp,* 194 F. Supp. 2d at 1359 (that the OCC was conducting an intensive investigation of bank served as a red flag to support an inference of scienter).[16]

---

[14] *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) ("It is axiomatic that a corporation ... cannot act other than through its officers, employees, and agents"). Defendants Camner, Ortiz and Lopez were the highest ranking officers of BankUnited.

[15] Defendants scoff at Plaintiffs' use of the word "concerns" (Camner Br. at 10, 25; O&L Br. at 31, 34), but this is precisely the word used by Defendants. *See* ¶137. ("BankUnited has been advised by the OTS of certain concerns that BankUnited has agreed to address."). These concerns are detailed in the Cease and Desist Order and can be inferred from Defendants' disclosure. ¶¶137, 145. If Plaintiffs' allegations about OTS' "concerns" are impermissively vague, so too were the disclosures about those concerns in BankUnited's SEC filings.

[16] Also, Confidential Witness 4 was, prior to resigning from BankUnited in March 2008, contacted by the SEC in connection with an investigation of BankUnited. ¶20. Subsequently,

Independent of the fact that it is based on a January 31, 2008 OTS Report of Examination – during the Class Period – Defendants' efforts to dismiss the Cease and Desist Order as non-probative and "after the Class Period terminated," (Camner Br. at 25) are mistaken. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("[P]laintiffs' partial reliance on alleged facts dating from the post-class period does not amount to 'fraud by hindsight'"); *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("[A]llegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (both post- and pre-class period data could be used to "confirm what a defendant should have known during the class period"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (declining to adopt defendants' reasoning that post-class period news articles could not establish what defendants should have known at the time statements were made, "Defendants provide nothing to impugn the veracity of these post-dated news articles. To accept defendants' reasoning, I should reward them for their successful concealment of their wrongdoing.").[17]

Equally telling is Defendant Lopez's response to the SEC's March 7, 2008 letter to Defendant Camner requesting that BankUnited provide material information not included in its 2007 Form 10-K. The SEC wrote:

> It appears that you have significant operational difficulties, and have experienced a decline in your capital adequacy and liquidity. Describe any agreements or understandings, written or oral, with your regulatory agencies or their representatives.

---

Defendant Lopez responded to a March 7, 2008 inquiry from the SEC to Defendant Camner questioning the Company's disclosures in its 2007 Form 10-K and Form 10-Q for the 1Q of 2008. ¶109. BankUnited disclosed a third contact with the SEC in December 2008. ¶150.

[17] Defendants' "allegation" that the OTS Examination was not an extraordinary event but rather "a required periodic exam" (O&L Br. at 35 n. 35) is not only an improper denial of Plaintiffs' allegations, it is belied by Defendants' own words. *See* Transcript of July 26, 2007 Conference Call, Plfs' Ex. 5 at 12; MTD1501; ¶75. When an analyst asked, "With regard to regulatory exams, can you tell us when your last one was or when your next one might be upcoming in terms of the evaluation on the loan portfolio?" Defendant Ortiz responded, "The last safety and soundness exam, the exit was a few months ago," and Defendant Lopez added, "And they're typically on a 12 to 15 month rotation." If BankUnited was on a 12 to 15 month rotation for its safety and soundness exam, and the last one ended a "few months" before July 26, 2007, one would not expect another exam until, at the earliest, sometime in the late spring of 2008. When OTS arrived in November 2007 – January 2008, it was well in advance of that typical cycle.

¶¶41, 109; MTD1594.  In response, Defendant Lopez did not attempt to deny the SEC's assertions about "significant operational difficulties" or a decline in "capital adequacy and liquidity," as one would expect if Defendants truly believed there were no such problems. Rather, Defendant Lopez wrote, "We do not have any agreements or understandings, written or oral, with our regulators, agencies or their representatives at the present time.  We have not been subject to any regulatory actions or received any recommendations from our financial regulators."[18]  *Id.*  Moreover, the exact argument made by Defendants – that they were precluded from revealing information about an OTS investigation, and therefore lacked scienter as to alleged misrepresentations in that regard – was recently rejected in *Folsom v. Indymac Bancorp, Inc.*, Case No. CV-08-3812-GW (VBKx), slip op. (C.D. Cal. Aug. 31, 2009), Plts' Ex. 6 at 30 ("[E]ven if [defendant] was nominally precluded from discussing the OTS investigation, once he speaks, he had an obligation to do so in a non-fraudulent/non-misleading manner.").  Similarly, here, once Defendant Lopez made representations about BankUnited's dealings with the OTS, he had an obligation to do so in a non-fraudulent/non-misleading way.

### 2. Defendants' Knowledge Of And Failure To Follow Interagency Lending Guidelines Support An Inference Of Scienter

The Complaint alleges (¶¶47, 66), and Defendant Camner admits (Camner Br. at 12), "BankUnited emphasized" its "practices were fully consistent with the Interagency Guidelines as ultimately issued by the Federal Agencies including the OCC, the FDIC, and the OTS." (*Id.* citing BankUnited public statements at n. 4).  However, this was false.  On October 4, 2006, an interagency group of federal banking regulators jointly drafted and published in the *Federal Register*, Interagency Guidance on Nontraditional Mortgage Product Risks ("2006 Guidelines").[19]  The 2006 Guidelines, attached hereto, addressed "risks associated with the

---

[18] The SEC's observation begs the question as to why the SEC would have made that statement. Notwithstanding Defendants' protestations about the "confidentiality of OTS examinations," OTS regulations clearly indicate that the Report of Examination may have been requested by and furnished to the SEC.  *See* 12 C.F.R. §510.5(c)(4) ("Reports of Examination and other information may be made available by the OTS to other agencies of the United States ... for use where necessary in the performance of their officials duties.").

[19] Defendant Camner was aware of these 2006 Guidelines, as during a conference call on October 24, 2006 (¶46), transcript at MTD1368, Camner referenced the Guidelines and stated,

growing use of mortgage products that allow borrowers to defer payment of principal and, sometimes, interest," including Option ARM mortgages.  Plts' Ex. 7, 71 Fed. Reg. 58,609 (2006).[20]

Importantly, the 2006 Guidelines specifically warned:

> ***Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ('reduced documentation') and are increasingly combined with simultaneous second lien loans.  Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans***.

***

> [T]he Agencies ... expect institutions to effectively assess and manage the risks associated with nontraditional mortgage loan products.  Institutions should use this guidance to ensure that risk management practices adequately address these risks.  The Agencies will carefully scrutinize risk management processes, policies, and procedures in this area.  *Institutions that do not adequately manage these risks will be asked to take remedial action*.

*Id.* at 58,613.  With respect to ***Qualifying Borrowers***, the 2006 Guidelines stated in relevant part:

> For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by` final maturity at the fully indexed rate, assuming a fully amortized repayment schedule.  ... ***Furthermore, the analysis of repayment capacity should avoid over reliance on credit scores as a substitute for income verification in the underwriting process.  The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets and outstanding liabilities***.

*Id.* at 58,614.  With respect to ***Risk Layering***, the 2006 Guidelines stated in relevant part:

> ***Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with reduced documentation or a simultaneous second-lien loan, face increased risk.***  When features are

---

"We do not anticipate that those recommendations will have a significant impact on our operations because we already followed many of those practices for a number of years."

[20] The Federal Register Act, 44 U.S.C. §1507, requires that the contents of the *Federal Register* be judicially noticed.  Further, a court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority.  *Int'l Brotherhood of Teamsters v. Zantop Air Transport Corp.*, 394 F.2d 36, 40 (6th Cir. 1968); *Southwest Ga. Fin. Corp. v. Colonial Am. Cas. & Sur. Co.*, 08-CV-55 (HL), 2009 U.S. Dist. LEXIS 42428, at *2-3 (M.D. Fla. May 19, 2009).

layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity.

*Id.*  With respect to ***Reduced Documentation***, the 2006 Guidelines stated in relevant part:

> Institutions increasingly rely on reduced documentation, ***particularly unverified income***, to qualify borrowers for nontraditional mortgage loans.  ***Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be used with caution.  As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity.  ... For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.***[21]

*Id.*  With respect to ***Management Information and Reporting***, the 2006 Guidelines stated in relevant part:

> Reporting systems should allow management to detect changes in the risk profile of its nontraditional mortgage loan portfolio.  ... ***At a minimum, information should be available by loan type (e.g., interest-only mortgage loans and payment option ARMs); by risk-layering features (e.g., payment option ARM with stated income and interest-only mortgage loans with*** simultaneous second-lien mortgages); by underwriting characteristics (*e.g.*, LTV, DTI, and Credit Score); and by borrower performance (*e.g.*, payment patterns, delinquencies, interest accruals, and negative amortization).[22]

*Id.* at 58,616.  With respect to ***Capital and Allowance for Loan and Lease Losses***, the 2006 Guidelines stated in relevant part:

> ***Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios.***  They should also consider the higher risk of loss posed by layered risks when establishing their ALLL. ... Capital levels should be commensurate with the risk characteristics of the nontraditional mortgage loan portfolios.  ***Lax underwriting standards or poor portfolio performance may***

---

[21] Contrary to BankUnited's practices, the 2006 Guidelines defined "Reduced Documentation" as a:  "loan feature that is commonly referred to as 'low doc/no doc', 'no income/no asset,' 'stated income' or stated assets.'  For mortgage loans with this feature, an institution sets reduced or minimal documentation standards to substitute the borrower's income and assets."  *Id.* at 58,618.  As discussed below, BankUnited misleadingly did not include "stated income" or no document loans in the percentage of its portfolio made on a "reduced documentation" basis.

[22] As also discussed below, BankUnited *never* disclosed during the Class Period the percentage of its loan portfolio which was *both* Option ARM *and* made on a less than fully documented basis until mandated by the SEC in the 10-Q filed on August 11, 2008.

23

> ***warrant higher capital levels***.

*Id.* With respect to ***Control Systems***, the 2006 Guidelines stated in relevant part:

> Institutions should develop and use strong control systems to monitor whether
> actual practices are consistent with their policies and procedures relating to
> nontraditional mortgage products. ... ***Attention should be paid to appropriate
> legal review and to using compensation programs that do not improperly
> encourage lending personnel to direct consumers to particular products.***

*Id.* at 58,618.

Many of these same concerns and cautionary principles were reiterated in a July 10, 2007
Interagency Statement on Subprime Mortgage Lending, 72 Fed. Reg. 37,569 (¶230c) ("July 2007
Interagency Statement"), which noted that, "While the Statement has retained its focus on
subprime borrowers, the Agencies note that institutions generally should look to the principles of
this Statement when such ARM products are offered to non-subprime borrowers." Plts' Ex. 8 at
37,570-71.

With respect to ***Reduced Documentation or Stated Income Loans***, the July 2007
Interagency Statement stated:

> ***The Agencies believe that verifying income is critical to conducting a credible
> analysis of borrowers' repayment capacity*** ... [S]tated income and reduced
> documentation should be accepted only if there are mitigating factors that clearly
> minimize the need for verification of repayment capacity.

*Id.* at 37,571.

These pronouncements from BankUnited's regulators expose the weaknesses of most of
Defendants' arguments. Defendants concealed BankUnited's true risk profile, emphasizing
instead the borrowers with high FICO scores and that "underwriting is performed at the fully
indexed rate." Defendants used these two "facts" to bolster their misrepresentations that
BankUnited engaged in "conservative" underwriting which was "fully consistent" with Federal
Agency Guidelines. ¶¶26, 49, 50, 53, 59, 64, 66, 74, 80, 90, 94, 102, 103, 105, 108, 117, 118,
126, 217. However, these were rank misrepresentations given that BankUnited was ignoring the
main focus of the Federal Guidelines which was "layered risk," or, *i.e.*, the granting of Option
ARM loans on less than full documentation. As ultimately disclosed when required by the SEC,
Option ARM loans made on less than full documentation made up a whopping 76.9% of
BankUnited's Option ARM portfolio. MTD1227. If "no doc" Option ARM loans are included,

24

this figure rises to 87.6%.  *Id.*[23]

Similarly, as made clear in the 2006 Guidelines, a FICO score does not substitute for good underwriting.  2006 Guidelines at 58,614.  Yet, for well over half of BankUnited's riskiest Option ARM loans, borrowers' income was not verified.  MTD1336.[24]

Thus, while Defendants' statements about borrowers' FICO scores and fully indexed rate underwriting may have been literally true (although as explained in the Complaint, ¶49 n.2, BankUnited's negative amortization rate raises an inference that it wasn't), they were still misleading in light of the 2006 Guidelines and BankUnited's undisclosed risk layering practices. *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007) ("Defendants' contention that the statements are literally true statements is unavailing where Plaintiffs' claims are based on Defendants' failure to disclose additional material information when making those true statements. ... '[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'") (citations omitted).  *See also*, *In re Gilead Scis. Sec. Litig.*, C-03-4999, 2009 U.S. Dist. LEXIS 46751, at *12-13 (N.D. Cal. June 3, 2009) ("[A] statement that is literally true can be misleading and thus actionable under the securities laws.") (citations omitted).

### 3.      Confidential Witnesses Confirm Defendants' Scienter

Supported by information obtained from numerous confidential witnesses, all of whom are specifically described by their positions and duties during their employment at BankUnited during the Class Period (¶20), Plaintiffs' allegations easily satisfy the standard for alleging a

---

[23] With respect to fn. 3 of the Complaint, Plaintiffs are correct.  O&L Br. at 9 n. 6. The 2Q 2008 Form 10-Q *did* contain a reporting error, and it is indeed the second quarter 2008 Form 10-Q because, as Defendants should know, BankUnited had a September 30th year end.  Moreover, not only was the reporting error in the 2Q 2008 Form 10-Q, it was *repeated* in the 2Q 2008 Form 10-Q/A.  *See* MTD1223 and MTD1332.  Further, the error relates to *both* the percentage of limited documentation loans and the percentage of no documentation loans in the payment option loan portfolio.  *Compare Id.* at  MTD1223 with MTD1227 and MTD1332 with MTD1336.

[24] Defendant Camner takes issue with Plaintiffs' use of the words "risky" and "liar's loans" (Camner Br. at 26), but the 2006 Guidelines were promulgated specifically to address the "risks" associated with nontraditional mortgages such as payment Option ARM loans.  Particularly because BankUnited was engaging in "risk layering," the description is extremely apt.

strong inference of scienter.[25]  As detailed below, the confidential witnesses provide a compelling, corroborated description of BankUnited's true and deficient lending and accounting practices as Defendants knowingly or recklessly fed the public a fiction of a prudent, conservative, adequately capitalized Bank, in compliance with regulations.

Defendants contend that the confidential witnesses are virtually irrelevant, dismissively referring to their descriptions as "vague" or "generalized."  Camner Br. at 28-29; O&L Br. at 29-31.  Nothing, however, could be further from the truth.  Virtually all of the witnesses were executives with direct, first-hand knowledge of Defendants' understanding of BankUnited's underwriting and appraisal policies, lending standards, loan loss reserves, financial statements, and communications with the OTS.  Among other things, these former BankUnited employees confirm that:

●    Defendants placed BankUnited on a path where pushing large volumes of Option ARM loans to risky borrowers without verifying their creditworthiness (primarily through its "wholesale" division staffed by non-employee mortgage brokers) became on an almost maniacal mission during the Class Period.  ¶¶20, 27.

●    Limited and no-documentation loans or "liar's loans" made up an increasingly dominant part of BankUnited's Option ARM portfolio.  ¶¶20, 27.

●    Defendants Camner and Ortiz were particularly interested in pushing the use of Option ARM loans at BankUnited, and Defendant Camner did not was diversification away from Option ARMs which resulted in BankUnited basically taking away the incentives for brokers to sell any product other than Option ARMs.  ¶¶20, 27.

●    There was a corporate culture of "extreme pressure to hit numbers" from the loan production staff and consequently, "pressure to pass on deals without diligent review" starting in early 2006 through December 2007.  ¶¶20, 28.

●    There were, from one individual, nearly 500 documented incidents of knowingly overstated property values and other inappropriate appraisal practices, resulting from pressures on BankUnited's loan production operations by Defendants and BankUnited's policies, including

---

[25] These witnesses include an in-house appraiser, an Executive Vice President of residential lending, a credit analyst, and Supervising Senior Manager for Financial Analysis, a CPA who served as a financial reporting manager and who was involved in preparing BankUnited's SEC filings, a financial analyst who performed analyses on loan losses, a "wholesale lending" account executive, an Assistant Vice President in the Finance Department and the Regulatory Reporting and Analysis Group, and a Senior Vice President of Retail Lending.

specific examples detailed in the Complaint.[26]  ¶¶29, 32.

●　　　Defendants attended weekly executive management meetings held every Monday in the Executive Conference Room in Coral Gables, held for the benefit of Defendant Camner, that included presentations regarding loan production and discussions regarding loan loss provisions and the impact any such provisions would have on the Company's quarterly reports. ¶¶14, 20, 206.

●　　　Unusual numbers of OTS personnel were onsite at BankUnited's Coral Gable headquarters on a daily basis from approximately November 2007 through May 2008 (¶¶20, 35), and met frequently with Defendants Camner and Lopez.  ¶41.

●　　　The OTS was concerned about BankUnited's Option ARM lending practices as early as the summer of 2007 when the OTS had been pressuring BankUnited to "perhaps limit Option ARMs."  ¶¶34, 82, 95.

●　　　Defendants all became aware of the OTS' concerns about the inadequacy of BankUnited's loan loss reserves in late 2007 – early 2008.  ¶¶20, 95.

●　　　The OTS was concerned about BankUnited's capitalization no later than early 2008.  ¶20.

●　　　Defendants all had a role in determining loan losses and related accruals.  ¶20.

●　　　Defendant Camner was deeply and personally involved in BankUnited's lending and underwriting practices, including with respect to BankUnited's adherence to standards governing reviews of appraisals of properties backing BankUnited's mortgages and, in the summer of 2006, personally traveled to California to tell an in-house appraiser that while he understood that the in-house appraiser had a duty to cut appraisals that were inappropriate, the appraiser should "cut them, but not too many."  ¶¶20, 165.

●　　　Despite the fact that Defendants became aware of escalating loan losses, they routinely failed to approve increased loan loss reserves to levels that accurately reflected anticipated losses, deciding instead to limit reserves for loan losses.  ¶¶20, 166.

It is entirely appropriate for this Court to credit the detailed and corroborated allegations based on the various confidential former employee sources referenced in the Complaint.

---

[26] Defendant Camner's "allegation" (Camner Br. at 2) that BankUnited's loans were secured by homes "valued well above loaned amounts," is particularly inappropriate, since Plaintiffs specifically allege that Defendants' inappropriate appraisal practices were part of what made their representations about BankUnited's underwriting policies false and misleading.

*Mizzaro*, 544 F.3d at 1239-40 (declining to require identification of confidential sources in securities fraud complaints, "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge.").[27]  *Accord Marrari*, 395 F. Supp. 2d at 1188.  The Court in *Mizzaro* rejected the same "confidential sources must be heavily discounted" argument advanced by Defendant Camner (Camner Br. at 32), stating. "[C]onfidentiality ... should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." 544 F.3d at 1240.[28]  *See also, Hubbard*, 625 F. Supp. 2d at 1284 (noting that *Mizzaro* held, "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case").[29]

Contrary to Defendants' mischaracterizations, Plaintiffs provide sufficient detail to describe the job positions of the witnesses, the information provided by the witnesses and the basis of the witnesses' knowledge.  *Grand Lodge*, 550 F. Supp. 2d at 1370 (finding allegations as to witnesses were "in sufficient detail to suggest reliability among them").

---

[27] *Mizzaro* confirmed the prevailing rule that "[n]ot only may confidential witnesses satisfy the particularity requirements, they may also form the basis on which an inference of scienter may be alleged."  *Grand Lodge*, 550 F. Supp. 2d at 1370; *In re 21st Century*, 2008 U.S. Dist. LEXIS 108196, at *18-21 (S.D. Fla. Nov. 7, 2008).

[28] Defendant Camner's reliance on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757-58 (7th Cir. 2007), for the proposition that the Court must "discount confidential source allegations" is seriously misplaced.  Camner Br. at 32.  Just months after the *Higginbotham* decision, the *same* court held in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*"), that confidential witnesses should not be discounted where the complaint adequately alleges that they were "in a position to know at first hand the facts to which they are prepared to testify." *Tellabs II*, 513 F.3d at 712 ("[T]he absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.").  As the latter case observed, not only were the sources in *Higginbotham* anonymous, they were also "described merely as three ex-employees of [the defendant company] and two consultants."  *Id.*

[29] In *Hubbard*, unlike here, there was "no specific information as to the confidential witnesses' positions in the Company, their employment duties, the foundation or basis for their knowledge, or whether they were even employed with the Company during the relevant times in the Complaint."  *Id.* at 1284.

### 4.    Defendants' Efforts To Raise Capital During The Class Period Support Lead Plaintiffs' Allegations Of Scienter

Defendants' knowledge of and failure to disclose BankUnited's deteriorating capitalization is outlined in allegations regarding BankUnited's efforts to raise capital during the Class Period.  Defendants did not disclose until August 2008 that the OTS had previously informed BankUnited that it needed to raise at least $400 million – and if it could not, "the OTS will reclassify the Bank to adequately capitalized primarily due to the deterioration in the Bank's nontraditional mortgage loan portfolio, the concentration of risk associated with that portfolio, and a resultant need for significant additional capital."  ¶137.  However, the Complaint alleges that Defendants were aware of the Bank's capital erosion long before August 2008.

- On April 18, 2007, after consistently touting its "strong capital position," (¶¶44-50, 65) BankUnited announced a $160 million offering of HiMEDS securities (¶177) which resulted in net proceeds of approximately $178.5 million.

- According to Confidential Witnesses, Defendants became aware of the OTS concerns about BankUnited's Option ARM lending practices during the summer of 2007, and OTS examiners were discussing these and related concerns with the Bank's senior management by November 2007.  ¶¶20, 34.

- Nevertheless from July 2007 through November 2007, in earnings releases and public filings, Defendants stressed BankUnited's "strong capital position."  ¶¶73, 83, 88, 89.

- On January 2, 2008, while the OTS' examination was underway, BankUnited filed a shelf registration in connection with a proposal to raise $400 million in capital.  ¶183.  This was at a time when Defendants were well aware of the OTS' concerns about BankUnited's capital position.  ¶20.

- On January 24, 2008, a week before the January 31, 2008 OTS Report of Examination, the basis for the OTS' finding that BankUnited engaged in "unsafe and unsound" practices, Defendant Camner emphasized BankUnited's "well capitalized business model" and "strong capital position." ¶¶102-10.

- On March 7, 2008, the SEC requested that BankUnited provide material information not included in its 2007 10-K, such as the percentage of BankUnited's Option ARM mortgages that were made on a reduced documentation basis.  In that Letter, the SEC noted, "It appears that you have significant operational difficulties, and have experienced a decline in your

capital adequacy and liquidity." ¶109.  As noted herein, Defendant Lopez did not dispute the SEC's observation in this regard.

● On May 6, 2008, Defendants filed a Preliminary Proxy Statement with the SEC announcing BankUnited's intention to amend its Articles of Incorporation to double the number of authorized Class A common shares – from 100 million to 200 million shares.  ¶185.

● On May 12, 2008, BankUnited issue its Form 10-Q for 2Q 2008 (the period ending March 31, 2008), in which Defendants represented that BankUnited continued to "maintain its strong capital position in excess of regulatory requirements." ¶117.

● On June 17, 2008, BankUnited filed a Preliminary Proxy Statement in connection with a further increase in the number of authorized Class A common shares from 200 million to 500 million shares – an increase of 250% (¶186), and on June 18, 2008, BankUnited filed documents to effectuate a $400 million offering of stock.  ¶187.

● On August 25, 2008, BankUnited filed a Form 10-Q for 3Q 2008 (the period ending June 30, 2008), which disclosed that BankUnited had agreed to address "certain concerns" of the OTS and set forth measures that were already in progress at the time BankUnited entered into agreements with the OTS to address its concerns, including, notably, making, "efforts to seek to raise at least $400 million of capital and to submit an alternative capital plan to be applicable if the Company is unable to raise the $400 million." ¶137.

This timeline strongly suggests Defendants knew BankUnited's capitalization was in jeopardy early into the Class Period given the HiMEDS Offering in April 2007, the repeated amendments to BankUnited's articles of incorporation, and the January 2008 shelf registration for $400 million – precisely the amount the OTS told BankUnited it needed.

> **5.      That Defendants' Misstatements And Undisclosed Facts All Related To BankUnited's Core Business Supports An Inference Of Scienter**

Defendants Camner, Ortiz and Lopez are all former BankUnited executives who were responsible for day-to-day management of BankUnited's affairs at the highest level, and who were aware of the critical importance of lending and appraisal standards and loan loss accounting to the accuracy and reliability of BankUnited's financial statements and other disclosures. ¶¶190, 202, 206.  As such, a strong inference arises that they possess the knowledge of matters central to BankUnited's core business and operations, such as less than fully documented Option ARM loans (which made up the majority of its residential loans) and its capitalization, two areas

which were vital to BankUnited's overall financial performance.

Defendants assert that Plaintiffs fail to allege a strong inference of scienter because each Defendant is not specifically tied to the fraud that BankUnited perpetrated. Camner Br. at 3, 30; O&L Br. at 36.  However, even ignoring the Complaint's specific allegations as to each Defendant (including the allegations sourced to various corroborating witnesses and the SEC's correspondence to Defendant Camner and from Defendant Lopez) (¶¶3, 14, 16, 20, 27, 28, 41, 53, 57, 95, 109, 127, 165, 166, 188, 190, 202, 203, 206, 207), knowledge of the truth concerning a business' core operations is frequently attributed to a company's senior officers.

For example, in *Tellabs II*, on remand from the Supreme Court, the Seventh Circuit agreed with Plaintiffs that it was "exceedingly unlikely" that the false statements about key parts of the Company's business were the result of "merely careless mistakes at the management level ... rather than of an intent to deceive or a reckless indifference to whether the statements were misleading," and further held "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key products] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity."  513 F.3d at 709.  Indeed, *Tellabs II* held that the more plausible inference was that facts critical to a company's core operations are known to the company's most senior officers:

> [A]t the top of the corporate pyramid sat [the CEO].  The 5500 and the 6500 were his company's key products.  Almost all the false statements that we quoted emanated directly from him.  Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is exceedingly unlikely.

*Id.* at 711.[30]  Similarly, in *South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008), the Ninth Circuit held that a plaintiff may adequately allege the scienter of key officers based on the "core operations" doctrine in three circumstances.  First, citing *Tellabs*, core operation allegations may

---

[30] Defendants' critique of Plaintiffs' scienter allegations by invoking group pleading (O&L Br. at 29) is a mismatching of concepts.  Group pleading relates to the PSLRA's and Rule 9(b)'s particularity requirements.  Here, Defendants are identified as makers of statements in press releases, conference calls, and as signers of SEC filings.  *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999) ("[S]tatements in group published information are presumed to be the collective action of corporate officers involved in the day-to-day management of the corporation.").

be used "in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations.'" *Id.* at 785 (citing *Tellabs*, 127 S.Ct. at 2510). Second, core operations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual *access* to the disputed information." *Id.* at 786 (emphasis added).[31]

Finally, where the nature of a relevant fact is sufficiently important to a company that "it would be 'absurd' to suggest that" its senior officers were unaware of the truth, a strong inference of scienter may again be inferred based on the "core operations" doctrine alone. *Id.* (citation omitted); *accord Schultz*, 488 F. Supp. 2d at 1226 n. 3 ("Courts have held that '[w]here accounting irregularities are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operation of the company.'") (citation omitted); *Primavera Investors v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) ("Each of the individual defendants held a controlling position during the class period, received advanced copies of the Liquidmetal's reports, corporate filings, and press releases, and personally participated in conference calls to analysts and investors. ... By virtue of their positions, [defendants] enjoyed both unfettered access to internal adverse information about Liquidmetal and ample opportunity to prevent the release of any misleading statement.").[32]

### 6. Defendants' Receipt Of Incentive Bonuses Tied To BankUnited's Financial Performance And Defendant Camner's Insider Stock Sales Support A Strong Inference Of Scienter

The Complaint alleges in detail how a substantial majority of each of the Defendants'

_____

[31] Defendants argue that it is not proper for Lead Plaintiff to infer that Defendants' statements with respect to BankUnited's capitalization were false and misleading because the OTS did not officially announce that BankUnited was not a "well-capitalized" institution until after the Class Period. O&L Br. at 10-11; Camner Br. at 10. This argument is, however, rather specious since it ignores the fact that the reality of this conclusion was readily apparent to Defendants well before the OTS made its final announcement, rendering Defendants' statements about the Bank's "strong capital position" (including that that position exceeded regulatory requirements) fundamentally false and misleading.

[32] *See also*, *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1066 (C.D. Cal. 2008) ("[I]t would be difficult to conclude that those Defendants at the top levels of [company] management did not know what was going on in their entire business.").

compensation during the Class Period consisted of performance-related cash and stock bonuses. ¶¶191-196, 206-210.  Although Defendants' receipt of substantial incentive bonuses based on BankUnited's performance does not independently establish Defendants' scienter, it nevertheless can support such an inference.  *In re Paincare*, 541 F. Supp. 2d at 1293 (that defendants' bonuses were tied to the company's earnings added to an inference of scienter).

Here, Defendants each stood to reap direct economic benefits as a result of performance-based bonuses and stock-based compensation that were tied directly to BankUnited's short-term financial performance.  In particular, over 92.5% of Defendant Camner's compensation for FY 2006 consisted of performance-related cash and stock bonuses.  ¶193.  Over 91.5% of Defendant Camner's FY 2007 compensation was also based on performance-based cash and stock bonuses. ¶195.  Further, the substantial majority of Defendant Ortiz's compensation for FY 2007 consisted of performance-related cash and stock bonuses (¶205), and in FY 2006 and FY 2007 Defendant Lopez received a $124,028 cash bonus and a $124,028 cash bonus respectively, as well as 4,000 shares of restricted stock and 8,800 stock options in FY 2007.  ¶¶208-209.

Even more revealing, during the Class Period in October 2006, Defendant Camner converted 80,315 shares of Class B common stock into 80,315 shares of stock, and then sold those shares for gross proceeds of $2,151,954.10 ¶¶198-199.  In June 2007, Defendant Camner converted another 50,000 shares of Class B common stock into 50,000 shares of stock, and also exercised 50,000 options to purchase Class A common stock, and then sold all 100,000 shares in a series of transactions that resulted in $2,224,126.92 in gross proceeds.  ¶200.  The October 2006 and June 2007 stock sales were unusual in their timing and amount given that, prior to the Class Period in 2006, Camner sold a total of 28,500 shares of BankUnited's Class A common stock and did not sell a single share of stock during 2005 or 2008.  ¶201.  Defendant Camner tries to "allege" that the shares sold "represented only a small fraction" of his "holdings," and that he "exercised options" during the Class Period, resulting in a "substantial net increase in his holdings."  Camner Br. at 33.  These allegations are not only improper they are incorrect.  The fact remains that one can only sell Class A common stock, and Defendant Camner sold 46% of his Class A common stock available for sale during the Class Period.  Any other options Camner exercised during the Class Period and did not sell were for stock that wasn't available for sale (*i.e.*, Class B common stock and/or preferred stock).

"[M]otive and opportunity are specific kinds of evidence, which along with other

33

evidence might contribute to an inference of recklessness or willfulness." *Bryant v. Avado Brands*, 187 F.3d at 1286. Therefore, stock sales by Defendants, while not essential, may contribute to a finding of scienter. *Mizzaro*, 544 F.3d at 1253 n. 3. ("We emphasize that suspicious stock sales are not *necessary* to create a strong inference of scienter.") (emphasis in original, citing *Tellabs*, 127 S.Ct. at 2511).[33] However, "Stock sales or purchases timed to maximize returns on non-public information weigh in favor of inferring scienter." *Mizzaro*, 544 F.3d at 1253.

### 7.   Defendants Either Knowingly Or Recklessly Failed To Follow GAAP

Plaintiffs do not allege GAAP violations standing alone, but in tandem with many other facts supporting an inference of scienter. "Courts have identified several factors or 'red flags' that often provide the necessary additional support for a finding of scienter based on GAAP violations, including allegations of insider trading, the magnitude of the improperly recognized revenue, whether the violations related to major balance sheet items based on contracts of great financial importance, and whether the GAAP violation violates the corporation's internal policies." *Schultz*, 488 F. Supp. 2d at 1225. Plaintiffs allege all of *Schultz's* "red flags" here.

#### a.   Defendants Failed To Disclose Risk-Layering In BankUnited's Option ARM Portfolio

Plaintiffs allege BankUnited's financial statements violated GAAP and contained misrepresentations and omissions as to the Company's true financial condition, in that, among other things, BankUnited misrepresented the actual risk inherent to its financial statements as a result of concentrations of risk. As alleged in ¶242:

> These concentration disclosures are related precisely to the issues constituted by BankUnited's holdings of Option ARM mortgages, and specifically those made on a limited- or no-documentation basis. Until the April 2008 correspondence with the SEC noted above, BankUnited's disclosures did not contain specific reference to the proportions of the Option ARM loans in its portfolio that were made on a limited- or no-documentation bases.

Defendants go to great lengths to improperly deny this allegation. Camner Br. at 13. (asserting

---

[33] *See also In re Paincare*, 541 F. Supp. 2d at 1293 (finding scienter as to the company, the CEO and the CFO without any evidence of insider trading because "[w]hile these circumstances show that the Company has potential defenses to the claim, '[t]he inference that the defendant acted with scienter need not be irrefutable.'") (quoting *Tellabs*, 127 S.Ct. at 2510).

Plaintiffs' allegation that no such disclosure was made until April 2008 is "patently wrong."); O&L Br. at 37 ("that fact is wrong.").[34]  These protestations are examples of the slick semantics in which Defendants engaged during the Class Period.  Defendant Camner points to BankUnited's 2007 10-K as "proof" that BankUnited identified as a "risk" factor the "fact" that BankUnited granted "residential loans under reduced documentation programs, which accounted for 31% of [all] residential loans ... as of September 30, 2007."[35]  Clearly, this "disclosure" says *nothing* about the percentage of Option ARM loans that were granted under reduced documentation programs.  *That* number does not appear in this filing and did not appear in any BankUnited filing until the SEC requested it.  That number would have disclosed the "risk layering" that the 2006 Guidelines were concerned about.  Rather, the SEC directed in March 2008:

> **In your *future* filings, disclose the amount of payment option loans that were originated under reduced documentation programs and no documentation programs** and if any are classified as nonperforming loans as of September 30, 2007.[36]

MTD1605.  The Cease and Desist Order also specifically provided that BankUnited's Board

---

[34] Of course, all Defendants admit, as they must, that *no* disclosure regarding the percentages of limited documentation and no-documentation loans in BankUnited's loan portfolio *as a whole* was made until April 18, 2007.  *Id.*

[35] This is particularly disingenuous because this filing is one of the documents the SEC was questioning in its March 2008 correspondence.  Also, the 31% figure is in and of itself misleading because it did not include BankUnited's "stated income" loans which the 2006 Guidelines included under the definition of "Reduced Documentation."  Plts' Ex. 7, 71 Fed Reg. at 58,618. Properly including stated income loans would have meant that Defendants would have had to disclose that BankUnited's less than fully documented residential loans accounted for a whopping 73% of residential loans.  *See* 2007 10-K at 50, MTD863.

[36] The SEC also directed BankUnited to "[d]isclose the approximate percentage of payment option ARM customers that select the minimum payment option instead of choosing a payment option that includes full payment of interest expense or payment of interest and principal."  In response, Defendant Lopez admitted, "The Company did not begin to compile information regarding payment option elections until the quarter ended December 31, 2007.  As of December 31, 2007, approximately 78% of our payment option loan customers were electing to make the minimum payment."  MTD1600.  Nevertheless, Defendants continued to boast that their loans were underwritten at the "fully indexed rate," (*i.e.*, borrowers were approved based on full principal and interest payment assumptions), ¶¶117, 126, and  made this misrepresentation as far back as November of 2006, notwithstanding the fact that Defendants, admittedly, had no negative amortization data during that period.  ¶49 n.2.

shall "ensure that [the Bank] appropriately measures the *multiple layered risks in its loan portfolio*." Plts' Ex.1, Cease and Desist Order, Ex. 10.3 at 3-4.

Defendants made sure that, while an investor might see the percentage of payment option loans in BankUnited's *entire* mortgage loan portfolio, (2007 10-K at 49, MTD562), or a (misleading) percentage of the *total* loan portfolio that was granted under "certain reduced documentation" programs (2007 10-K at 22, MTD835), no one could see these two matrices combined – *i.e.*, the percentage of BankUnited's Option ARM loans made on a less than a fully documented basis. Accordingly, despite Defendants' denials, Plaintiffs' allegation that BankUnited failed until April 2008 to disclose the percentage of its Option ARM loans that were made on a less than fully documented basis, is absolutely correct and not "patently wrong."

The truth regarding this improper accounting and reporting was known to Defendants at least as early as the beginning of the Class Period when the 2006 Guidelines were released and which specifically stated, with respect to "Management Information and Reporting," that:

> At a *minimum* information should be available by loan type (*e.g.*, interest-only mortgage loans and payment option ARMs); by risk-layering features (*e.g.*, payment option ARM with stated income and interest only mortgage loans with simultaneous second-lien mortgages) ...

Plts' Ex. 7, 71 Fed. Reg. at 58,616. Nevertheless, Defendants failed to disclose this information which was a key focus of the 2006 Guidelines.

      **b.**      **"Smoke And Mirrors" Accounting And BankUnited's Failure To Follow The Second Step Of Proper GAAP Accounting**

Defendants also attack Plaintiffs' references to BankUnited engaging in "smoke and mirrors" accounting. Camner Br. at 28; O&L Br. at 11-12. This term, used by Confidential Witness 6,[37] describes BankUnited's practice of recognizing as up-front revenue the deferred

---

[37] Defendants Ortiz and Lopez attempt to diminish this assessment as coming from "a salesman" and further attempt to draw some significance to the fact that the quotation marks are around "smoke and mirrors" and not "accounting." Confidential Witness 6, while employed in a sales capacity at BankUnited, had direct knowledge of BankUnited's goal of maximizing the up front recognition of deferred income streams from Option ARM loans and also displayed a solid understanding of relevant GAAP accounting rules, citing specific SFAS sections concerning the recognition of interest income that drove BankUnited's practice. As stated in the Complaint, Confidential Witness 6 was aware of "BankUnited's preferences for selling Option ARM mortgages" (¶20) and described that those preferences were based on BankUnited's ability to immediately "claim[] income from the deferred [payment] stream" under FASB rules. ¶27.

interest payment streams from Option ARM loans.  Defendants' objections to this characterization demonstrate a fundamental misunderstanding of GAAP accrual accounting.

Defendants argue that there was nothing wrong with BankUnited's recognition of deferred revenues from Option ARM loans because the recognition of deferred revenue is, in and of itself, permissible.  Camner Br. at 28; O&L Br. at 11-12.  However, this argument only addresses the first component of what is fundamentally a two-step GAAP analysis.  Indeed, while Defendants refer to a part of the key paragraph in the Complaint that states that immediate recognition of deferred revenue is permissible, they completely ignore the second part of that same paragraph, which reads in full:

> 25.  Defendants, however, preferred to issue Option ARM mortgages because accounting rules permitted BankUnited to recognize as immediate period income the amount of the expected, higher rate interest payments that were scheduled to come due on its Option ARM mortgages at a later date, not just the low introductory payments being paid by borrowers. *The same accounting rules, however, also required BankUnited to reserve for the reasonably expected losses from these Option ARM loans, including determining the likelihood of whether a borrower would eventually make future payments at the higher rate. As otherwise discussed herein, BankUnited failed to adequately reserve for the losses in its portfolio of risky Option ARM loans, which inflated both BankUnited's reported loan revenues as well as stockholders' equity.*

(¶ 25) (emphasis added).

In addition to GAAP principles requiring ongoing assessment of the collectability of loans in BankUnited's portfolio, the 2006 Interagency Policy Statement on allowances for loan losses made clear that banks were required to conduct ongoing assessments of their loan portfolios and to immediately write down anticipated losses in the current period when they become known.  *See* 2006 ALLL Policy Statement, Plts' Ex. 3, at 10-13 and n. 26.

Defendants misrepresented the Bank's loan revenues and stockholder equity because BankUnited failed to undertake the necessary second step – reducing the expectation of future revenues by taking appropriate reserves to write down the expected income streams from the Option ARM loan portfolio given the known or reasonably anticipated deficiencies in that portfolio.  ¶¶20, 21, 25, 34, 224-25, 241-42.  Increasing BankUnited's loan loss reserves would, of course, have reduced its period income during the Class Period – causing BankUnited to miss earnings targets and, in turn, resulting in Defendants' failure to achieve performance-based compensation incentives.

Contrary to Defendants' arguments, neither BankUnited's failure to restate nor the fact that BankUnited's auditor, PricewaterhouseCoopers ("PwC") gave a clean opinion as to its financials (Camner Br. at 32), absolve Defendants of liability.[38]  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("The company argues that because it has never restated any of its financials or otherwise indicated any error in the 1998 financial statements, and because its financial statements were audited by an independent accounting firm, no inference of accounting error, and so no inference of scienter, can be drawn.  We disagree."); [39] *In re Paincare*, 541 F. Supp. 2d at 1293 (rejecting defendants' argument that the Company's financials were reviewed and certified by an independent auditor).

Moreover here, Defendants' scienter in connection with BankUnited's GAAP violations is further highlighted by the fact that Defendants Camner, Ortiz and Lopez were respectively BankUnited's CEO; President and Chief Operating Officer; and Chief Financial Officer and a Certified Public Accountant (¶¶10-12), and these members of BankUnited's senior management played a role in determining loan losses and related accruals.  ¶20.  Further, Defendants Camner and Lopez attended weekly executive management meetings held *every* Monday where loan production, loan loss provisions and the impact of any such provisions would have on the Company's quarterly reports were discussed.[40]  ¶14.  These Defendants had specific reason to know, or but for their own recklessness should have known, that BankUnited's accounting was improper.  *Grand Lodge*, 550 F. Supp. 2d at 1370-71 ("As the top officers of CFHI, it is much more likely that they knew that the construction-to-permanent loans made up the most crucial portion of its loan portfolio.  Additionally, knowledge of the cease and desist order of May 2007,

---

[38] Defendants' arguments with respect to PwC's "clean" audit opinion are further spurious given that bankrupt and delisted BankUnited *never* filed a Form 10-K for FY 2008.  Given that auditors only opine on year-end consolidated financial statements, PwC never gave an opinion as to BankUnited's FY 2008 financials – and similarly would not have had occasion to review the FY 2007 audit to determine whether PwC's prior year opinion should have been withdrawn or BankUnited's 2007 financials restated.

[39] The Court in *Aldridge* noted that, "To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Id.*

[40] Confidential Witness 3 places Defendant Ortiz at these meetings also.  ¶20.

coupled with the GAAP violations alleged, further support sufficiency of the allegations."); *In re Paincare*, 541 F. Supp. 2d at 1293 (finding scienter had been adequately pled with respect to the CEO and the CFO, given *inter alia* their access to insider information, experience and accounting backgrounds, by which they knew of GAAP standards, and stating, "The Company's implicit assertion that a Company can ignore the elephant in the room, as long as no one *told* them it was there does not negate recklessness.") (emphasis in original). *See also*, *Hubbard II*, slip op. at 3-4 ("[T]he Amended Complaint clearly states that [the vice chairman of the board of directors; the chief executive officer; and the former CEO] knew, or were reckless in not knowing, about the underwriting deficiencies in the Company's commercial real estate loans because they were at meetings where such deficiencies were discussed and regularly received reports ...detailing such deficiencies during the Class Period.").[41]

Defendant Lopez was a CPA and the Company's Chief Financial Officer during the Class Period.  ¶12.  Lopez responded to the SEC's March 2008 inquiry that observed that the Company had "significant operational difficulties" and had experienced a "decline in its capital adequacy and liquidity."  ¶¶41, 109.  Lopez was well equipped to spot the particular risks of fraud in BankUnited's financial statements.  Defendants Camner and Lopez signed certifications attesting to the fact that they designed or supervised the design of disclosure and internal controls relating to the Company's financial reporting.  These controls gave Defendants Camner and Lopez access to BankUnited's Option ARM and underwriting information.  ¶¶51, 60, 70, 79, 93,107, 116, 231, 237.  Further, Defendants Camner and Ortiz were particularly interested in pushing the use of Option ARM loans at BankUnited (¶27), and made affirmative statements regarding the Company's conservative "credit culture" (¶76) and, according to BankUnited's former Executive Vice President of Residential Lending, Defendant Ortiz was, along with Defendants Camner and Lopez, aware of the OTS' concerns about BankUnited's Option ARM lending in the summer of 2007 (¶95).  *Reina v. Tropical Sportswear Int'l.*, 8:03-CV-1958, 2005 U.S. Dist. LEXIS 6129, at *20 (M.D. Fla. Apr. 4, 2005) ("[T]he allegations of false and misleading financial reporting and

---

[41] The Court in *Hubbard II* also rejected defendants' argument that a competing inference could be drawn from the fact that the company's financials received approval from an outside auditor. *Id.* slip op. at 5-6.  *See also*, *In re Hamilton Bancorp,* 194 F. Supp. 2d at 1357 ("Defendants' contentions that they were entitled to and did rely on the financial statements certified by [the bank's] auditor, Deloitte, is an affirmative defense which cannot be resolved on a motion to dismiss.").

GAAP violations sufficiently allege scienter as to the CFOs. ... The allegations create a sufficiently strong inference that the failure to account loss reserves and the loss of goodwill was an extreme departure from the standards of ordinary care known to the defendant or so obvious that the defendant must have been aware of it. ...  The complaint describes violations of GAAP and asserts a profound financial impact as a result of the GAAP violations.").[42]

### 8.  Defendants' Ineffective Internal Controls And False SOX Certifications Support A Strong Inference Of Scienter

Plaintiffs allege that BankUnited's internal controls were inadequate, even though Defendants Camner and Lopez continued to certify that they were adequate.  ¶¶51, 60, 70, 79, 93, 107, 116, 231, 237.  Defendants' argument that Plaintiffs have not sufficiently supported their allegations, O&L Br. at 35-36; Camner Br. at 9,  is not true.  The Complaint is replete with allegations establishing the existence of "glaring accounting irregularities or other 'red flags'," at the time of the SOX certifications, which is more than sufficient to make such SOX certifications probative of Defendants Camner and Lopez's scienter.  *Garfield*, 466 F.3d at 1266-67; *Mizzaro*, 544 F.3d at 1252.[43]  These include Defendants' knowledge of the OTS examination and the SEC inquiry into BankUnited's financial disclosures (admitted by BankUnited, ¶150, and described by Confidential Witness 4 as being in effect before March 2008 ¶20).  As noted herein, the Cease and Desist Order eventually disclosed that, based on its January 31, 2008 Report of Examination, the OTS found that the Bank had "engaged in unsafe and unsound practices," and with respect to "Loan Analysis and Reporting," stated:

> Effective immediately, the Board shall ensure that [the Bank] has, maintains and adheres to internal loan analysis and reporting policies and procedures that, at a minimum, (a) address the concerns and recommendations noted by the OTS in its January 31, 2008 Report of Examination (2008 Examination); (b) ensure that [the Bank] appropriately measures the multiple layered risks in its loan portfolio; (c) ensure that [the Bank] appropriately performs a portfolio migration analysis of its [payment option adjustable rate mortgage] loan portfolio by refreshing credit

---

[42] Defendant Camner is therefore clearly mistaken in asserting that the Complaint does not allege he had any reason to believe that BankUnited's appraisals were "not accurate" or that BankUnited's accounting was not in accordance with GAAP.  Camner Br. at 3.  *See*, *i.e.*, ¶¶14, 17, 20, 27, 41, 51, 111, 164, 165, 166, 188-201.

[43] Misstatements about the adequacy of internal controls are actionable.  *In re Wash. Mut.*, 08-MD-1919, 2009 U.S. Dist. LEXIS 41575, at *50 (W.D. Wash. May 15, 2009); *In re NetBank, Inc. Sec. Litig.*, 07-CV-2298, 2009 U.S. Dist. LEXIS 69030, at *33-34 (N.D. Ga. Jan. 29, 2009).

scores and collateral valuations.

Plts' Ex. 1, Cease and Desist Order, Ex. 10.3 at 3-4.

Further, BankUnited's Form 10-Q for the quarterly period ending June 30, 2008 (filed late on August 25, 2008) ("3Q Form 10-Q") stated specifically:

> As required by SEC rules, an evaluation of the effectiveness of the design and operation of BankUnited's disclosure controls and procedures was carried out by BankUnited, as of the end of the period covered by this report, under the supervision and with the participation of BankUnited's management, including the Chief Executive Officer [Defendant Camner] and Chief Financial Officer [Defendant Lopez]. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that BankUnited's disclosure controls and procedures *were not effective as of June 30, 2008*.

3Q Form 10-Q, Plts' Ex. 4 at 57; ¶137.

Plaintiffs here adequately allege that Defendants Camner and Lopez were *responsible* for the Company's internal control deficiencies (as opposed to alleging that they simply "should have known" about them). ¶¶53, 64, 71, 82, 111, 123, 164. Moreover, as discussed above, the Complaint obviously does not rely "solely" on the existence of glaring internal control weaknesses to infer scienter. *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) ("Defendants are not alleged to be simply poor managers [for falsely stating the status of the company's internal controls], they are alleged to be dishonest ones.").

In sum, the Complaint pleads an overwhelming array of facts and circumstances that, particularly when considered in their totality as required by *Tellabs*, support a strong inference of scienter as to Defendants Camner, Ortiz and Lopez. Accordingly, a reasonable person, accepting the allegations as true and taken collectively, would deem the inference of scienter here at least as strong as any opposing inference. *Tellabs*, 551 U.S. at 324. In fact, a reasonable person would deem the inference of scienter in this case as being *stronger* than other inferences, if any.

### B.      There Is No Fraud By Hindsight Here

There are no allegations of "fraud by hindsight" in this case. Camner Br. at 8, 26-27; O&L Br. at 4. The Complaint does not merely assert that later disclosures should have been made earlier, or that later-determined facts showed that earlier statements were false. Instead, the Complaint, as it must, alleges why the challenged statements were false *at the time they were made* and why the asserted omissions should have been made earlier in light of the allegedly

*then-existing* facts.  The basis of Plaintiffs' claims is that Defendants each knew *at the time they made their statements* about BankUnited's conservative underwriting and capitalization and at the time they failed to disclose the risk of layering in BankUnited's Option ARM portfolio, that those statements were false and misleading.  *See In re Eagle Bldg. Techs.*, 319 F. Supp. 2d at 1329 ("[H]ere it appears that Plaintiffs are not pleading that 'later disclosed information' would have been discovered earlier, but that information actually disclosed should have been investigated."); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114-15 (M.D. Fla. 2005) ("This [fraud by hindsight] argument ignores that Plaintiffs do not rely solely on the GAAP violations and resulting restatement, but also on the contemporaneous statements praising the success of Catalina U.K. while simultaneously failing to disclose the loss of its largest contract.").

Courts routinely reject fraud by hindsight challenges when, as here, the Complaint alleges that statements were false at the time such statements were made.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004) (rejecting defendants' fraud by hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 454 (S.D.N.Y. 2005).  In *Alstom*, the company had extended vendor financing to a customer that plaintiffs alleged was known to be in financial trouble without disclosing that financing.  *Id.* at 458-59. The court reasoned:

> Alstom contends that Plaintiffs' allegations as to its knowledge of Renaissance's financial condition amounted to pleading fraud by hindsight.  As discussed above, the Court disagrees.  Accepting as true the facts alleged by Plaintiffs, Alstom would not have had to be 'clairvoyant' to be aware of Renaissance's allegedly unstable financial condition prior to the bankruptcy.

*Id.* at 459 n. 18.

Likewise, Defendants here did not need to be clairvoyant to know that as of January 2008, OTS had raised with Defendants concerns with respect to BankUnited's lending practices and the deficiency of BankUnited's capitalization, and that in March 2008 the SEC had noted deficiencies in BankUnited's financial disclosures.[44]

---

[44] Thus, the cases Defendant Camner relies on (Camner Br. at 26-27) for his "fraud by hindsight" argument are completely inapposite.

**III.   THE COMPLAINT ADEQUATELY PLEADS ACTIONABLE
         MISSTATEMENTS AGAINST DEFENDANTS CAMNER, ORTIZ AND
         LOPEZ WITH THE REQUISITE PARTICULARITY**

As detailed above, Plaintiffs have met the pleading requirements of both Rule 9(b) and the PSLRA.  As this Court said in *Hubbard*, 625 F. Supp. 2d at 1281-82, finding the factual allegations of a fraud complaint sufficiently particularized:

> The Court finds that Plaintiff's Complaint alleges misrepresentations and omissions in a manner sufficient to withstand a motion to dismiss.  The Complaint sets forth in detail and with particularity the loans that were inherently risky (*e.g.*, loans in the BLB, LAD, and LADC segments), why they were risky (*e.g.*, approved notwithstanding underwriting deficiencies and secured by undeveloped land), what lending practices contributed to the undisclosed risk (*e.g.*, approving loans before satisfaction of closing conditions), what statements were materially false (*e.g.*, statements during investor conference calls that the Company was a conservative lender), why such statements were false (*e.g.*, the Company was lending to borrowers without properly investigating their creditworthiness), and what the Defendants stood to gain in making the statements (*e.g.*, artificially high stock prices allowed Individual Defendants to sell their stocks at a premium). [45]

Similarly, Plaintiffs here allege with particularity that the loans in BankUnited's Option ARM portfolio were inherently risky, they were risky because they were made on a less than a fully-documented basis and were approved notwithstanding underwriting deficiencies such as faulty appraisals.  The Complaint identifies statements in BankUnited's public filings, press releases and during investor conference calls that the Company was a "conservative" lender, when in fact BankUnited was primarily issuing Option ARM loans without full documentation, and that BankUnited's artificially high stock prices allowed Defendant Camner to sell his stock at a premium and allowed Defendants Camner, Ortiz and Lopez to garner significant performance-based compensation and bonuses.

**A.   The Complaint Sufficiently Alleges Particularized Facts That
       Defendants' Statements Were False And Misleading**

The Complaint alleges sufficiently particularized facts with respect to the false and

---

[45] As noted above, the complaint was dismissed in that opinion because "Plaintiff provided absolutely no information from which the Court could evaluate the bases for [the confidential witness] statements," *Hubbard II*, Plts' Ex. 2 at 3, but the amended complaint was upheld upon a finding that it contained sufficient information regarding those confidential witnesses.  *Id.*

misleading nature of Defendants' statements and/or conduct concerning: (1) BankUnited's lending practices, including its unsafe and unsound disregard for borrower quality and industry-standard appraisal/underwriting practices; (2) BankUnited's accounting practices in connection with the level of risk in the Bank's Option ARM loan portfolio (particularly among less than fully-documented Option ARM loans), including setting loan loss reserve levels and reporting inflated period income and earnings; (3) BankUnited's lack of adequate disclosures of the compounded risks of Option ARM loans made on a less than fully-documented basis (or "risk layering") in its Option ARM loan portfolio; (4) BankUnited's deteriorating capital position and escalating need for additional capital; (5) BankUnited's GAAP violations; and (6) BankUnited's actionable misstatements regarding loan loss reserves.

For the reasons described above in the discussion of Defendants' scienter, it is clear that Defendants' tortured reading of the Complaint fails to recognize that it indeed alleges sufficiently particularized facts that Defendants engaged in a scheme to mislead investors with respect to the lending practices and financial position of BankUnited. Accordingly, Plaintiffs have more than sufficiently pled the necessary "who, what, when, where, and how" of the circumstances of Defendants' fraud to support their claims. *Garfield,* 466 F.3d at 1262.[46]

> 1. **The Complaint Adequately Alleges Defendants' Knowledge Or Reckless Disregard Of BankUnited's Unsafe And Unsound Lending Practices, Accounting Practices, Risk Layering, And Capitalization In A Scheme To Artificially Inflate Income And Earnings**

In addition to the numerous references to facts alleged in the Complaint that support the strong inference of Defendants' scienter with respect to BankUnited's unsafe and unsound underwriting, improper accounting, risk layering, and capitalization as noted above, the Complaint also alleges particularized facts describing the circumstances of how Defendants desperately sought to falsely and misleadingly convince investors during the Class Period that BankUnited was somehow different from and/or superior to other mortgage lenders. BankUnited's purportedly "stringent credit standards," "credit quality," "conservative

---

[46] Defendants Ortiz and Lopez admit that in the Complaint: "In certain instances, Plaintiffs have pled the 'who, what and when' required to state a 10b-5 claim." O&L Br. at 2. Relying on generalities in their brief, Ortiz and Lopez do not, however, actually specify which particular claims are or are not sufficiently pled.

underwriting" and non-reliance on "sub-prime lending," "high-touch underwriting processes, in-house appraisers in each market and well-trained experienced underwriters," "utilizing in-house appraisers to review external appraisals," "strict policies for outside appraisals," "strict appraisal review process," underwriting standards that were "probably some of the strongest in our industry," and other assurances that BankUnited's underwriting was based on sound, industry-standard, risk assessment rather than pressures to increase loan volumes are all alleged to be false and misleading.  ¶¶45-46, 49, 66, 74, 80, 94, 102-05, 108, 113, 115, 117, 126.

As alleged in the Complaint, Defendants' statements concerning the quality of BankUnited's borrowers and the Bank's underwriting and appraisal practices were false and misleading because Defendants: (1) were aware of considerable evidence to the contrary given that Defendants attended weekly management meetings where they received information on loan production, loan losses, and other topics relevant to BankUnited's financial position (¶¶14, 20), and that Defendants further received periodic reports on loan risks from the risk management group (¶61); (2) were aware of OTS' concerns about BankUnited's Option ARM lending since the summer of 2007 and that the OTS required BankUnited to cease Option ARM lending and issuing less than fully documented loans during the Class Period (¶¶20, 27, 34-35, 41, 82, 95, 137); and (3) knew or should have known about pervasive deficiencies in BankUnited's appraisal and underwriting practices.  ¶¶16, 20-21, 28-32, 57, 109, 164-65, 167, 225.

The Complaint also alleges Defendants knew or were reckless in not knowing of BankUnited's inappropriate accounting practices in connection with the accounting for the level of risk in the Bank's Option ARM loan portfolio – particularly with respect to less than fully-documented Option ARM loans as described above – including maintaining loan loss reserves below reasonable levels that resulted in inflated income and earnings during the Class Period. ¶¶20-21, 25, 33-34, 109, 142-44, 217, 221-25, 229-31, 238-42.

Further, the Complaint alleges how Defendants concealed the fact that, throughout the Class Period, BankUnited was faced with escalating threats to its capitalization due to increasing loan losses and risks in its Option ARM loan portfolio; that the OTS had expressed concern about BankUnited's capitalization during the Class Period; and that Defendants were aware of this situation and were affirmatively acting to raise capital to keep BankUnited afloat without disclosing these facts to investors.  ¶¶14, 20, 27, 35, 37, 39-40, 42, 82, 95, 98-99, 132, 135, 137, 142-45, 174-76, 180-87.  Notably, the Complaint describes how in January 2008, BankUnited

filed a registration statement in connection with a $400 million stock offering – precisely the amount that BankUnited eventually disclosed, after the Class Period, that the OTS required it to raise to maintain its "well capitalized" status.  ¶¶137, 183.

### 2.     The Complaint Properly Pleads GAAP Violations

The Complaint alleges in great detail why BankUnited's financial statements failed to comply with GAAP.  ¶¶211-247.  Plaintiffs' GAAP allegations are well founded, properly pleaded, and far from "conclusory," as Defendants argue.  Camner Br. at 9; O&L Br. at 36.  Defendants' GAAP violations include failing to:  disclose the Company's true risk profile (¶217); consider risk factors such as "unrealistically aggressive" incentive programs for loan originations as shown by "relaxation of credit standards" (¶222); follow guidance published by the federal financial regulatory agencies (¶230); and provide disclosure on concentration of risk such as the proportions of BankUnited's Option ARM loans in its portfolio that were made on a limited- or no-documentation basis, otherwise known as "layered risk." ¶242.

Defendants' protests notwithstanding, Lead Plaintiffs are not required to allege "what loans at what times, and in what amounts were 'risky'; "what the loss reserves should have been;" or "the status of each of the problem loans at the time of the alleged misstatement." Camner Br. at 26, 28, 30.[47]  Nor are Plaintiffs required to detail what the "actual capital ratios were."  O&L Br. at 39.  *Aldridge*, 284 F.3d at 79, 81 (holding that district court erred in dismissing complaint for failing to allege "specific figures regarding which transactions were misstated and by what amounts" because there is no requirement that a plaintiff, "before discovery, must in every case allege the amount of overstatement of revenues and earnings in order to state a claim"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294-95 (S.D.N.Y. 1999) (despite lack of restatement, Court held that complaint alleged Section 10(b) claim with specificity where it identified accounting irregularities and demonstrated that

---

[47] Although Defendants claim ignorance, the Complaint explains exactly what Confidential Witness 6 meant by Defendants' desire to take advantage of "smoke and mirrors" accounting rules.  *See* ¶53(a) ("[T]o claim as period income deferred interest payments on negatively amortizing Option ARM loans that Defendants knew BankUnited would not and could not ever collect"); ¶191 ("[A]ccounting that, in part, permitted BankUnited to claim income from deferred interest payments on Option ARM loans in the current period (provided, however, such recognition of income was accompanied by a corresponding increase in the loan loss reserve").

company's financial statements were false).[48]   Furthermore, as discussed above, the Complaint

alleges far more than GAAP violations as the basis for Lead Plaintiffs' §10(b) claim.

>3.   **The Complaint Properly Pleads Actionable Misstatements Regarding BankUnited's Loan Loss Reserves**

Defendants argue the Complaint's allegations are merely allegations of "insufficient"

loan loss reserves (Camner Br. at 27; O&L Br. at 38).  They argue that Plaintiffs are simply

"quibbling with the judgment of senior management" or claiming Defendants should "more

accurately have predicted the future."  *Id.*   This is not Plaintiffs' claim.  Rather, Plaintiffs allege

that these Defendants knowingly affirmatively misrepresented the adequacy of BankUnited's

reserves when they knew, or recklessly disregarded, that those representations were false.

Allegations of misstatements regarding loan loss reserves are clearly actionable under the

Exchange Act.  *United States v. Morris*, 80 F.3d 1151, 1164 (7th Cir. 1996) ("[R]epresentations

by management about the adequacy of reserves still may be fraudulent if they are knowingly

false or misleadingly incomplete."); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 364-

65 (1st Cir. 1994) (allegations that bank officers and directors violated securities laws in

describing bank's loan review capabilities as "strong" and its allowance for loan losses as

"sufficient" when those representations were inconsistent with internal information then

available to bank management were actionable because bank management "knew, or should have

known, that its public statements were inconsistent with the actual conditions *then* being reported

to them.") (emphasis in original); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992)

("There is nothing unique about representations and omissions regarding loan loss reserves that

removes them from the purview of the antifraud provisions of the federal securities laws.").

Falsely understating reserves to avoid a negative impact on current earnings and

stockholder equity is securities fraud.  *See In re NetBank,* 07-CV-2298, 2009 U.S. Dist. LEXIS

69030, at *23-25 (N.D. Ga. Jan. 29, 2009) (upholding complaint that alleged misrepresentations

---

[48] *Accord In re Daou Sys.*, 411 F.3d 1006, 1017, 1019-20 (9th Cir. 2005) (reversing district court's dismissal of complaint for failure to plead overstatements in earnings and revenues with sufficient specificity, where complaint set forth the approximate amount by which revenues and earnings were overstated); *In re Premiere Techs., Inc. Sec. Litig.*, 98-CV-1804, 2000 U.S. Dist. LEXIS 19207, at *57 (N.D. Ga. Dec. 8, 2000) ("While particular instances of accounting irregularities must be alleged, the complaint 'need not specify the exact dollar amount of each accounting error.'") (citation omitted).

about company's reserves when "NetBank *knew* its underwriting guidelines were insufficient, and that the reserves that it knew or should have known were necessary were not in place") (emphasis in original); *In re Hamilton Bancorp,* 194 F. Supp. 2d at 1358 (upholding complaint that alleged misrepresentations concerning growth in earnings where there were numerous adverse factors affecting defendant's banking business including *inter alia* that bank "failed to properly establish a reserve fund for its substantial and troubled Latin American loans in violation of GAAP and GAAS;" and bank "failed to properly account for uncollectible loans in violation of GAAP and GAAS"). *See also*, *In re PMA Capital Corp. Sec. Litig.*, 03-6121, 2005 U.S. Dist. LEXIS 15696, at *33-34 (E.D. Pa. July 27, 2005) ("Defendants represented that the statements were prepared in accordance with GAAP, when in fact they were not because the loss reserves were understated and mislead [sic] investors. ... Defendants contend that an increase in a company's reserves does not give rise to a securities violation. ... Defendants misstate Plaintiffs' position.  PMA reported that its financial statements were prepared in accordance with GAAP. Plaintiffs claim that such statements were materially false because PMA understated loss reserves and failed to maintain adequate internal controls.  This is a well plead Exchange Act violation.").

### B.   Defendants Cannot Sanitize Their Misrepresentations And Omissions By Calling Them "Forward Looking"

Defendants' assertions that their statements about their conservative underwriting standards, (*i.e.*, ¶¶58, 63, 66, 75, 104, 108); their strict appraisal process (*i.e.*, ¶¶50, 74, 80, 90, 102, 103, 113, 115, 117, 118, 126); BankUnited's strong capital position (*i.e.*, ¶¶37, 44, 55, 65, 73, 83, 88, 89, 91, 102, 103, 104, 114, 117), and their misrepresentations regarding BankUnited's loan loss reserves (*i.e.*, ¶¶33, 63, 105) are entitled to safe harbor protection are also without merit.  The PSLRA safe harbor ("safe harbor") can insulate a defendant from §10(b) liability for forward-looking statements.[49]  However, the safe harbor and related "bespeaks caution" doctrine apply only to "forward-looking statements," not to statements of existing or

---

[49] Under the PSLRA, a safe harbor exists for forward-looking statements if (1) they are identified as forward-looking and (a) are accompanied by meaningful cautionary language, or (b) are immaterial; or (2) the plaintiff fails to prove that the statements were made with actual knowledge of their falsity.  15 U.S.C. §78u-5(c).

historical fact.[50]

 For the reasons discussed below, Defendants' conduct is not immunized under the safe harbor because:  (1) the challenge to statements concern existing or historical fact rather than forward-looking information; (2) even if found to be forward-looking, the challenged statements were not accompanied by meaningful cautionary language; and (3) Plaintiffs adequately allege Defendants had actual knowledge that their statements were false and misleading.[51]

  **1.** **Defendants' Misrepresentations And Omissions Concerned Existing And/Or Historical Fact And Thus Are Not Forward-Looking Statements**

 Statements of present or historical fact are not protected by the safe harbor provisions. "An otherwise actionable omission concerning past or present problems, however, cannot be sanitized by forward-looking statements about similar problems."  *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320 (N.D. Ga. 2001).  *Towne Svcs.* expressly distinguished the Eleventh Circuit holding in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999) as addressing "the typical 'forward-looking' scenario, *i.e.*, predictions that do not come true."  *Id.* at 1321 n.10.  Here, Defendants improperly cherry-picked portions of some of their misstatements and presented them out of context to argue that the entire statement was forward-looking and thus subject to safe harbor protection.[52]  However, the false statements detailed above are obviously statements of historical or present fact, rather than forward-looking predictions about future events.  *See*, *e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (holding that plaintiffs

---

[50] Moreover, the unambiguous language of the PSLRA expressly exempts from its safe harbor provisions any forward-looking statements contained in financial statements purportedly prepared in accordance with GAAP.  *See* 15 U.S.C. §78u-5(b)(2)(A).  Accordingly, financial results in BankUnited's press releases, and quarterly and annual reports are not subject to safe harbor protection under the PSLRA.

[51] Defendants argue materiality by claiming their false and misleading statements were mere "puffery."  That erroneous contention is discussed below.

[52] *See Schultz*, 488 F. Supp. 2d at 1229 ("The November 4, 2004 press release contains both protected statements and historical facts which are not protected by the safe harbor.").  *See also Harris*, 182 F.3d at 806 ("Of course, if any of the individual sentences describing known facts ... were allegedly false, we could easily conclude that the smaller, non-forward-looking statement falls outside the safe harbor.").

adequately pled false and misleading statements against subprime lender where complaint alleged that the defendants misrepresented adequacy of company's reserves and risk valuations, employed outdated valuation models, over valued its residual interests in securitizations, falsely certified adequacy of internal controls and quality of its loans, and failed to identify existing problems in its public filings) (citing *In re Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d 1160 (C.D. Cal. 2008)); *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149-50 (S.D. Cal. 2008) (finding similar statements regarding loan quality and underwriting to provide a basis for actionable securities law violations); *In re Olympic Fin. Ltd. Sec. Litig.*, 97-496, 1998 U.S. Dist. LEXIS 14789, at *14 (D. Minn. Sept. 10, 1998) ("[T]he complaint sets forth numerous misrepresentations of past and current facts regarding the nature of loans, their riskiness, and their continuing decline throughout the class period, none of which constitute forward-looking statements.").[53]

### 2.   Reserves Relate To The Current Period And Are *Not* Forward-Looking Statements

Defendants argue – unsupported by references to the relevant accounting literature – that reserves and provisions for loan losses are "forward-looking projections" (O&L Br. at 18) or otherwise "obviously involve prediction of future losses." Camner Br. at 9. This is simply not correct. Moreover, Defendants' positions are untenable given fundamental principles of GAAP accrual accounting, as well as specific guidance provided by the FASB in SFAS 5 and 114.

Under basic accounting principles, revenues are offset against expenses on the basis of their cause-and-effect relationship in what is referred to by accounting professionals as the

---

[53] Defendants' contrived examples of "classically forward-looking statements" are not statements Plaintiffs allege to be false and misleading in isolation. *See* O&L Br. at 15. Such cherry picking flies in the face of *Tellabs*. Examples of *classically not* forward-looking statements alleged in the Complaint are ¶57 ("Camner falsely stated that 'everybody has to remember that we have continuously tightened our standards as we have gone through the year.'"); ¶75 (Defendant Camner stated, "[t]he reason that we are not reporting what [the Company's competitors] are reporting [in terms of increased non-performing assets and charge-offs] is because ... our underwriting was much stricter from the get go."); ¶91 ("This was accomplished, according to Lopez, because of the 'underwriting that [the Company has] done in the past ... .'"); ¶108 ("BankUnited has adhered to conservative underwriting standards ... ."); and ¶113 ("BankUnited has adhered to conservative underwriting standards ... [and] has underwritten to the fully indexed rate and followed strict policies for outside appraisals combined with internal appraisal reviews conducted by the company's own staff.").

"matching principle."  GAAP accrual accounting further provides that income is reported as earned and expenses are reported as they are incurred.  *See*, *e.g.*, FASB Statement of Financial Accounting Concepts No. 6 (Elements of Financial Statements) at ¶¶134-152 ("FASB Concept Statement No. 6").[54]  Furthermore, GAAP requires companies to make current judgments about the recoverability of revenues that are recorded but may not be received, and to set up accruals to reflect reductions in those revenues.  *See id*. at ¶¶144-49 (describing matching of costs to revenues and the deduction from period revenues of any costs/expenses associated with that transaction or event).

GAAP accrual accounting distinguishes "probable" losses *inherent* in a portfolio as of the balance sheet date from possible or future losses *not inherent* in the balance sheet as of that date and requires the loss to be recorded against revenues in the period in which that loss becomes ascertainable.  ¶¶238-239.  A loss is deemed to be incurred by the entity when it is probable and should be immediately reflected on the balance sheet – not at some later point when cash flows may be affected.  Therefore, a loan loss reserve is a present-tense statement as to the financial position of a company and must be reflected in the current period financial statements.  The accuracy of a company's financial statements, including the expectation that those financial statements reflect the true economic position of the company, is of central concern to investors.

These concepts are specifically addressed in the American Institute of Certified Public Accountants Audit and Accounting Guide for Depository and Lending Institutions ("D&L AAG").  ¶¶219, 221-25.  The D&L AAG clearly states: "The allowance for loan losses [reserve] is an accounting estimate of credit losses *inherent in an institution's loan portfolio* that have been incurred *as of the balance-sheet date*."  D&L AAG at § 9.01 (describing accounting for credit losses) (emphasis added).  Accordingly, the relevant accounting guidelines clearly state that a loan loss reserve is <u>not</u> a forward-looking statement or expression of an opinion about the future, but rather is a statement about the present condition of the Company's loan portfolio.

Defendants acknowledged during the Class Period that loan loss reserves were current period reflections of BankUnited's financial condition – *not* forward-looking statements.  In its March 2008 correspondence with BankUnited, the SEC also sought clarification with respect to

---

[54] Accrual accounting differs from "cash" accounting in that accrual accounting is intended to reflect the reality that various transactions and events have on an entity's financial position *at the time they have a substantive financial effect on the entity*, rather than in the period in which there is a change in the entity's cash position.  *See*, *e.g.*, FSAB Concept Statement No. 6 at ¶139.

BankUnited's determination of its allowance for loan losses and non-performing assets as of the end of FY 2007.  In his April 11, 2008 response to the SEC, Defendant Lopez wrote that BankUnited's reserves reflected BankUnited's then-present assessments of loan losses, stating: " . . . The Company's allowance for loan loss methodology strives to quantify the losses *inherent in the loan portfolio at the balance sheet date*" and "[t]he expected frequency and severity of loss for our loans in the identified areas are estimated using historical loss rates adjusted for the estimated *inherent losses in those performing loans at the balance sheet date*."  MTD1621-22. Lopez's responses track, nearly verbatim, the D&L AAG.  Defendants' arguments in this regard therefore not only fail to comport with the requirements of GAAP, but also with BankUnited's stated position on this matter.

In addition, there is specific accounting guidance on loan loss reserves which clearly state that a loan loss reserve is a statement of the Company's present financial condition.  SFAS 5 requires the accrual of a loss contingency when information available prior to the issuance of the financial statements indicates it is probably that an asset has been impaired at the date of the financial statements and the amount of loss can be reasonably estimated.  If conditions are met, an accrual should be made even though particular loans that are uncollectible may not be identifiable.  Also, under SFAS 114, an individual loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.  It is implicit in these conditions that it must be probable that one or more future events will occur confirming the fact of the loss.  Thus, under GAAP, the purpose of an allowance for loan losses is "to cover probable credit losses that have *already been incurred*."[55]

### 3.   Defendants' False And Misleading Statements And Omissions Were Not Accompanied By Meaningful Cautionary Language

For a forward-looking statement to receive safe harbor protection, the accompanying "cautionary statement" must be "meaningful" as required by 15 U.S.C. §78u-5(c)(1)(A)(i).  Only "when an investor has been warned of risks of a significance similar to that actually realized, *she*

---

[55] *See*, *e.g.*, 2006 ALLL Policy Statement, Plts' Ex. 3 at 3 n. 7 and 5 (noting further that, "[a]n institution's failure to analyze the collectibility [sic] of the loan portfolio and maintain and support an appropriate [allowance for loan losses] in accordance with GAAP and supervisory guidance is generally an unsafe and unsound practice").

*is sufficiently on notice of the danger* of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807 (emphasis added).

Cautionary language, by definition, cannot be meaningful when applied to already-existing facts, since no one can make an intelligent decision when existing facts about an investment have not been disclosed.[56] Moreover, "boilerplate" will not suffice. *Bellocco v. Curd*, No. 8:02-CV-1141, 2005 U.S. Dist. LEXIS 24251, at *12 (M.D. Fla. Oct. 20, 2005) ("The cautionary language should not be 'boilerplate' or 'buried among too many other things', but rather, should be 'explicit, repetitive and linked to the projections about which the plaintiff complains.'"). *See also Sherleigh*, 178 F. Supp. 2d at 1273 ("Yet the harbor has limits .... The cautionary language must therefore meet a threshold of specificity.").

BankUnited's risk warnings, repeated again and again, unchanged, bore no relationship to actual events, and could have applied at any point in BankUnited's history. The cautionary language Defendants cite is so general it can apply to any mortgage company or bank that does business in Florida at any time, *i.e.*, "fiscal or monetary policies; significant weather events such as hurricanes; changes or fluctuations in the interest rate environment; a deterioration in credit quality and/or a reduced demand for credit; reduced deposit flows and loan demand; real estate values; competition from other financial service companies in our markets; legislative or regulatory changes ... ." Camner Br. at 22.[57] The unspecified reference to "legislative or regulatory changes" does not inform investors of the then ongoing OTS investigation, the SEC inquiry or Defendants failure to follow the federal regulatory guidelines with respect to risk layering in its Option ARM portfolio. *Primavera*, 403 F. Supp. 2d at 1156-57 ("The cautionary language in the prospectus warned about the risk of investment but failed to notify the plaintiffs of the eventuality that the defendants were perpetrating a fraud.") (citing cases). As the former

---

[56] In *Sherleigh Assocs., LLC v. Windmere-Durable Holdings, Inc.*, the court held that "the cautionary language ... did not fairly and adequately warn potential investors" where plaintiffs alleged defendants "failed to reveal either known, present facts, or facts that should have been known through due diligence." 178 F. Supp. 2d 1255, 1274 (S.D. Fla. 2000).

[57] Defendant Camner does not specifically challenge any alleged false and misleading statements, but assumes that the repeated, boilerplate, supposedly "cautionary statement" appended to most of BankUnited's filings "protects Defendant Camner from liability under the Reform Act's safe harbor." Camner Br. at 24. As discussed below, this is clearly not the law.

Fifth Circuit stated, "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd. in relevant part and rev'd. in part*, 459 U.S. 375 (1983).[58] Because the Defendants here did not disclose that the "risk" factors were not merely hypothetical, the disclosures were not meaningful. *In re Evci Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102-03 (S.D.N.Y. 2006) ("[D]isclosures failed to warn investors that the risk factors were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences.").[59]

Similarly, Defendants cannot avail themselves of the analogous, judicially created "bespeaks caution doctrine." *See Sherleigh*, 178 F. Supp. 2d at 1274 ("By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements."). *See also*, *In re Giant Interactive Group, Inc. Sec. Litig.*, 07 CIV 10588(RWS), 2009 U.S. Dist. LEXIS 69414, at *19-20 (S.D.N.Y. Aug. 5, 2009) ("Defendants cannot, as a matter of law, be absolved of liability pursuant to the 'bespeaks caution' doctrine where they failed to disclose the existence of facts known for many months that would negatively affect Giant's business but only warned that these facts 'could' negatively affect their business."); *In re Prudential Sec. Ltd. P'shps. Litig.*, 930 F. Supp. 68, 72-73 (S.D.N.Y. 1996) (stating "[c]autionary language cited to justify application of the [bespeaks caution] doctrine must precisely address the substance of the specific statement or omission that is challenged," and "[t]he doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

---

[58] Because the *Huddleston* opinion was issued before the close of business on September 30, 1981, it is binding precedent. *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 769 n. 19 (11th Cir. 2007).

[59] Also, because, as Defendants acknowledge, the *same* boilerplate disclaimer with only slight variations was used in conjunction with almost every alleged misrepresentation, it clearly was not meaningful. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009) (reversing district court for falling into "legal error in its application of the safe harbor provision" where it "granted blanket safe harbor protections for the statements, because each was perfunctorily accompanied by essentially nothing more than the same boiler plate language," and noting that "[e]ach statement that benefits from the safe harbor must be addressed individually").

Of course, there cannot be meaningful cautionary language when, as discussed below, Defendants had actual knowledge of the false and misleading nature of their statements. *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading, or, at the very least, clearly articulates the reasons why it is false or misleading.").

### 4.    The Complaint Adequately Alleges Defendants' Misstatements Were False When Made

A forward-looking statement accompanied by meaningful cautionary language is still actionable if "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B)(i). Knowing falsity includes not just knowing a forecast will not come true, but also statements made where a defendant "lacked a reasonable basis for making the statement." *Primavera*, 403 F. Supp. 2d at 1159. ("A defendant remains liable, even for a forward-looking statement, if the plaintiff shows that the defendant 'knew at the time of the statement of false and misleading content and thus lacked a reasonable basis for making the statement'.") (citations omitted); *Reina*, 2005 U.S. Dist. LEXIS 6129, at *23 (Complaint sufficiently alleged that "no reasonable basis existed for the forward-looking statements contained in the prospectus and issued during the class period."). As detailed in the Complaint, Defendants did not have a reasonable basis for their statements regarding, *i.e.*, BankUnited's sufficient capital or conservative underwriting policies.

Defendants seek to lead this Court astray by claiming Plaintiffs need to *prove* in the Complaint that the Defendants made the statements with actual knowledge. (O&L Br. at 14 n.14; Camner Br. at 24 n.13.) This is not true. While actual knowledge must be proven by a preponderance of the evidence at *trial* to overcome the safe harbor provision, Plaintiffs need only *plead* sufficient facts to raise a reasonable and strong *inference* that Defendants had actual knowledge of the false and misleading nature of the forward-looking statements for purposes of this motion. *Marrari*, 395 F. Supp. 2d at 1189 ("If Plaintiffs' allegations are true, as the Court must presume at this stage, Defendants' statements were made with 'actual knowledge' that they were false and misleading."); *Reina*, 2005 U.S. Dist. LEXIS 6129 at *23 ("[T]he complaint sufficiently alleges that no reasonable basis existed for the forward-looking statements."); *In re*

*Catalina*, 390 F. Supp. 2d at 1116 ("Plaintiffs have therefore pled sufficient facts to give rise to a strong inference that Defendants had actual knowledge that the forward-looking statements were false or misleading and the safe harbor provision is not applicable."); *Primavera*, 403 F. Supp. 2d at 1159 ("Although the [complaint] contains allegations based on 'forward-looking' statements, including projections of revenue, business objectives, and future economic performance, the plaintiffs sufficiently allege that no reasonable basis existed for the forward-looking statements issued during the class period.  Further, the [complaint] alleges actual knowledge of the falsity of the statements.  Accordingly, the [complaint] satisfactorily pleads facts to counter the presumption that the defendants' forward-looking statements are not actionable."); *McBride v. Vision Twenty-One*, 99-CV-138, 2000 U.S. Dist. LEXIS 14742, at *13-14 (M.D. Fla. Aug. 18, 2000) (because plaintiff alleged defendants made statement with knowledge it was false, dismissal not appropriate).  *See also*, *Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations.").[60]  *Lormand* specifically stated, "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment [pursuant to Rule 12(b)(6)] that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to satisfaction of the fact finder." *Id.* at 248 (citing *Twombly*, 127 S.Ct. at 1969 n. 8).  The Court in *Lormand* further explained, "This does not foreclose the safe harbor's possible applicability in latter stages of these proceedings."  565 F.3d at 248.[61]  Plaintiffs have alleged facts sufficient to raise a reasonable and strong inference that Defendants had actual knowledge of the false and misleading nature of the purportedly forward-looking statement for purposes of this motion.

---

[60] As the Court in *Asher v. Baxter Int'l., Inc.*, No. 02-C-5608, 2005 U.S. Dist. LEXIS 2131, at *15-16 (N.D. Ill. Feb. 3, 2005), explained, "Although the language of the second prong requires the plaintiff 'to prove,' which this Court construes as proving at trial, courts interpreting this provision have held that plaintiffs must allege sufficient facts 'to raise a reasonable and strong inference that defendants' had 'actual knowledge' of the 'false or misleading nature' of the forward-looking statements." (citing cases).

[61] Nor can Defendants deny the falsity of their statements.  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 343 (D. Mass. 2009) (information offered by defendants to refute plaintiffs' claims of falsity "may be pertinent to an assessment of a future motion for summary judgment, but it cannot support dismissal prior to discovery.").

**C.      Defendants' Misstatements Were Not Mere "Puffery"**

Contrary to Defendants' argument, their statements regarding BankUnited's "strict" underwriting and "conservative" credit culture (O&L Br. at 23-24) are not immaterial "puffery." A statement can be dismissed as puffery only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it. *Bellocco*, 2005 U.S. Dist. LEXIS 24251, at *8-11. Defendants' repeated statements about the quality of BankUnited's underwriting; its loan portfolio and its capitalization could not have been more material to an investor. *See In re New Century*, 588 F. Supp. 2d at 1225 (misstatement regarding "strict underwriting and risk management disciplines" and "better credit quality" actionable); *In re Countrywide*, 588 F. Supp. 2d at 1185 ("The materiality of the representations and omissions are not persuasively disputed ... '[A]s a mortgage lender ... underwriting practices would be among the most important information looked to by investors.'") (quoting *Atlas*, 556 F. Supp. 2d at 1155).

Moreover, although "[p]uffing generally refers to an expression of opinion not made as a representation of fact," *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982), "not all such statements of opinion are properly classified as puffery." *United States v. Skilling*, 554 F.3d 529, 552-53 (5th Cir. 2009). The Fifth Circuit in *Skilling* went on to explain that, as set forth in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 1098 (1991), while "'generalized, positive statements about [a] company's competitive strengths ... and future prospects' can in some cases constitute immaterial puffery, such statements of opinion by corporate insiders are not *per se* immaterial." 554 F.3d at 553.[62]

Plaintiffs do not simply identify management problems or point to statements that put a positive spin on the Company's circumstances, without indicating how or why Defendants should have known the descriptions were inaccurate. Rather, Plaintiffs present a contrast between what Company officials were hearing and knew or should have known about their loan underwriting and the adequacy of their reserves, and what Defendants were telling the public *at the same time*. When Defendants "affirmatively characterize [] management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'" *Shapiro*, 964 F.2d at 282. *Shapiro* went on to note that:

---

[62] Thus, Defendant Lopez's argument that his use of the word "conservative" was his opinion and "may not be what another person would consider 'conservative,' so it is immaterial" (O&L Br. at 24), is clearly incorrect and made with no citation to authority.

> If a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.  Likewise, if a defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud.

*Id.  See also Serabian*, 24 F.3d at 364-65 (Defendants violated federal securities laws in describing bank's loan review capabilities as "strong" and its allowance for loan loss reserves as "sufficient" when their representations were inconsistent with internal information then available to bank management.); *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-CV-03148-LDD, 2008 U.S. Dist. LEXIS 103549, at *25-26 (E.D. Pa. Dec. 22, 2008) (statements that company's "credit underwriting involves an extensive due diligence process" could not be deemed puffery); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("[The complaint] does more than identify rosy predictions or vague statements about Goldman's integrity; Goldman stated that such integrity 'was at the heart' of its business and attempted to distinguish itself from other institutions based on its 'truly independent investment research' while it allegedly knew the contrary was true."); *Bellocco*, 2005 U.S. Dist. LEXIS 24251, at *9-11 (with respect to statements that "the market is strong and our objective is to be a major player in this industry," and "brightness levels we are currently demonstrating provide Uniroyal the opportunity to be the leader in the high brightness LED market," the court found that, "[b]ecause Uniroyal's ability to develop HB-LED products was critical to its success, Defendants' assurances regarding the development and production of these products cannot be deemed immaterial as a matter of law at this stage of the proceedings."); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (if defendant put the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information").  This is precisely what Defendants did in this case.  They put BankUnited's underwriting, reserves, and capitalization "in play."

Further, Defendants did not only declare their underwriting policies to be conservative, they listed verifiable actions they were taking.  "Time and time again, Defendants defined what they meant by 'strict underwriting' and 'conservative underwriting' in their statements and public filings."  O&L Br. at 9.  Thus, these were not vague statements but rather specific, verifiable statements.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y.

2009) ("Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence. ... Rather than being general statements, these were specific steps that Moody's was taking to ensure its independence and ratings integrity.").[63]  Defendants' statements were actionable misrepresentations and omissions, not "puffery."

## IV.   PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON CLAIMS

"[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements disseminated by its company, are sufficient to state a cause of action for controlling person liability." *In re Hamilton Bancorp,* 194 F. Supp. 2d at 1360.  Plaintiffs' allegations regarding Defendants' control person liability are sufficient.[64]

## CONCLUSION

For all the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated:  October 29, 2009                Respectfully submitted,

                                              **BERMAN DeVALERIO**

                                              By:    s/ Michael J. Pucillo
                                                     Michael J. Pucillo
        Fla. Bar No. 261033
        Email: mpucillo@bermandevalerio.com
        Wendy H. Zoberman
        Fla. Bar No. 434670
        Email:  wzoberman@bermandevalerio.com
        4280 Professional Center Dr.
        Suite 350
        Palm Beach Gardens, FL 33410

---

[63] Recently, this Court in *Dance v. Levitt Corp.*, No. 08-60111-CIV slip op. (S.D. Fla. Aug. 10, 2009), attached as Plts' Ex. 9 at 17, distinguished *Next Century Communs. Corp. v. Ellis*, 318 F.3d 1023 (11th Cir. 2003), upon which Defendants Ortiz and Lopez rely, noting that *Next Century* "is not a federal securities fraud case; rather, it involved a common law fraud claim brought under Georgia law," and finding that the Defendants' description of early sales and marketing results as "positive" was actionable.

[64] Plaintiffs believe the Complaint states claims against all Defendants.  If the Court finds the Complaint deficient, Plaintiffs respectfully request leave to replead in accordance with Federal Rule of Civil Procedure 15(a).

Tel:  561/835-9400
Fax:  561/835-0322

and

Steven J. Buttacavoli
Email:  sbuttacavoli@bermandevalerio.com
Jason M. Leviton
Email:  jleviton@bermandevalerio.com
One Liberty Square
Boston, MA  02109
Tel:  617/542-8300
Fax:  617/542-1194

***Lead Counsel***

Roger B. Greenberg, Esq.
Email:  rgreenberg@schwartz-junell.com
Schwartz Junell Greenberg
  & Oathout LLP
909 Fannin Street
Suite 2700
Houston, TX  77010
Tel:  713/752-0017
Fax:  713/752-0327

***Additional Plaintiffs' Counsel***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 29, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served to all counsel on the attached Service List this day via transmission of Notice of Electronic Filing generated by CM/ECF.


 s/Michael J. Pucillo

*In re Bank United Securities Litigation*

Case No. 08-CIV-22572-COOKE/BANDSTRA
United States District Court, Southern District of Florida

**<u>SERVICE LIST</u>**

Michael J. Pucillo
mpucillo@bermandevalerio.com
Wendy H. Zoberman
wzoberman@bermandevalerio.com
BERMAN DeVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel:    561/835-9400
Fax:    561/835-0322

*Lead Counsel for Lead Plaintiffs Louisiana*
*Municipal Police Employees*
*Retirement System and Oklahoma*
*Police Pension & Retirement System*


Glen DeValerio
gdevalerio@bermandevalerio.com
Leslie R. Stern
lstern@bermandevalerio.com
Jason M. Leviton
jleviton@bermandevalerio.com
Steven Buttacavoli
sbuttacavoli@bermandevalerio.com
BERMAN DeVALERIO
One Liberty Square
Boston, MA 02109
Tel:    617/542-8300
Fax:    617/542-1194

*Lead Counsel for Lead Plaintiffs Louisiana*
*Municipal Police Employees*
*Retirement System and Oklahoma*
*Police Pension & Retirement System*
*[Via CM/ECF]*

Jack Reise
jreise@csgrr.com
Paul J. Geller
pgeller@csgrr.com
Douglas Scott Wilens
dwilens@csgrr.com
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel:    561/750-3000
Fax:    561/750-3364

*Attorneys for Plaintiff Waterford*
*Township General Employees Retirement*
*System and Movant The Pension &*
*Annuity Funds*
*[Via CM/ECF]*

Martin D. Chitwood
mchitwood@chitwoodlaw.com
Ze'Eva K. Banks
zbanks@chitwoodlaw.com
Robert W. Killorin
rkillorin@chitwoodlaw.com
James M. Wilson, Jr.
jwilson@chitwoodlaw.com
CHITWOOD HARLEY HARNES LLP
1230 Peachtree Street NE
Promenade II Suite 2300
Atlanta, GA 30309
Tel:    303/873-3900

*Attorneys for Movant Georgia Municipal*
*Employee Benefit System Retirement*
*Fund*
*[Via CM/ECF]*

Ryon M. McCabe
rmccabe@mccaberabin.com
McCABE RABIN, P.A.
1601 Forum Place, Suite 301
West Palm Beach, FL 33401
Tel:   561/659-7878
Fax:   561/242-4848

*Attorneys for Movant The New Jersey
Building Laborers Pension and Annuity
Funds
[Via CM/ECF]*

Jeffrey Miles Ostrow
ostrow@thkolaw.com
THE KOPELOWITZ
  & OSTROW FIRM PA
200 S.W. 1st Avenue
12th Floor
Ft. Lauderdale, FL 33301
Tel:   954/525-4100
Fax:   954/525-4300

*Attorneys for Movant Georgia Municipal
Employee Benefit System Retirement
Fund
[Via CM/ECF]*

Maya Susan Saxena
msaxena@saxenawhite.com
SAXENA WHITE PA
2424 N. Federal Highway
Suite 257
Boca Raton, FL 33431
Tel:   561/394-3399
Fax:   561/394-3382

*Attorneys for Movant The City of Tulsa
Municipal Employees Retirement Plan
[Via CM/ECF]*

Dennis A. Nowak
dn@tewlaw.com
C. Thomas Tew
tt@tewlaw.com
Jeffrey A. Tew
jt@tewlaw.com
TEW CARDENAS, LLP
Four Seasons Tower
1441 Brickell Avenue, 15th Floor
Miami, FL 33131
Tel:   305/536-1112
Fax:   305/536-1116

*Attorneys for Defendants
Ramiro Ortiz and Humberto L. Lopez
[Via CM/ECF]*

Kendall Coffey
kcoffey@coffeyburlington.com
Jeffrey B. Crockett
jcrockett@coffeyburlington.com
Kevin C. Kaplan
kkaplan@coffeyburlington.com
David J. Zack
dzack@coffeyburlington.com
COFFEY BURLINGTON
2699 Bayshore Drive, PH
Miami, FL  33133
Tel:   305/858-2900
Fax:   305/858-5261

*Attorneys for Defendant Alfred R.
Camner
[Via CM/ECF]*