## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO.: 08-CIV-22572 COOKE/BANDSTRA

WATERFORD TOWNSHIP GENERAL
EMPLOYEES RETIREMENT SYSTEM,
individually and on behalf of all others similarly situated

       *Plaintiffs*,

v.

BANKUNITED FINANCIAL CORPORATION, *et al.*,

       *Defendants*.

_____/

## ORDER GRANTING DEFENDANTS ORTIZ, LOPEZ AND CAMNER'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

THIS MATTER is before me on Defendants, Ramiro A. Ortiz ("Ortiz"), and Humberto L. Lopez's ("Lopez") Motion to Dismiss [D.E. 86], and Alfred R. Camner's ("Camner") Motion to Dismiss [D.E. 88], the Consolidated Amended Class Action Complaint ("Complaint") [D.E. 67]. The matter has been fully briefed by the Parties, and I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons explained in this order, Defendants' Motions to Dismiss are granted.

### I. BACKGROUND

This is a federal securities class action brought by Lead Plaintiffs, Louisiana Municipal Employees' Retirement System and the Oklahoma Police Pension and Retirement System, on behalf of themselves and a putative class of other persons and entities (collectively "Plaintiffs") who purchased Class A common stock ("stock") of BankUnited between October 24, 2006 and June 19, 2008 (the "class period"). Plaintiffs seek remedies under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, and Securities and Exchange Commission ("SEC") Rule 10b-5.  (Compl. ¶¶ 1, 266-280).  Plaintiffs bring this action against three senior executive officers of BankUnited Financial Corporation ("BankUnited" or "the Company") and its primary subsidiary, BankUnited FSB (the "Bank").[1]  During the class period, Defendant Camner, BankUnited's founder, served as Chairman of the Board and Chief Executive Officer; Defendant Ortiz was BankUnited's President and Chief Operating Officer; and Defendant Lopez was BankUnited's Senior Executive Vice President and Chief Financial Officer.  Camner, Ortiz, and Lopez are collectively referred to in this Order as "Defendants."

Plaintiffs allege that during the class period Defendants "embarked upon, and implemented, an unlawful strategy for increasing BankUnited's market value artificially." (Compl. ¶ 3).  This unlawful strategy, the claim goes, consisted of Defendants' repeated assurances in public releases, statements, and reports as to BankUnited's strict credit quality standards, conservative appraisal and underwriting practices, adequate loan loss reserve ratios, and strong capital position.  Plaintiffs assert that these representations were misleading, and served to conceal the unsound undertakings that increasingly characterized the Bank's lending practices; namely, reliance on limited or no documentation loans, (Compl. ¶¶ 22, 23); an aggressive push to increase the volume of risky option ARM loans, (Compl. ¶ 25); pressure to approve overstated appraisals, (Compl. ¶¶ 28-33); and failure to adequately reserve for probable loan losses, (Compl. ¶¶ 33-37).  Additionally, Plaintiffs allege that Defendants falsely represented that their financial reports were in conformity with Generally Accepted Accounting

---

[1]  BankUnited is not a named defendant in this action based on its filing for Chapter 11 bankruptcy protection on May 22, 2009.  (Compl. ¶ 18).

Principles (GAAP), (Compl. ¶ 211), and that they provided false statements in their Sarbanes-Oxley Act ("SOX") certifications,[2] (Compl. ¶¶ 51, 60, 70, 79, 93, 107, 116).  The specific statements and business practices alleged by Plaintiffs are described in the following sub-sections, A–H.

**A. Fourth Quarter 2006 ("4Q 2006") and Full Year 2006 ("FY 2006") Results**

The Class Period begins on October 24, 2006, the day that BankUnited issued a press release announcing record financial results for its fourth quarter (4Q 2006) and fiscal year (FY 2006).  (Compl. ¶ 44).  Specifically, the Company reported FY 2006 net income of $83.9 million; earnings per share of $2.43; and a loan loss provision of $10.4 million.  (*Id.*)  This press release also noted that the Bank "continues to maintain its strong capital position in excess of regulatory requirements."  (*Id.*)  In commenting on these results, Defendant Camner stated, "[W]e've kept an unrelenting focus on credit quality," and that the Company had "stringent credit standards" that "will position [BankUnited] well for the future."  (Compl. ¶ 45).  Furthermore, during a conference call that same day, Camner stated that the Company's results were achieved with "foresight and discipline to not waver in [the Company's] credit standards or internal lending guidelines."  (Compl. ¶ 46).  With respect to non-performing assets ("NPAs") and non-performing loans ("NPLs"), Camner stated, "we do not anticipate that our numbers relating to nonperformings will necessarily get any higher."  Defendant Lopez agreed with Camner's statements, and further represented that the Company's mortgage products continued to "meet the

---

[2] *See generally* Public Company Accounting and Investor Protection Act of 2002 ("Sarbanes Oxley Act of 2002"), Pub. L. No. 107-204, § 302, 116 Stat. 777 (codified in part at 15 U.S.C. § 7241(a)) (requiring the principal officers of a public company to certify quarterly and annual reports).

needs of educated borrowers while adhering to federal guidelines and maintaining [the

Company's] strict underwriting and credit quality standards." (Compl. ¶ 47). The Company's

stock rose from $26.38 per share on October 24, 2006 to $27.78 per share at closing on October

25, 2006. (Compl. ¶ 48).

On November 2, 2006, in its Form 8-K filing with the SEC, Defendants attached an

investor presentation which claimed that the Company focused on a "high quality credit culture"

and that BankUnited's "[u]nderwriting is performed at the fully-indexed rate." (Compl. ¶ 49).

Additionally, the presentation stated that the Company had "[n]o subprime loans," and that it

followed a "[s]trict [underwriting] process from start to finish," which included a "[s]trict

appraisal process." (*Id.*). Many of the same types of assurances made in its 4Q statements were

repeated on December 14, 2006 in the Company's Form 10-K filing for FY 2006. (Compl. ¶ 50).

Additionally, the Form 10-K for FY 2006 stated that the Company's financial statements were

prepared in accordance with GAAP (*Id.*), and it contained SOX certifications[3] signed by Camner

and Lopez, (Compl. ¶ 51). The Company's share price rose from $26.78 on December 14, 2006,

to $27.13 at closing on December 15, 2006. (Compl. ¶ 51).

## B. First Quarter 2007 ("1Q 2007") Results

In its press release on January 22, 2007, the Company again announced record financial

---

[3] The SOX certifications stated that the Form 10-K: (1) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," (2) that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of BankUnited; and (3) that "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [BankUnited's] ability to record, process, summarize and report financial information" were "disclosed". (Compl. ¶ 51).

results, including net income of $27.4 million, and earnings per share of $0.75.  (Compl. ¶ 55).

With a loan loss provision of $4.0 million, the Bank was said to have maintained "its strong

capital position in excess of regulatory requirements."  (*Id.*).  With respect to the apparent

downturn in the housing market, Defendant Camner stated that:

> While we expect the level of non-performing assets to increase, we do not anticipate
> that they will exceed levels that we have experienced in the past several cycles.  We
> expect that our historically conservative credit standards and relatively low loan to
> values will keep our loss experience well below industry averages . . . [and we will]
> maintain [] our strong credit standards.

(Compl. ¶ 56).  That same day, Defendants hosted a conference call to discuss the quarterly

results.  During the call, Camner made certain remarks regarding how the existing and

anticipated delinquency and foreclosure levels were expected to affect the Company's future

performance.  Camner stated, "the historically conservative underwriting process and loan-to-

value standards should keep our loan experience well below industry average," and that, "[w]e do

not expect nonperforming assets to exceed the highs we have experienced in the past several

cycles."  (Compl. ¶ 57).  He went on to state that the Company had "continuously tightened [its

underwriting] standards," and had done so over the previous four to five months.  (*Id.*).

Defendant Lopez made similar assurances to the effect that the Company had strict and

conservative underwriting standards, and that ultimate losses were not expected to be

significantly higher than what they were at that moment.  (Compl. ¶ 58).

    In its February 7, 2007 Form 10-Q for the 1Q 2007, signed by Defendant Lopez, the

Company stated that "the weighted average FICO score for BankUnited's option ARM loans was

710."  (Compl. ¶ 59).  The filing also reported that management, after performing an evaluation

of delinquency trends in its residential portfolio, had "increased the allowance for loan losses to a

level it believes to be appropriate given the composition of its loan portfolio."  On February 26,

2007, the Company made a presentation in an analysts' conference, the materials of which were

filed with the SEC, where Defendants again attested to the Company's commitment to credit

quality, its "[l]ow risk asset profile" backed by real estate collateral, and its conservative

underwriting.

**C. Second Quarter 2007 ("2Q 2007") Results**

With regard to the Company's 2Q 2007 results, Plaintiffs point to statements made by

Defendants which substantially echo those statements highlighted from releases made in the

preceding two quarters.  Again, Defendants touted the Company's "strong capital position in

excess of regulatory requirements", the strong credit quality of its customers, conservative

underwriting, and non-reliance on sub-prime lending.  (Compl. ¶ 65-66).  Additionally,

Defendant Lopez and Camner made statements to the effect that they did not expect significant

loan losses in the ensuing quarters due to the otherwise stringent underwriting criteria used by the

Bank to counterbalance the risk of reduced documentation loans.  (Compl. ¶¶ 66-69).

**D.  Third Quarter 2007 ("3Q 2007") Results**

In the course of releasing its results for the 3Q 2007, Defendants made the same types of

statements that they made in the preceding quarters.  Defendant Camner stated, with regards to

the challenging market conditions, "[w]e do not expect our loan losses in the coming months to

be significantly higher than levels we experienced in comparable periods in the past, although we

expect that non-performing assets will increase."  (Compl. ¶ 74).  Again, Defendants Camner and

Lopez made statements that they believed that the Company's focus on credit quality and stricter

underwriting would help it fare through the downturning real estate market.  (Compl. ¶¶ 74-77).

Plaintiffs aver that these statements were false and misleading because, in addition to misstating the Company's conservative lending philosophy and capital position, the Office of Thrift Supervision ("OTS"), according to Confidential Witness 2 ("CW2"), had by the summer of 2007 expressed concerns with BankUnited's option ARM lending, questioning whether BankUnited should "perhaps limit Option ARMs."  (Compl. ¶ 82).

**E.  Fourth Quarter 2007 ("4Q 2007") and Full Year 2007 ("FY 2007") Results**

By the 4Q 2007, the Company's results were taking a dramatic turn for the worse.  On October 3, 2007, shortly before the release of the Company's official 4Q 2007 and FY 2007 results, the Company announced that its loan loss provisions were expected to at least double from $4.4 million for the 3Q 2007 to between $8 million and $10 million for 4Q 2007.  (Compl. ¶ 83).  Net charge-offs related to the Company's residential portfolio were expected to total $3 million.  (*Id.*).  These results fell short of Wall Street expectations, and the Company's stock dropped by 11.45% in the two days following the announcement.  (Compl. ¶ 84).  Downgrades by financial analysts followed thereafter, sending the stock south by another 28% over the next fifteen days.  (Compl. ¶ 85).

The actual results for 4Q 2007 and FY 2007 were even worse than the Company had anticipated in its October 3, 2007 press release.  The Company announced loan loss provisions for 4Q 2007 of $19.1 million.  (Compl. ¶ 87).  Defendant Camner stated that management was "disappointed" with the results of the 4Q 2007, but that the Company's "capital position [was] strong," and that "net charge-offs remain manageable."  (Compl. ¶ 89).  In an analyst conference call, Camner and Lopez also suggested that the Company's underwriting standards had positioned it better than many of its competitors.  (Compl. ¶ 90).

Plaintiffs assert, these statements were false and misleading because they were a product of improper use of accepted accounting principles; they failed to account for probable loan losses on risky option ARM loans; and they ignored escalating loan losses.  (Compl. ¶ 95). Additionally, Plaintiffs claim that these statements were materially misleading because they failed to disclose the fact that, as indicated by Confidential Witness 4 ("CW4") and 7 ("CW7"), the OTS examiners were on site at BankUnited headquarters in November 2007 to begin their examination of BankUnited.  (*Id.*).

**F.  First Quarter 2008 ("1Q 2008") Results**

In early January 2008, the Company filed a shelf registration with the SEC to allow it to raise up to $400 million in offerings.  (Compl. ¶ 96).  The market, reading this as a signal that the Company was in need of additional capital, sent the stock price down by 17% over the next two days.  The Company's 1Q 2008 results, announced on January 24, 2008, revealed a net loss of $25.5 million, and a $65 million provision for loan losses.  (Compl. ¶ 100).  Defendant Camner continued to reassure investors that the Company's "well-capitalized business model" should carry it through the economic downturn.  (Compl. ¶ 102).  In statements made to analysts, Defendants Lopez and Camner again defended the Company's provisions for loan losses, stating that they were lower than competitors' loan loss provisions because the Bank had relatively stricter underwriting guidelines in place when loans were originated.  (Compl. ¶ 105).

**G.  Second Quarter 2008 ("2Q 2008") and Third Quarter ("3Q 2008") Results**

The Company's financial woes continued in the 2Q and 3Q 2008.  In the 2Q, net loss increased to $65.8 million; loan loss provisions increased to $98 million; and loan loss allowances were at $202.2 million.  (Compl. ¶ 112).  The Company's Form 10-Q continued to

make the same representative statements made in the preceding quarters regarding the strict underwriting, strong capital position, and strong credit quality of its borrowers.  (Compl. ¶ 117). Around this time, the SEC also began inquiring into the Company's Form 10-K for FY 2007 and Form 10-Q for the 1Q 2008.  (Compl. ¶¶ 109, 124, 129).

By the 3Q 2008, the Company had announced a significant offering to raise $400 million in cash for "general corporate purposes, including contributing capital to [the Bank]."  Viewing this as a sign of more trouble ahead, and realizing the dilutive effect of the offering, the market sent shares of BankUnited down by nearly 47% over two trading days.  (Compl. ¶¶ 130-135). The stock's value at this time stood at $1.90 per share.  (Compl. ¶ 134).  This two-day stock price tailspin, ending on June 19, 2008, marks the end of the class period.

**H.  Beyond the Class Period**

In an effort to bolster its claims of wrongdoing, Plaintiffs point out certain occurrences that took place after the close of the class period, namely, that on August 25, 2008, in its Form 10-Q for the 3Q 2008, the Company announced that the OTS had raised concerns about the Bank, which the Company agreed to address.  (Compl. ¶ 137).  Specifically, the Company and the Bank agreed to: (1) raise at least $400 million of capital; (2) terminate the option ARM loan program; (3) terminate the reduced and no documentation loan programs; (4) reduce the portfolio of negative amortization loans; and (5) enhance its policies and procedures regarding the Bank's allowance for loan losses.  (*Id.*).

Ultimately, the Company and Bank each consented to Cease and Desist Orders issued by the OTS.  (Compl. ¶¶ 141-145).  Based on its examination of the Company and Bank, which began in mid-2007 and were completed in early 2008, the OTS determined that the Company and

-9-

Bank had "engaged in unsafe and unsound practices" that resulted in the Bank being in an "unsatisfactory condition, primarily due to the rising delinquencies and defaults in its payment option arm loan portfolio, a significant portion of which was originated on a 'stated income' basis." (Compl. ¶ 142). By May 21, 2009, with mounting losses to the tune of $1.2 billion in 2008, and deteriorating loan quality, BankUnited was closed by the OTS and the Federal Deposit Insurance Corporation was appointed as receiver. (Compl.¶ 156).

In their motions, Defendants argue that Plaintiffs' Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for securities fraud pursuant to § 10(b) of the Securities Act of 1934, Rule 10b-5 of the same Act, and the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") .

## II. STANDARDS OF LAW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted," a complaint must state factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, the district court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1325 (11th Cir. 2004). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

The legal claims asserted by Plaintiffs arise under § 10(b) of the Securities Exchange Act of 1934, which prohibits:

[A]ny person, directly or indirectly . . . [from] . . . us[ing] or employ[ing], in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Pursuant to these provisions, a securities fraud claim has six elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

Plaintiffs also assert liability premised on Section 20(a) of the Exchange Act, which imposes joint and several liability for "[e]very person who directly or indirectly, controls any person liable under any provision of this chapter."  15 U.S.C. § 78t(a).  The viability of a Section 20(a) claim is contingent upon the Plaintiffs successfully pleading a primary violation of Section 10(a) of the Exchange Act.  *See Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001) (affirming the dismissal of a section 20(a) claim where the complaint had failed to allege a primary violation of section 10(a)).

-11-

Fraud claims, including securities fraud claims, must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a complaint "to state with particularity the circumstances constituting fraud."  Rule 9(b) is satisfied when the complaint sets forth: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, . . . (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).  Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

In an effort to curb abusive securities litigation, the PSLRA altered the pleading requirements for securities fraud class actions.  Pub.L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.).  Specifically, the PSLRA modified the particularity requirement of Rule 9(b) by requiring that a securities fraud class action complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  "[W]here the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004).

-12-

Additionally, the PSLRA raised the standard for pleading scienter by requiring that the complaint, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The Supreme Court has held that the "strong inference" of scienter required under the PSLRA means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In making this determination, a court must consider the complaint in its entirety, not any particular allegation in isolation.  *Id.* at 322.

In this Circuit, it is well settled that claims under §10(b) and Rule 10b-5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro*, 544 F.3d at 1238 (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999)).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.*

Importantly, when considering a motion to dismiss in a securities fraud case, a court may take judicial notice of the contents of relevant public documents required to be filed with the SEC, and actually filed.  *Bryant*, 187 F.3d at 1278.  The SEC documents should be considered only for the purpose of "determining what statements the documents contain and not to prove the truth of the documents' contents."  *Id.*

-13-

## III. ANALYSIS

In order to survive the motions to dismiss, Plaintiffs must allege securities fraud with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  Additionally, with respect to each fraudulent act or omission, Plaintiffs must allege sufficient facts to give rise to a strong inference that each Defendant acted with an intent to deceive, manipulate or defraud, or with severe recklessness in perpetuating the fraud.  For the reasons that follow, I find that Plaintiffs have failed to meet this burden.

### A.  Plaintiffs May Not Rely on Immaterial Statements

Only those misrepresentations or omissions that are fairly considered material may form the basis for a securities fraud case.  17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . [t]o make any untrue statement of a *material* fact or to omit to state a *material* fact[.]") (emphasis added).  A statement is material if a "reasonable shareholder would consider it important" in making a decision of whether to invest, or if  "'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  A statement that is too vague, too generalized, or mere corporate puffery is immaterial because a reasonable investor would not base her investment decision on the basis of these statements.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 205-07 (2d Cir. 2009) (remarks by defendants that company had "risk management processes [that] are highly disciplined" were unactionable puffery); *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("[G]eneralized positive

-14-

statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial").

Plaintiffs' attempt to base liability on numerous vague statements of corporate puffery is unavailing.  Defendants' description of the Company's underwriting, appraisal, and credit standards as "strict," (Compl. ¶¶ 47, 49, 58), "stringent," (Compl.¶ 45), "conservative," (Compl. ¶¶ 56, 57, 58, 66), and "strong" (Compl. ¶¶ 53, 56, 66, 68), is immaterial because these commonplace statements of corporate puffery could not influence a reasonable investor's investment decision.  *See ECA, Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 206 (corporate puffery was "too general to cause a reasonable investor to rely upon them"); *Southland Sec. Corp.*, 365 F.3d at 372 (5th Cir. 2004) (same).  Plaintiffs must look beyond these optimistic characterizations to the specific, verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws.  For example, in touting the Company's "conservative" underwriting, Defendants frequently elaborated on the meaning the Company ascribed to this label by stating that the Company did not engage in subprime or piggyback lending, maintained low LTV ratios, and lent to customers with high FICO score. (*See, e.g.*, Compl. ¶¶ 50, 66).  These are the sorts of specific assertions that, if properly plead, may form the basis of a securities fraud claim.  By contrast, the general, vague, unverifiable statements of corporate puffery proffered by Plaintiffs are not the sort of information that would inform a reasonable investor's investment decision; as such, they lend no credence to Plaintiffs' claim of securities fraud.

**B. Plaintiffs May Not Rely on Certain Forward-Looking Statements**

The PSLRA contains a safe harbor provision for certain forward-looking statements,

insulating those statements from liability.[4]  Forward-looking statements, which are identified as

such, are not actionable if they are accompanied by meaningful cautionary statements.  15 U.S.C.

§ 78u-5(c)(1)(A)(i) (written forward-looking statements); 15 U.S.C. § 78u-5(c)(2) (oral forward-

looking statements).  Forward-looking statements included in financial statements prepared in

accordance with GAAP are excluded from the PSLRA's safe harbor provision.  The PSLRA

defines a "forward-looking statement" to include "a statement of future economic performance,

including any such statement contained in a discussion and analysis of financial condition by the

management or in the results of operations included pursuant to the rules and regulations of the

Commission[.]"  15 U.S.C. § 78u-5(i)(1)(C).  On a motion to dismiss based on the safe harbor

provision, a court shall consider not only "any statement cited in the complaint" but also "any

cautionary statement accompanying the forward-looking statement, which are [sic] not subject to

material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).

*1. Forward-looking statements identified as such and accompanied by meaningful cautionary statements.*

The Complaint recites numerous forward-looking statements made by Defendants

Camner and Lopez in press releases, conference calls, and investor presentations where

Defendants expressed their expectations as to the Company's future performance.  Defendants

---

[4] The PSLRA's safe harbor is the statutory equivalent of the judicially created "bespeaks caution" doctrine, which holds that certain forward-looking statements, when considered in context, may be rendered immaterial due to meaningful cautionary statements.  *S.E.C. v. Merchant Capital, L.L.C.*, 483 F.3d 747, 768 n.18 (11th Cir. 2007) ("The bespeaks caution doctrine has a statutory equivalent in the safe harbor provided by the Private Securities Litigation Reform Act.").

-16-

argue that these statements are not actionable because they were identified as forward-looking, and were accompanied by meaningful cautionary statements.  I agree.

The numerous forward-looking statements raised by the Complaint are so similar in nature and form that an exhaustive reproduction of them is unnecessary to show why they fail to support Plaintiffs' claims; a representative sample will suffice.  For instance, at the outset of the class period, Defendant Camner stated in a press release on the 4Q 2006 and FY 2006 results that the Company had "stringent credit standards" that "will position [BankUnited] well for the future."  (Compl. ¶ 45).  This statement is clearly a "statement of future economic performance" because it purports to predict how the Company's credit standards will influence the Company's economic position at some undefined future point.  The forward-looking nature of this statement is further evidenced by the fact that the actual position of the Company in the future was unverifiable at the moment that this statement was made.  *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("[W]hether Ivax is 'well positioned' is a statement whose truth can only be known after seeing how Ivax's future plays out.  That puts this statement in the safe harbor[.]").

In order to determine whether this statement was identified as forward-looking and contained adequately cautionary language, I must next examine the context of the statement. This particular statement was identified as forward-looking in a section of the press release titled "Forward-Looking Statements," which provided readers with notice that words and phrases like "will likely result" and "will continue" were meant to identify "forward-looking statements." This section cautioned readers that, "[a]ctual results or performance could differ from those implied or contemplated by such statements," due to factors including general business and economic conditions, deposit flows, loan demand and real estate values, and changes in interest

-17-

rates.  The notice and warnings provided by this section of the press release anchored this

particular forward-looking statement within the safe harbor of the PSLRA.[5]

Another statement relied upon by Plaintiffs, and likewise unavailing, was made by

Camner during the October 24, 2006 conference call.  There, Camner stated: "[W]e do not

anticipate that our numbers relating to non-performing[] [assets] will necessarily get any higher

. . . you're going to have some ups and downs . . . but we don't foresee much in the way of any

losses."  (Compl. ¶ 46).  This statement is forward-looking because it relates to the Company's

future economic performance, and was unverifiable at the time that it was made.  This conference

call, like all the conference calls cited by Plaintiffs, began by providing attendees with notice that

the call would contain forward-looking statements, pointing out words and phrases that would

indicate that a statement was forward-looking, and listing factors that could impact the actual

results or performance.  These factors included such risks as general economic conditions,

changes in interest rates, and the issuance of additional company equity.  (Ortiz and Lopez Mot.

to Dismiss at 1367 [D.E. 86-17]).  For this reason, this statement, and all others like it, is

protected by the safe harbor.[6]

---

[5]  Other forward-looking statements made in the course of press releases, and which were
accompanied by similar cautionary statements, can be found in the Complaint at ¶¶ 56, 66, 67,
72, 74.  Beginning in the 4Q 2007, the Company's press releases also referred readers to
additional factors that could cause actual results to differ from management's current
expectations.  (Ortiz and Lopez Mot. to Dismiss at 808 [D.E. 86-11]).  Those additional factors
were included in the Company's periodic filings with the SEC.  They included the risk that
borrower defaults would exceed the Company's allowance for loan losses, that the secondary
market would have reduced demand for the Company's mortgages, and that the secondary market
would become illiquid.  *Id.* at 830-31.

[6] Other forward-looking statements made in the course of conference calls, and which were
accompanied by similar cautionary statements, can be found in the Complaint at ¶¶ 57, 68, 75,
90, 104.

In addition to statements made in press releases and conference calls, Plaintiffs point to statements made by Defendants in the Company's quarterly Form 10-Q's filed with the SEC. For example, in paragraph 80 of the Complaint, Plaintiffs quote Defendants' statement, contained in the 10-Q, that they did "not expect loan losses in the coming months to be significantly higher than levels experienced in comparable periods in the past, although non-performing assets are expected to increase." This statement is forward-looking, as it addresses Defendant's expectation as to an aspect of future economic performance. It was identified as a forward-looking statement in a page preceding the statement, where the 10-Q provided that "Words and phrases such as: . . . 'expect' are intended to identify 'forward-looking statements[.]" It was also accompanied by meaningful cautionary language warning of risks such as, "general business and economic conditions, either nationally or regionally; . . . a deterioration in the credit quality; . . . real estate values and market conditions; . . . [and] the concentration of operations in south Florida[.]" Therefore, this statement, and all others like it, is within the safe harbor.

*2. Forward-looking statements not proven to be made with actual knowledge of false or misleading nature.*

In addition to providing a safe harbor to forward-looking statements that are identified as such and accompanied by meaningful cautionary statements, the PSLRA also extends safe harbor protection to forward-looking statements that Plaintiffs fail to prove were made with "actual knowledge by that person that the statement was false or misleading". 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiffs argue that the cautionary statements provided in the Company's presentations, conference calls, and periodic filings with the SEC amount to meaningless boilerplate because they "bore no relationship to actual events," and were merely broad risk

warnings repeated again and again.  (Pl.'s Resp. 53 [D.E. 90]).  For this reason, Plaintiffs aver that these cautionary statements were inadequate to render the misleading forward-looking statements protected under the PSLRA's safe harbor.

The PSLRA insulates forward-looking statements from liability if they are accompanied by meaningful cautionary statements "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i). The cautionary statements must be "detailed and informative" and must warn the reader "what kind of misfortunes could befall the company and what the effect could be."  *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).  The risks identified by the cautionary statements must be "of a significance similar to that actually realized".  *Id.*  Meaningfulness does not hinge on whether the cautionary language explicitly mentioned the precise factor that ultimately undermined the accuracy of the forward-looking statement.  *Harris*, 182 F.3d at 807 ("[F]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor") (citing H.R. Conf. Rep. 104-369, at 44 (1995)).

Even if the forward-looking statements discussed above were not accompanied by the types of cautionary statements that would be considered detailed enough to be adequately meaningful under the PSLRA, for the reasons stated below in the discussion of scienter, Plaintiffs fall short of proving that Defendants made these statements with actual knowledge of their falsity at the time the statements were made.  As such, these statements are protected by Section (c)(1)(B)(i) of the safe harbor.  *See Theoharous v. Fong*, 256 F.3d 1219, 1225 (11th Cir. 2001) ("Because the statement pertained to future economic performance, it was

forward-looking, and the plaintiffs therefore would have been required to allege that Fong

possessed actual knowledge of the statement's falsity, which the plaintiffs did not do.").  In sum, I

find that these forward-looking statements are sheltered by the safe harbor, and cannot form the

basis of the present securities fraud action.

### C. Plaintiffs Fail to Sufficiently Plead Falsity of Specific Underwriting Practices

Survival of these motions to dismiss also requires that Plaintiffs adequately plead falsity

of the allegedly fraudulent statements.  Federal Rule of Civil Procedure 9(b) requires plaintiffs in

a securities fraud case to specify the "who, what, when, where, and how" of the alleged fraud.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).  The PSLRA likewise

requires that Plaintiffs "specify each statement alleged to have been misleading, [and] the reason

or reasons why the statement is misleading[.]"  15 U.S.C. § 78u-4(b)(1)(B).  For the reasons that

follow, I find that the Plaintiffs have failed to meet this burden with respect to the falsity of

various specific underwriting practices touted by the Company.

Plaintiffs generally allege that numerous statements made by Defendants throughout the

class period regarding the Company's underwriting standards were false or misleading.

Defendants, for example, made repeated claims that the Company's underwriting standards were

"performed internally" and aimed to limit risk by "analyzing the borrower's repayment ability at

the fully indexed rate;" "not allowing financing of the down payment through other loans at

BankUnited;" and "requiring private mortgage insurance (PMI) on loans where the loan to value

would exceed 80% without the insurance."  (Compl. ¶ 53; *see also* Compl. ¶¶ 66, 80, 90).

Likewise, Defendants touted the Company's conservative underwriting by referring to the high

average FICO scores of its customers, (Compl. ¶¶ 59, 66, 68), and stating that the Company did

not engage in sub-prime lending, (Compl. ¶¶ 103, 104, 105, 108).  According to Plaintiffs, these

statements were false or misleading because "BankUnited engaged in 'unsafe and unsound'

lending practices that relied on the extensive use of limited documentation and no-documentation

'liar's loans' including mortgages issued based upon stated yet never verified levels of

borrowers' incomes, assets, and/or complete and accurate credit history," (*see, e.g.*, Compl. ¶¶

53a-c, 64, 82).

      Plaintiffs' conclusory statement that "BankUnited engaged in 'unsafe and unsound'

lending practices," including reliance on limited or no documentation loans – referring to the

OTS' post-class period conclusion after investigating BankUnited – is no answer to the question

of how Defendants' specific outline describing the manner in which the Company deemed itself

to pursue strict underwriting was false or misleading at the time the statements were made.  To

say that BankUnited relied on less than fully documented loans does not make Defendants'

specific statements regarding its underwriting practices – reliance on customers' high FICO

scores; the Company's policy not to engage in piggyback lending; the Company's practice of

calculating repayment ability at the fully indexed rate; use of PMI; and in-house appraisal

reviews – misleading or false.

      Conspicuously missing from the Complaint are any specific facts alleging, for example,

that the Company did not "analyz[e] the borrower's repayment ability at the fully-indexed rate,"

as Defendants claimed was the Company's practice.  Nor do Plaintiffs point to a single fact

belying Defendants' claimed practice of not allowing piggyback lending, or of requiring private

mortgage insurance on loans where the LTV value exceeded 80%.  Likewise, Plaintiffs never

directly address the numerous assertions by Defendants that the average FICO scores of their

clients were in the 710 range.  In fact, Plaintiffs entirely neglect to raise any specific facts from which I could find that the particular claims asserted by Defendants, and exhaustively recited in Plaintiffs' Complaint, were false.  Instead, Plaintiffs ask me to draw the unwarranted inference that because the OTS ultimately found that the lending practices followed by the Company were "unsafe and unsound," the specific factors touted by Defendants throughout the class period making up the Company's underwriting conservatism was somehow misleading.

　　　Nor can I find that Plaintiffs have properly pled fraud by omission.  Although the Complaint, in a vague and roundabout manner, seems to suggest that Defendants understated the inherent risk in the Company's loan portfolio because Defendants failed to disclose the Bank's reliance on mortgages issued on a less than fully documented basis, Plaintiffs fail to demonstrate the extent of this omission, and how this omission was misleading.  For example, while Plaintiffs state in Paragraph 22 that "BankUnited disclosed in May 2008 [that] only 17.4% of all loans in its residential mortgage portfolio as of March 31, 2008 were made on a 'full documentation employment verified' ('full documentation') basis," they fail to specifically allege in their Complaint that Defendants, with fraudulent intent, omitted this fact from its prior statements; that this fact was material; and how this omission misled them.  To the contrary, the Complaint in Paragraph 66 specifically quotes Defendant Camner as stating on April 17, 2007, that "[o]ur reduced documentation loans are counterbalanced by stringent requirements for other underwriting criteria . . . .  Our experience has been that these loans when properly underwritten, perform as well if not better than, our full documentation loans."  In sum, it is not at all clear from the face of the Complaint how these disclosures were misleading, or what omissions are alleged, and for what period of time.

I find that Plaintiffs have failed to properly allege the falsity of Defendants' statements regarding the Company's recipe for underwriting conservatism, or how Defendants committed a fraud by omission by failing to disclose the Company's practice of underwriting mortgage loans on a less than fully documented basis.

**D.  Plaintiffs Fail to Adequately Allege Facts Giving Rise to a Strong Inference of Scienter**

To withstand dismissal, the Complaint must overcome the most significant hurdle posed by the PSLRA by stating with particularity facts giving rise to a strong inference that each defendant acted with scienter in each act or omission alleged.  15 U.S.C. § 78u-4(b)(2); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004) ("[A] plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations.").  A "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In evaluating whether scienter is adequately pled, the allegations must be viewed collectively, not in isolation.  *Id.* at 326.  In this Circuit, the scienter required to make out a securities fraud case is intent to defraud or severe recklessness in making the allegedly materially false or misleading statements.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008).  Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.*  A motive and opportunity to commit fraud, without

more, cannot establish scienter. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999).

Plaintiffs have alleged that Defendants failed to properly account for the true risk inherent in the Company's portfolio of risky option ARM loans, and that in doing so they fraudulently inflated the Company's financial results.  Plaintiffs claim that Defendants' scheme consisted of fraudulently: (1) touting the Company's internal appraisal review process as stringent; (2) failing to adequately reserve for foreseeable losses; (3) claiming that the Company was well capitalized; (4) violating GAAP; and (5) issuing false SOX certifications.

Plaintiffs have generally shown that Defendants had the motive (by virtue of their own securities and options positions in the Company, as well as the performance-based bonuses they enjoyed), and the opportunity (by virtue of their authority in the company) to artificially inflate BankUnited's stock price.  Motive and opportunity alone, however, are insufficient to support a finding of scienter. *Bryant*, 187 F.3d at 1285.  In light of the purpose of the PSLRA – to preclude frivolous lawsuits – the import of motive and opportunity is necessarily reduced due to the prevalence of these factors among high ranking executives.

Plaintiffs also attempt to prop up the inference of scienter by stating that Defendants' long-term professional and executive experience in the banking industry would have made them aware of the importance of "loan underwriting, real estate appraisals, and loan loss reserves to the accuracy and reliability of a mortgage lending bank's public statements."  (Compl. ¶¶ 190, 202, 206).  Likewise, Plaintiffs point to Defendants' attendance at weekly executive management meetings as an indication that they knew or were reckless in not knowing about the fraud alleged. (Compl. ¶¶ 20, 190, 206).

These generalized allegations do not support an inference of scienter, let alone a strong one.  Plaintiffs fail to allege any specific information discussed during the executive management meetings.  Simply averring that Defendants attended weekly meetings where topics discussed included "the Company's loan production status and the impact higher loan loss provisions would have on the Company's financial reports", (Compl. ¶¶ 190, 206), does not lead to the strong inference that Defendants acted with scienter in committing the fraudulent acts alleged.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) (rejecting attempt to raise a strong inference of scienter from Plaintiff's general averment that Defendants attended monthly operations meetings where company's channel stuffing efforts were allegedly discussed).  Instead of averring specific facts from which the inference of scienter would naturally flow, Plaintiffs' offer broad assertions regarding Defendants' knowledge base and attendance at meetings, and ask this Court to fill in the factual gaps with conjecture and speculation.  Under the strictures of the PSLRA, however, to do so would be improper.

Plaintiffs also aver that Camner engaged in insider stock sales during the class period "to take advantage of his knowledge that BankUnited's stock was trading at artificially inflated prices." (Compl. ¶ 197).  The Complaint describes Camner's sale of stock in October 2006, resulting in gross proceeds of $2,151,954, and another series of sales in June 2007, resulting in $2,224,126 in gross proceeds.  (Compl. ¶¶ 198-200).  Plaintiffs claim that these sales were unusual in timing and amount because Camner's stock sales in May 2006, prior to the class period, resulted in gross proceeds that were about 60% less than each of the sales during the class period.  (Compl. ¶ 201).  Additionally, Plaintiffs point out that Camner did not sell a single share of BankUnited stock in 2005 or 2008.  (*Id.*)

-26-

Plaintiffs' suggestion that Camner's sales of BankUnited stock during the class period support an inference of scienter is unconvincing.  Plaintiffs have failed to sufficiently plead how Camner's stock sales were suspiciously timed, especially given the fact that the sales occurred prior to the alleged start of the OTS investigation in November 2007, (Compl. ¶ 41), which Plaintiffs claim should have alerted Defendants to the purportedly unreported risks in the Company's lending practices.  *See Mizzaro*, 544 F.3d at 1253 ("Stock sales . . . timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weigh against inferring scienter.").  Moreover, Plaintiffs fail to discuss what proportion of Camner's stock was sold, as compared to the proportion that  was held by him during the relevant time period.  *See Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009) (finding an insufficient inference of scienter where Defendant sold 39 percent of his shares during the class period).  Far from demonstrating that Camner sold a suspicious amount of his stock position in the Company, a close reading of the Complaint shows that Camner's sales during the class period were less than the sum of restricted stock awarded to him as compensation during 2005 and 2006.  In short, Plaintiffs have failed to plead with particularity facts which would indicate scienter on Camner's part based on his stock sales during the class period.

The remaining circumstances pled in the Complaint, taken in the aggregate, fail to raise the required cogent and compelling inference that Defendants acted with scienter in misleading investors.

*1. Internal Appraisal Review Process*

       Plaintiffs allege that Defendants misled the investing public into believing that the Company followed a stringent internal appraisal review process that had the effect of lowering the overall risk profile of the Company's loan portfolio.  In reality, Plaintiffs claim, the "appraisal review process . . . was consistently undermined and/or circumvented for the purpose of meeting aggressive loan production targets set by Defendants." (Compl. ¶ 29).  To demonstrate Defendants' scienter, Plaintiffs rely on statements made by Confidential Witness 1 ("CW1"). CW1 worked as an in-house appraiser and a post-closing appraisal reviewer for BankUnited from August 2005 through December 2007.  (Compl. ¶ 20).  As an in-house appraiser, CW1 reviewed appraisals "to determine whether a property's originally assigned value, and in turn the Bank's collateral, was overstated or otherwise misrepresented[.]" (*Id.*)  While serving as a post-closing appraisal reviewer, CW1 "prepared reports on BankUnited appraisals that were provided to senior management of BankUnited, including Defendant Camner." (*Id.*)  CW1 stated that there was "extreme pressure to hit [loan production] numbers," and "pressure to pass on deals without diligent review." (Compl. ¶ 28).  CW1 also recounts an instance when Defendant Camner stated that when reviewing appraisals, "cut them, but not too many." (*Id.*)  The Complaint also states that CW1 "documented close to 500 incidents of overstated property values and other inappropriate appraisal practices[.]" (Compl. ¶ 29).  Specifically, the Complaint points to three instances where CW1 reported concerns to various supervisors and managers, none of which included any of the Defendants herein, that the appraisal value of property was overstated. (Compl. ¶ 29-32).  In each case, CW1's concerns did not lead to revised appraisal values. (Compl. ¶ 29-32).

The statements of CW1 do not adequately support Plaintiffs' claim that any of the Defendants acted with scienter in misleading the public with regards to the Company's internal appraisal review process.  Although Plaintiffs claim that Defendant Camner stated to CW1 with regards to reviewing inappropriate appraisals to "cut them, but not too many," they fail to provide any context whatsoever to this six-word exchange between Camner and CW1.  (Compl. ¶ 28, 165).  It is important to note that Plaintiffs' characterization that the discussion between Camner and CW1 revolved around "inappropriate appraisals;" CW1 him or her self is not quoted as having made this representation.  Without more context to this alleged conversation, I cannot accept Plaintiffs' conclusory characterization. *See Mizzaro*, 544 F.3d 1230, 1240 (11th Cir. 2008) ("[T]he weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider.").  This isolated snippet could just as readily be understood to mean that Camner was concerned that CW1 was being overly cautious in his or her appraisal reviews – a concern which would have been wholly legitimate.

Missing from the Complaint is any specific allegation that any of the Defendants were approached by CW1, or anybody else, about a problem with overstated property values, or insufficient appraisal reviews.  At most, the Complaint suggests that Defendants pushed hard for greater loan production.  This, of course, was within Defendants' prerogative.  Certainly, these facts alone do not make out a cogent and compelling inference that Defendants acted with severe recklessness in stating that the Company performed an internal review of outside appraisals.

-29-

2.  *Failure to adequately reserve for foreseeable loan losses*

Plaintiffs further allege that Defendants' fraud consisted of their repeated assertions that the Company maintained adequate loan loss reserves.  (Compl. ¶ 33) ("Defendants also failed to take into account the extreme risk with [the Company's] lending practices by adequately reserving for increasingly likely loan losses, thus overstating BankUnited's net income throughout the Class Period.").  Plaintiffs, however, do not allege with sufficient specificity facts necessary to raise a strong inference that Defendants acted with scienter in failing to adequately reserve for loan losses.

Belying Plaintiffs' assertion of fraudulent intent to understate probable loan losses is the fact that throughout the class period Defendants increased loan loss provisions dramatically in the face of mounting defaults and delinquencies.  At the outset of the class period, Defendants reported a FY 2006 loan loss provision of $10.4 million.  (Compl. ¶ 44).  As trouble seemed to emerge in the Company's mortgage portfolio, around the 4Q 2007, the Company began boosting its loan loss provision to $19.1 million for that quarter.  (Compl. ¶ 87)  By the very next quarter, Defendants were reporting another dramatic increase to the Company's loan loss provision, to $65 million.  (Compl. ¶ 100).  By 2Q 2008, the Company had increased its loan loss provision to $98 million.  (Compl. ¶ 112).

Although Plaintiffs would have this Court infer that these increasing loan loss provisions indicate that Defendants were concealing the truly risky nature of the mortgages it carried, the opposite inference – that Defendants were disclosing the perceived riskiness of the Company's loans by telling the market, through the steep incremental increases in loss provisions, that the Company was preparing for probable defaults and delinquencies – is far more cogent and

-30-

compelling.  In fact, it seems the market got the message, as it sent the Bank's stock spiraling downward at each step of the way.

3.  *Statements Regarding the Bank's Capital Position*

Plaintiffs assert that Defendants' repeated statements throughout the class period that BankUnited was "well capitalized," and that BankUnited, "continue[d] to maintain its strong capital position in excess of regulatory requirements," were materially false and misleading. (Compl. ¶ 37).  Specifically, Plaintiffs claim that the only reason that Defendants were able to offer regulators data showing that BankUnited met the OTS's minimum capital requirements to maintain its well-capitalized status, was by "repeatedly violating regulatory requirements relating to the appropriate calculation of net capital by understating the known true risk of its mortgage loan portfolio."  (*Id.*)  The trouble with this theory is that it relies on the Plaintiffs pleading with sufficient particularity facts giving rise to a strong inference that Defendants, in fact, knew or were reckless in not knowing that the true risk of the Company's mortgage loan portfolio was greater than what they periodically reported to the public.  For the reasons stated above, Plaintiffs failed to make this showing.  Thus, the conclusory assertion that Defendants recklessly misrepresented the Company's capital position by understating the known true risk of the Company's loan portfolio fails to increase the inference that Defendants acted with scienter.

Plaintiffs also allege that BankUnited's efforts during the class period to prepare for a $400 million offering demonstrates that Defendants made knowing or recklessly false statements regarding the Company's well-capitalized position.  Plaintiffs assert that the Company's ultimate post-class period agreement with the OTS to raise $400 million of capital indicates that Defendants' earlier statements that the Company was well-capitalized and that the $400 million

shelf registration in early 2008 was not indicative of any "near-term transaction," (Compl. 104), were fraudulent. Plaintiffs, however, have failed to allege any facts that any of the Defendants knew or should have known that, prior to the OTS's requirement that the Company raise $400 million in capital, the Company was in fact undercapitalized. Plaintiffs suggest that because the Company filed a shelf registration allowing it to offer up to $400 million dollars in equity and debt securities, and then was asked by the OTS to raise exactly $400 million in capital, that the Defendants knew all along that the Company would need this exact amount of capital truly be adequately capitalized. This logic fails to consider the possibility that the OTS simply required the Company to raise that amount of capital because it was the full amount allowable under the shelf registration then existing. The inference that Defendants were simply unaware of the potential losses inherent in the Company's loan portfolio during the class period is simply more compelling than the inference of scienter.

Finally, Plaintiffs claim that Defendants' fraudulent concealment of the compromised capital position of the Company throughout the class period is apparent from the fact that Defendants never publicly released information that the OTS began to investigate the Bank as early as November 2007, according to two confidential witnesses. (Compl. ¶ 36). Despite Plaintiffs' conclusory statements that the "OTS had expressed grave concerns about BankUnited's 'unsafe and unsound' lending practices" and the Bank's capital, (Compl. ¶ 35), there are no specific facts alleged in the Complaint detailing what information the OTS provided to Defendants regarding its alleged "concerns." Instead, Plaintiffs assert that the Defendants frequently met with OTS investigators between November 2007 and January 2008, (Compl. ¶ 41), and from that assertion Plaintiffs ask me to infer that the OTS provided Defendants with

-32-

specific information that Defendants then fraudulently concealed.  I decline to draw the multiple

inferences Plaintiffs suggest from the few facts alleged, and find that the opposing inference –

that Defendants were unaware during the course of the investigation that the OTS held anything

other than nascent, unsubstantiated concerns – more compelling.[7]

*4.  GAAP Violations*

Plaintiffs also base their fraud allegations on Defendants' assurances in mandatory

periodic filings with the SEC that the Company's financial statements were prepared in

accordance with GAAP.  (Compl. ¶ 211-247).  Plaintiffs, however, fail to raise a strong inference

that any of the Defendants acted with scienter in the alleged GAAP violations.  At the heart of

the alleged GAAP violations is Plaintiffs' claim that Defendants fraudulently concealed the true

risks inherent in the Company's loan portfolio, and inadequately provided for probable loan

losses that were evident to them.  Having failed to aver facts creating a strong inference that

Defendants did either of these things, it necessarily follows that Plaintiffs fail to reach their

pleading requirements with respect to the alleged GAAP violations as well.  Missing from the

Complaint are any facts suggesting that there were glaring "red flags" that should have been

apparent to Defendants.  Instead, the Complaint provides an exhaustive review of overarching

accounting principles.  Despite the recitation of broad principles governing proper financial

---

[7]  Similarly, I find that Plaintiffs' suggestion that Defendants' fraudulently concealed the OTS investigation from the SEC to be unconvincing.  Plaintiffs state that in April 2008, Defendants wrote the SEC, in response to several questions and comments made by the SEC, stating that the Company had no "agreements or understandings, written or oral, with our regulators, agencies or their representatives at the present time.  We have not been subject to any regulatory actions or received any recommendations from our financial regulators."  I fail to see how this response was fraudulent, considering that Plaintiffs have not alleged any facts to show that the OTS regulators made any specific agreements or arrived at any specific understandings with the Company at the time of the SEC response.

accounting, the Complaint fails to detail with any degree of particularity how any of the

Defendants violated GAAP, let alone how they did so with scienter.  The opposing

(unactionable) inference – that Defendants underestimated the risks in their loan portfolio and the

oppressive nature of the slumping economy – is more compelling than the one Plaintiffs offer.

*5.  False SOX Certifications*

      Plaintiffs also argue that Defendants Camner and Lopez violated the strictures of the

Sarbanes-Oxley Act by falsely certifying that the Company reported its financial results

accurately and reliably, and maintained effective internal controls.  (Compl. ¶ 237).  Specifically,

Plaintiffs note that after the end of the class period, the Company admitted that it "expect[ed] to

report at least one material weakness" in its internal controls, and that "there [was] a reasonable

possibility that a material misstatement of the consolidated annual or interim financial statements

will not be prevented or detected on a timely basis" because of an "insufficient compliment of

personnel with a level of accounting knowledge, experience, and training in the application of

generally accepted accounting principles."  (*Id.*)  Defendants argue that Plaintiffs' allegation of a

false SOX certification is not probative of scienter because they have failed to allege any glaring

accounting irregularities or other red flags known to Defendants and ignored by them.  I agree.

      Even if I were to accept the post-class period admissions by the Company (that its

internal controls were inadequate) to be a sufficient basis to find that Plaintiffs have properly

pled SOX violations during the class period, Plaintiffs have still failed to allege how Defendants

were reckless in their SOX certifications.  The accounting irregularities alleged by Plaintiffs

center around the assertion that Defendants failed to properly account for the risks inherent in the

company's loan portfolio.  Assessment of risk is necessarily based on management's judgment,

and Plaintiffs have failed to show how the alleged misjudgment of risk was so obvious at the time it was made as to make this accounting violation supportive of scienter. *See Garfield v. NDC Health Corp.*, 466 F.3d at 1266-67 (11th Cir. 2006) (finding that company's dramatic increase in its allowance for doubtful accounts did not support an inference of scienter as to senior executives who made allegedly false certifications).

Since Plaintiffs' primary claims under § 10(b) of the Securities Exchange Act was not properly pled, the derivative claim upon based upon § 20(a) of the Act is precluded. *See Mizzaro*, 544 F.3d at 1255; *Garfield*, 466 F.3d at 1261.

## IV. CONCLUSION

For the reasons explained above, it is **ORDERED and ADJUDGED** that:

1. The Defendants' Motions to Dismiss [D.E. 86 & 88] are **GRANTED**.

2. The Plaintiffs' case is **DISMISSED** *without prejudice*.

3. The Clerk is directed to **CLOSE** this matter.

**DONE and ORDERED** in chambers, at Miami, Florida, this 30th day of March 2010.

_____

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Ted E. Bandstra, U.S. Magistrate Judge*
*Counsel of record*

-35-